**24-2965**

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆

AMERICAN SOCIETY FOR TESTING & MATERIALS, D/B/A ASTM INTERNATIONAL,

*Plaintiff-Appellant,*

—v.—

UPCODES, INC.; GARRETT REYNOLDS; SCOTT REYNOLDS,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
HONORABLE ANITA B. BRODY, NO. 2:24-CV-01895

**BRIEF FOR ASSOCIATION OF AMERICAN PUBLISHERS
AND NEWS/MEDIA ALLIANCE AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLANT URGING REVERSAL**

MARY E. GOETZ
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
marygoetz@dwt.com

LINDA J. STEINMAN
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas,
  21st Floor
New York, New York 10020
(212) 489-8230
lindasteinman@dwt.com

*Counsel for Amici Curiae Association of American Publishers and News/Media Alliance*

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, the Association of American Publishers ("AAP") and the News/Media Alliance ("N/MA") make the following disclosures:

AAP is a non-profit trade association operated for the purpose of representing its book, journal, and educational publisher members on matters of law and policy. AAP has no parent company, and no publicly held company owns any interest in the AAP.

N/MA is a trade association operated for the purpose of representing news, magazine, and digital media organizations in the United States and abroad. N/MA has no parent company, and no publicly held company owns any interest in N/MA.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ...................................................... i

STATEMENT OF IDENTIFICATION AND INTEREST OF AMICI ....................1

SUMMARY OF ARGUMENT ..................................................................4

I.    THE DISTRICT COURT'S IMPROPER ANALYSIS OF THE FIRST "WRINKLE" TO THE FOURTH FACTOR ANALYSIS ......................................8

II.   THE DISTRICT COURT'S IMPROPER ANALYSIS OF THE SECOND "WRINKLE" TO THE FOURTH FACTOR ANALYSIS ....................................13

   A.   A Public Benefit Balancing Test Does Not Belong in the Fourth Factor .....13

   B.   Any Public Benefit Analysis Should Highlight the Public Benefits of Copyright Protection.............................................................17

III.  UPCODES IS A COMMERCIAL USER ...................................................21

CONCLUSION ................................................................................24

ELECTRONIC DOCUMENT CERTIFICATE .................................................26

CERTIFICATE OF BAR ADMISSION ......................................................27

CERTIFICATE OF IDENTICAL BRIEFS ...................................................28

CERTIFICATE OF SERVICE ...............................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ................................................................22

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*,
  2024 WL 4374117 (E.D. Pa. Oct. 2, 2024) ...............................*passim*

*Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021) ...........................................................4, 5, 8

*Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023).......................................................................4, 21

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ...........................................8, 16, 19, 23

*Authors Guild v. Hathitrust*,
  755 F.3d 87 (2d Cir. 2014) ..............................................................23

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994).....................................................................*passim*

*Capital Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018) .......................................................12, 20

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ...............................................................8

*Dr. Seuss Enterprises, L.P. v. Comic Mix LLC*,
  983 F.3d 443 (9th Cir. 2020) ..............................................................9

*Google LLC v. Oracle America, Inc.*,
  593 U.S. 1 (2021)..........................................................................*passim*

*Hachette Book Grp., Inc. v. Internet Archive*,
  664 F. Supp. 3d 370 (S.D.N.Y. 2023) .................................................9

*Hachette Book Grp., Inc. v. Internet Archive*,
  115 F.4th 163 (2d Cir. 2024) .......................................................*passim*

*Harper & Row Publishers Inc. v. Nation Enters.*,
471 U.S. 539 (1985)......................................................................................*passim*

*Lotus Dev. Corp. v Borland Int'l*,
49 F.3d 807 (1st Cir. 1995)..............................................................................15

*Murphy v. Millennium Radio Grp. LLC*,
650 F.3d 295 (3d Cir. 2011) .........................................................................9, 10

*Nat'l Fire Protection Ass'n v. UpCodes*,
No. 21-cv-5262 (C.D. Cal. Nov. 4, 2024) ...........................................................9

*Penguin Grp., Inc. v. American Buddha*,
2015 WL 11170727 (D.Ariz.) ...........................................................................20

*Society of Holy Transfiguration Monastery v. Gregory*,
689 F.3d 29 (1st Cir. 2012).................................................................................20

*Sony BMG Music Ent. v. Tenenbaum*,
672 F. Supp. 2d 217 (S.D.N.Y. 2023) .................................................................9

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)............................................................................................19

*Swatch Grp. Mgmt. Servs. Ltd v. Bloomberg L.P*,
756 F.3d 73 (2d Cir. 2014) .................................................................................17

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2003) ................................................................7, 8, 9, 17

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989) .............................................................................22

## Federal Statutes

17 U.S.C. § 107 ..........................................................................................*passim*

## Rules

Federal Rule of Appellate Procedure 29...................................................................1

iv

**Other Authorities**

Joshua Berlowitz, *The Five Factor Framework: A New Approach to Analyzing Public Benefits of Fair Use Cases*, 46 Colum. J.L. & Arts 61 (2022) ..15, 16, 17, 18

Ralph D. Clifford, *The Fair Use Holding in Google v. Oracle: Now for Software, the Fair Use Tail Wags the Copyright Dog*, 64 IDEA: L. Rev. Franklin Pierce Ctr. for Intell. Prop. 456 (2024).............................................................15, 16, 17

Mark Marciszewski, *What Do Andy Warhol and Google Have in Common? Transformative Uses and the Effect Upon the Potential Market: The Next Question for Fair Use and the Right to Prepare Derivative Works*, 92 UMKC L. Rev. 291 (2023).........................................................................15, 16, 17, 18

Gary Myers, *Muddy Waters: Fair Use Implications of* Google LLC v. Oracle America, Inc., 19 Nw. J. of Tech. & Intellection Prop. 155 (2022).............16, 17

Terry Hart, *Breyer's Flawed Fourth Fair Use Factor in Google v. Oracle*, Copyhype (June 1, 2021), https://www.copyhype.com/2021/ ...............15, 16, 17

## <u>STATEMENT OF IDENTIFICATION AND INTEREST OF AMICI</u>

*Amici* are the Association of American Publishers ("AAP") and the News/Media Alliance ("N/MA").[1]

AAP represents book, journal, and education publishers in the United States on matters of law and policy, including major commercial houses, small and independent houses, and university presses and other noncommercial scholarly publishers. AAP seeks to promote an effective and enforceable framework that enables publishers to create and disseminate a wide array of original works of authorship to the public on behalf of their authors and in furtherance of informed speech and public progress.

N/MA represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Plaintiff-Appellant and Defendant-Appellee both consented to the filing of this *Amici* Curiae brief. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici* and their counsel, made any monetary contribution toward the preparation or submission of this brief.

Copyright protection and the fair use doctrine are of tremendous importance to both *amici*. On the one hand, AAP's and N/MA's members rely on the fair use doctrine on a daily basis to engage in news reporting or research, and to quote from and comment on existing works. In this regard, the fair use doctrine facilitates the creation of commentary and other expressive content, allowing *amici* to reflect on and critique the work and actions of writers, artists, musicians, corporations, politicians and other public leaders, among others. On the other hand, it is critical to *amici* that the fair use doctrine be interpreted consistently with the fundamental purpose of copyright law: to incentivize the creation and distribution of new works, which require substantial time and investment by publishers. The district court's decision in the instant case misapplied the law in several critical regards, including in its conclusion that the fourth factor of the fair use analysis set forth in 17 U.S.C. § 107—which concerns the potential market harm to a copyright owner's works— did not favor the plaintiff because of the alleged public benefit of free distribution of the plaintiff's works. This is a disturbing rationale, in particular in light of the fact that a wide array of actors, ranging from ebook pirates such as Libgen and Z-Library, to more credentialed organizations such as the Internet Archive, have sought to copy and distribute free ebooks or other digital materials in the name of greater access, while disregarding the rights of authors and publishers. *See Hachette Book Group v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) (rejecting Internet

Archive's fair use defense). Likewise, with the growing presence of generative artificial intelligence tools that were trained on and operate by using news and book content without permission of the copyright owners, it is essential that courts properly apply the fair use analysis, including the market harm factor, so as to consider the harm to content creators that would result from the wholesale misappropriation of their works. In short, this case has ramifications far beyond its limited and quite unusual facts, and the content industries rely heavily on the correct construction of copyright laws.

## SUMMARY OF ARGUMENT

In an effort to aid the Court, this *amici* brief will focus in depth upon (i) the District Court's erroneous analysis of the fourth factor of the fair use analysis, which is "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107; and (ii) the District Court's erroneous analysis under the first factor as to whether UpCodes was a noncommercial actor.[2]

The District Court erred in its analysis of the fourth factor. As the District Court recognized, "If the Copyrighted Standards can be obtained for free from UpCodes, consumers will be less incentivized to purchase the standards from *ASTM* for a fee . . . . [I]t is fair to say that UpCodes' copies are 'an effective substitute' for the Copyrighted Standards." *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 2024 WL 4374117, at *15 (E.D. Pa. Oct. 2, 2024) (*ASTM*). Indeed, this is a case involving the defendant's systematic and verbatim copying and distribution of the plaintiff's works in their entirety without any payment to plaintiff. In such a setting, the fourth factor must heavily favor the plaintiff. The central inquiry of the market harm factor is whether a secondary use "usurps the market for the [original] by offering a competing substitute"—and the District Court explicitly found this to be the case. *See Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021) (*Warhol I*), *aff'd*, 598 U.S. 508 (2023) (*Warhol II*).

---

[2] *Amici* take no position as to the rest of the District Court's fair use analysis.

Despite its initial acknowledgement of the obvious market harm, the District Court erroneously concluded that the fourth factor was neutral and did not weigh in the plaintiff's favor based on "two important wrinkles." *ASTM*, 2024 WL 4374117, at \*14–16. First, the court misconstrued long-standing caselaw that courts must consider the "source" of the loss. This simply means that a court must "ask not whether the second work would *damage* the market for the first (by, for example, devaluing it through parody or criticism), but whether it *usurps* the market for the first by offering a competing substitute." *Warhol I*, 11 F.4th at 48; *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994). Instead of focusing on this narrow question, with its ready answer, the District Court wandered into entirely different terrain, speculating that *ASTM* might have *other* incentives to continue developing technical standards even if UpCodes usurped its sales, such as compliance-focused trainings. This surprising inquiry has no grounding in the case law, requires expertise and foresight courts do not possess, and inverts the burden of proof. It was error for the District Court to conclude that these other hypothetical incentives for *ASTM* to create technical standards somehow negated the defendant's usurpation of the market for plaintiff's works. *See infra* § I.

Second, citing Justice Breyer's decision in *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 35–36 (2021) (*Google*), the District Court found that the fourth factor was also neutralized because of public benefits created by defendant's free

distribution of the Copyrighted Standards. Justice Breyer's recent reference to considering the public benefits of copying as part of the fourth factor analysis (rather than as part of the overall-factor assessment or under a limited examination of transformativeness under the first factor) should not be overread to impose a new balancing test or requirement into the market harm factor. As Justice Breyer himself explains, these questions will not be "always relevant" in every case, *id.* at 36, and his concern is best read as pertaining only to the distinguishable setting of cases involving the copying of highly functional code that bears upon the interoperability of computer programs. In any event, the district court's analysis erred by detaching its fourth factor inquiry from the "likely market effects" of the copying, and by inadequately crediting the full market harms to the plaintiff. *Cf. id.* at 31. The acknowledged reality is that UpCodes' free distribution of exact copies of *ASTM*'s Copyrighted Standards provided an effective substitute for the original and thus had a clear "effect . . . upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). More broadly, the key premise underpinning the Copyright Clause of the U.S. Constitution and the Copyright Act is that legal protection for copyrighted works is necessary to provide an incentive to create new works, ultimately for the public good. As the Second Circuit wrote when faced with an "enhanced access" public benefit argument in *Hachette Book Group*, "the Copyright Act and its empowering constitutional authority reflect a considered judgment that

6

'the Progress of Science and useful Arts' is best promoted by laws that protect authors' original works and permit authors to set the terms of engagement, at least for a limited time." 115 F.4th at 195. Further, the Supreme Court has made clear that by itself, the goal of promoting broader access is a destabilizing rationale that cannot be accorded significant weight since "[a]ny copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." *Harper & Row Publishers Inc. v. Nation Enters.*, 471 U.S. 539, 569 (1985); *accord Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 199 n.5 (3d Cir. 2003), *abrogated on other grounds*, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). *See infra* § II. In considering the specific facts of this case, the Court should reinforce this principle, and clarify that providing public access alone will not neutralize a demonstrated harm to a plaintiff's market.

It is critical that this Court correct the legal errors committed by the District Court on the fourth factor. As the U.S. Supreme Court has proclaimed, potential market harm from the contested use is "undoubtedly the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, and thus it is essential that the fourth factor be properly construed and therefore properly weighed in any fair use analysis.

Finally, the District Court erred in treating UpCodes as a noncommercial actor under the first factor given that UpCodes is a for-profit corporation that receives

indirect financial benefits from offering free copies of the Copyrighted Standards in order to draw sales of its premium service and other offerings and to collect data. *See infra* § III.

## ARGUMENT

## I. THE DISTRICT COURT'S IMPROPER ANALYSIS OF THE FIRST "WRINKLE" TO THE FOURTH FACTOR ANALYSIS

The basic law on the fourth factor of the fair use analysis is well established. This factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy [rather than] the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015) (*Google Books*); *see also Video Pipeline*, 342 F.3d at 202–03 (focusing on whether defendant's product will "serve as a market replacement" (cleaned up)). An accused infringer usurps an existing market "where the infringer's target audience and the nature of the infringing content is the same as the original." *Cariou v. Prince*, 714 F.3d 694, 709 (2d Cir. 2013); *accord Warhol I*, 11 F.4th at 49–50. The fourth factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (cleaned up). The "burden of proving that the secondary

use does not compete in the relevant market is . . . borne by the party asserting the defense." *Hachette*, 115 F.4th at 189; *accord Campbell*, 510 U.S. at 590; *Video Pipeline*, 342 F.3d at 197; *Dr. Seuss Enterprises, L.P. v. Comic Mix LLC*, 983 F.3d 443, 459 (9th Cir. 2020).

All of these basic principles point firmly to the presence of market harm where the copying is used to directly compete in a plaintiff's legitimate market. "To state the obvious, '[i]t is difficult to compete with a product offered for free.'" *Hachette Book Grp. v. Internet Archive*, 664 F. Supp. 3d 370, 389 (S.D.N.Y. 2023) (quoting *Sony BMG Music Ent. v. Tenenbaum*, 672 F. Supp. 2d 217, 231 (D. Mass. 2009)), *aff'd*, 115 F.4th 163 (2024). Further, market substitution is inevitable when the defendant copies and distributes the plaintiff's entire work. *See, e.g., Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011) ("If it were possible to reproduce [a photographer's] unaltered work, as a whole, without compensation . . . it would surely have a 'substantially adverse effect' on his ability to license his photographs.") As a California federal court noted in a similar case involving UpCodes, "[i]n a landscape where [plaintiff] shoulders all of the costs to develop the standards and UpCodes (and copycats) pay nothing, [plaintiff] would be at an unsustainable competitive disadvantage." *Nat'l Fire Protection Ass'n v. UpCodes*, No. 21-cv-5262 (C.D. Cal. Nov. 4, 2024), ECF No. 232 at 40–41.

While the District Court acknowledged these various realities, it then addressed two "wrinkles."  It began by correctly noting that courts must consider the "source" of the loss, since not all market effects are cognizable under the Copyright Act, but then misconstrued this doctrine.  As the Supreme Court spelled out in *Campbell*: "[W]hen a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act.  Because parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically, the role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement which usurps it.'"  *Campbell*, 510 U.S. at 591–92 (cleaned up); *see also Murphy*, 650 F.3d at 309 (reversing district court's finding of fair use where "the court has not explained how the use by the [defendants] is of such a nature as to require analysis similar to that of parody").  Here, defendant's distribution of exact full copies "usurps" demand for the Copyrighted Standards and bears no resemblance to a parody or scathing review that "suppresses" interest in a work by dint of its criticism.  That should have been the end of the story in terms of the District Court's examination of the "source" of the harm.

Instead, the District Court launched into a different analysis not supported by any caselaw.  Citing an out-of-context quote from *Google* that "Copyright 'should not grant anyone more economic power than is necessary to achieve the incentive to

create,'" it concluded that, even if UpCodes infringed *ASTM*'s works, *ASTM might have other material incentives* to create industry standards because of its mission to promote public safety and other potential monetary streams of income, such as compliance-focused training. *ASTM*, 2024 WL 4374117, at *15 (quoting *Google*, 593 U.S. at 21). Based on this speculation, the District Court concluded that the fourth factor did not favor the plaintiff.

There are numerous problems with the District Court's reasoning. *First*, this conjecture has nothing to do with the examination of the source of the loss directed by *Campbell* or echoed in *Google*. *Google*, 593 U.S. at 35. Instead, the District Court's quote from *Google* has been wrenched entirely out of context. It comes from a section of the *Google* opinion in which Justice Breyer was quoting the considerations of the National Commission on New Technological Uses of Copyrighted Works ("CONTU") in determining whether to extend copyright protection to computer programs, which differ from other expressive literary works given their functional aspects—*not* any discussion of the application of the fourth factor of the fair use analysis. 593 U.S. at 21.[3]

---

[3] More specifically, Justice Breyer explained that the differences between traditional literary works and computer programs "led Congress to think long and hard about whether to grant computer programs copyright protection . . . . CONTU concluded that the availability of copyright protection for computer programs is desirable. At the same time, it recognized that computer programs had unique features. Mindful of not unduly burdening users of programs and the general public, it wrote that

*Second*, the District Court's conjecture as to whether *ASTM* "might" be incentivized to continue to create industry codes despite widespread unauthorized distributions of its Copyrighted Standards by UpCodes is speculative. Moreover, courts are ill equipped to make such economic-forecast judgments. *Cf. Capital Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 663–64 (2d Cir. 2018) (observing that "[c]ourts are poorly equipped to assess the inevitably multifarious economic consequences" of whether an infringing use will further the objectives of copyright). Additionally, the District Court failed to take into account that it would need to include in its assessment "unrestricted and widespread conduct of the sort engaged in by the defendant." *Campbell*, 510 U.S. at 590.

*Third*, and most importantly, the District Court's conjecture inverts the burden of proof and alters the question before the Court. As stated above, UpCodes has the "burden of proving that the secondary use does not compete in the relevant market," *Hachette*, 115 F.4th at 189, and mere guesswork that *ASTM* might have other incentives to publish its industry standards does nothing to negate the fact that the secondary use here—the free distribution of exact copies of the Copyrighted Standards in their entirety—plainly competes in *ASTM*'s market.

---

copyright should not grant anyone more economic power than is necessary to achieve the incentive to create." *Id.* (cleaned up).

## II.   THE DISTRICT COURT'S IMPROPER ANALYSIS OF THE SECOND "WRINKLE" TO THE FOURTH FACTOR ANALYSIS

The District Court also erred in its reasoning that the fourth factor was neutral because of the public benefit in free distribution of industry standards incorporated into law—reasoning that misinterpreted Justice Breyer's recent suggestion of a public benefit balancing test in the market harm factor in *Google v. Oracle*. This consideration of public benefits was raised by Justice Breyer but immediately cabined in the same paragraph to the fact-bound nature of his opinion in a software copying context, and should be narrowly construed. *See infra* § II.A.  In any event, any public benefit analysis should expressly recognize the public benefits of copyright protection and explain that there is no untethered public interest in providing unauthorized access to copyrighted works.  *See infra* § II.B.

### A.   A Public Benefit Balancing Test Does Not Belong in the Fourth Factor

*Google v. Oracle* is a fair use case involving computer code, and a particularly functional form of computer code, namely declaring code.  There, the Supreme Court examined the use of a widely used "programming language" to create a vastly new and different product—a software program for mobile devices—in stark contrast to the case at bar.  In *Google*, the Supreme Court repeatedly emphasized the differences between computer code and literary works, as well as their respective

treatment under copyright law, thus emphasizing the narrowness of its holding.  *See* 593 U.S. at 21–23.

In that specific context, Justice Breyer stated the following under the fourth factor:

> Further, we must take into account the public benefits the copying will likely produce.  *Are those benefits, for example, related to copyright's concern for the creative production of new expression?*  Are they comparatively important, or unimportant, when compared with dollar amounts likely lost (taking into account as well the nature of the source of the loss)?
>
> *We do not say that these questions are always relevant to the application of fair use, not even in the world of computer programs.*  Nor do we say that these questions are the only questions a court might ask.  But we do find them relevant here in helping to determine the likely market effects of *Google*'s reimplementation."

*Id.* at 35–36 (emphases added) (citation omitted).

This passage from Justice Breyer should not be read to impose an entirely new fourth factor test.  As Justice Breyer himself explains, the questions he raises will not be "always relevant" in every case, *id.* at 36, and his focus on the public interest here is best understood in the distinguishable context of cases involving the copying of highly functional code that bears upon the interoperability of computer programs. Indeed, his opinion, in addition to emphasizing the case-by-case nature of fair use analysis, repeatedly highlighted that "applying copyright law to computer programs

14

is like assembling a jigsaw puzzle whose pieces do not quite fit." *Id.* at 21 (quoting *Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807, 820 (1st Cir. 1995) (Boudin, J., concurring)).  Further, for this passage to remain harmonized with earlier case law, it is best construed as a continuation of *Campbell*'s explanation that, as a last step in the fair use analysis (rather than under the fourth factor), courts should weigh all the factors together in light of the purpose of copyright.  *See* 510 U.S. at 577–78.

Any contrary reading risks a conflict with seminal case law and principles, as many commentators have noted.[4]  There is nothing in the statutory language of the Copyright Act to suggest any public benefit balancing test as an integral part of the fourth factor, or indeed any consideration of matters external to the economic impact on the plaintiff—namely, the "effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4); *see also* Clifford, *supra* n.4, at 495; Berlowitz, *supra* n.4, at 62–63, 66–67; Marciszewski, *supra* n.4, at 314–15; Myers,

---

[4] *See, e.g.*, Ralph D. Clifford, *The Fair Use Holding in Google v. Oracle: Now for Software, the Fair Use Tail Wags the Copyright Dog*, 64 IDEA: L. Rev. Franklin Pierce Ctr. for Intell. Prop. 456, 494 (2024); Joshua Berlowitz, *The Five Factor Framework: A New Approach to Analyzing Public Benefits of Fair Use Cases*, 46 Colum. J.L. & Arts 61 (2022); Mark Marciszewski, *What Do Andy Warhol and Google Have in Common?  Transformative Uses and the Effect Upon the Potential Market:  The Next Question for Fair Use and the Right to Prepare Derivative Works*, 92 UMKC L. Rev. 291 (2023); Gary Myers, *Muddy Waters:  Fair Use Implications of* Google LLC v. Oracle America, Inc., 19 Nw. J. of Tech. & Intellection Prop. 155 (2022); Terry Hart, *Breyer's Flawed Fourth Fair Use Factor in Google v. Oracle*, Copyhype (June 1, 2021), https://www.copyhype.com/2021/06/breyers-flawed-fourth-fair-use-factor-in-google-v-oracle/.

*supra* n.4, at 183.  Indeed, as the Second Circuit noted in *Google Books*, "Even if the *purpose* of the copying is for a valuably transformative purpose, such copying might nonetheless harm the value of the copyrighted original if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute."  804 F.3d at 223.  Further, given that courts examine under the *first* factor whether a use is transformative or otherwise advances the purposes set forth in the preamble to Section 107, if public benefit is broadly considered in all cases under the *fourth* factor, then it is *counted twice*, thus watering down the critically important fourth factor.  Berlowitz, *supra* n.4, at 68–69; *see also* Hart, *supra* n.4.  As a perfect example, the District Court's public benefit analysis under the fourth factor in the instant case is identical to its transformative use analysis under the first factor.  *Compare ASTM*, 2024 WL 4374117, at *9–12, *with id.* at *15–16.

As AAP's general counsel summed up in a recent article:

> Th[e] . . . consideration [of public benefits] is already a part of the fair use analysis, which is designed overall to determine when certain publicly beneficial, but otherwise infringing, uses of works should be permitted.  The consideration of publicly beneficial copying is addressed specifically through the first fair use factor—and Congress has even provided an illustrative list the types of copying considered publicly beneficial to aid courts: "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."

> Incorporating an additional, independent consideration of the public benefits of copying within the fourth fair use factor undermines that factor, which the Supreme Court has said "is undoubtedly the single most important element of fair use."

Hart, *supra* n.4 (citations omitted).[5]

## B. Any Public Benefit Analysis Should Highlight the Public Benefits of Copyright Protection

If this Court considers the respective public benefits of the parties' positions as part of the fourth factor analysis, it should start by affirming the public purpose of copyright and the established legal principle that offering an effective substitute for the original in a rightsholder's market impedes that purpose. This is a case in which the District Court found that UpCodes was usurping *ASTM*'s market by distributing an effective substitute to the original.[6] In that context, any public benefit analysis must draw upon the fundamental premise of the U.S. Constitution and the Copyright Act that legal protection for copyrighted works is necessary to provide an incentive to create new works. *See Video Pipeline*, 342 F.3d at 198 ("[A]s we apply

---

[5] A broad reading of Breyer's passage as announcing an across-the-board new test as part of the fourth factor would also make the fair use analysis more unpredictable, a concern already plaguing the doctrine. Berlowitz, *supra* n.4, at 61–62; Marciszewski, *supra* n.4, at 314.

[6] Thus, this case differs significantly from the peculiar fact setting in *Swatch Group Management Services Ltd v. Bloomberg L.P*, 756 F.3d 73, 90–92 (2d Cir. 2014), where Swatch "had no interest in the exploitation of the copyright-protected aspects of" its earnings calls, which were designed to inform the financial markets of factual developments regarding the company.

copyright law, and the fair use doctrine in particular, we bear in mind its purpose to encourage creative activity for the public good.").

In *Harper & Row*, the Supreme Court made clear that even when a work is of significant public interest, it does not follow that there is a significant public benefit of depriving it of robust copyright protection:

> It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public. Such a notion ignores the major premise of copyright and injures author and public alike. To propose that fair use be imposed whenever the 'social value of dissemination outweighs any detriment to the artist,' would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it."

471 U.S. at 559 (cleaned up). As the Supreme Court underscored, to permit the copying of any work of great public interest would "effectively destroy any expectation of copyright protection . . . . Absent such protection, there would be little incentive to create or profit in financing such [works], and the public would be denied an important source of significant . . . information." *Id.* at 557.

In *Hachette Book Group, Inc. v. Internet Archive*, the Second Circuit faced a fourth-factor argument similar to the one made here by UpCodes.[7] Internet Archive

---

[7] To the extent this case involves additional arguments because plaintiff's works have been incorporated into law, such considerations should be examined after explaining more generally that copyright protection inures to the public benefit and that there is no freewheeling public interest in the unauthorized distribution of works for free.

scanned and distributed from its website millions of ebooks for free to users around the world without compensation to the books' authors or publishers. Internet Archive "argue[d] that its Free Digital Library provides significant public benefits, including expanding access to free library materials," including to those who have difficulty accessing physical libraries. 115 F.4th at 195. Rejecting this argument, the Second Circuit easily found that the public benefit balance weighed in the book publishers' favor:

> To be sure, expanding access to knowledge would, in a general sense, benefit the public. But "[a]ny copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." *Harper & Row*, 471 U.S. at 569, 105 S.Ct. 2218. That does not alone render the infringement lawful. Indeed, the Copyright Act and its empowering constitutional authority reflect a considered judgment that "the Progress of Science and useful Arts" is best promoted by laws that protect authors' original works and permit authors to set the terms of engagement, at least for a limited time. *See Sony* [*Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984)], 104 S.Ct. 774. Doing so benefits the public "by providing rewards for authorship." *Google Books*, 804 F.3d at 212. This monopolistic power is a feature, not a bug, of the Copyright Act.

*Id.* At base, the Second Circuit found Internet Archive's argument that "free" works benefit the public to be "short-sighted": "If authors and creators knew that their original works could be copied and disseminated for free, there would be little motivation to produce new works. And a dearth of creative activity would

undoubtedly negatively impact the public.  It is this reality that the Copyright Act seeks to avoid." *Id.* at 195–96.[8]

As the Second Circuit succinctly stated, "When a secondary use competes in the rightsholder's market as an effective substitute for the original, it impedes the purpose of copyright, which is to incentivize new creative works by enabling their creators to profit from them." *ReDigi*, 910 F.3d at 662.  "If every volume that was in the public interest could be pirated away by a competing publisher, the public soon would have nothing worth reading." *Harper & Row*, 471 U.S. at 559 (cleaned up).

In conclusion, even if the Court considers a public benefit balancing test, to ensure the proper application of copyright law, it should affirm the above legal principles and clarify that the law requires giving great weight to the unequivocal finding that UpCodes provides an effective substitute for plaintiff's works.  It would disturb the entire copyright eco-system for a court to decree in general that greater access to copyrighted works can overcome the obvious market harm to the copyright

---

[8] *See also Society of Holy Transfiguration Monastery v. Gregory*, 689 F.3d 29, 37, 64–65 (1st Cir. 2012) (rejecting fair use defense and finding that fourth favor favored the plaintiff where defendant posted plaintiff's translations of religious texts "free-of-charge" on website for "non-profit educational purposes"); *Penguin Grp., Inc. v. American Buddha*, 2015 WL 11170727, at *6 (D. Ariz. May 11, 2015) ("If anyone could freely access the Works, electronically or otherwise, the [plaintiff] would have no market in which to try and publish, disseminate, or sell . . . ." (quoting *Gregory*, 689 F.3d at 65)).

holder from the distribution of exact, full copies that serve as effective substitutes for the original.

## III.    UPCODES IS A COMMERCIAL USER

The district court also erred in holding that UpCodes was a non-commercial user of the Copyrighted Standards. *ASTM*, 2024 WL 4374117, at *10–12. The first factor of the fair use analysis includes a consideration of "whether such use is of a commercial nature or is for nonprofit educational uses." *Warhol II*, 598 U.S. at 525 (quoting 17 U.S.C. § 107(1)). "The crux of the profit/nonprofit distinction . . . is not whether the sole motive of the use is monetary gain, but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

Here, UpCodes is plainly profiting from exploitation of the Copyrighted Standards without paying *ASTM*'s customary price and thus should have been deemed a commercial user. UpCodes is a for-profit company, far from a nonprofit academic institution. This fact alone is not dispositive, but as the District Court acknowledged, while UpCodes does not charge users for its most basic service providing the Copyrighted Standards, it obtains two important indirect commercial benefits. First, "posting these standards may . . . enabl[e] the collection of user information." *ASTM*, 2024 WL 4374117, at *2. The collection and sale of data is perhaps the largest business activity on today's internet, and for-profit UpCodes

21

collects and sells the personal data of visitors to its site.  *See Privacy Policy*, UpCodes (June 15, 2023), https://up.codes/privacy [https://perma.cc/YSJ7-A6DX]. Second, UpCodes uses its basic, free service to lure in premium customers who pay for an enhanced service featuring the standards and additional related functionality, such as bookmarking and annotating.  *ASTM*, 2024 WL 4374117, at *2.  Indeed, the District Court directly admitted that "posting these standards may provide UpCodes with tangential benefits like drawing users to its website, increasing active account numbers, and enabling the collection of user information."  *Id.*  Many a commercial company—from Amazon to discount brick and mortar chains—has used free giveaways or loss leaders to increase its sales of more expensive products; this hardly makes their giveaways or loss leader sales noncommercial.

Court have long considered indirect commercial benefits in the analysis of whether a given use is a commercial use or a nonprofit educational use.  *See, e.g.*, *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (holding that commerciality can be found when "the link between . . . commercial gain and . . . copying is somewhat attenuated" and that the first factor weighed against fair use where "Texaco reaps at least some indirect economic advantage from its photocopying" of scientific articles for its scientists without payment to the publisher).  In *Google Books*, *Google* had no revenues flowing directly from its operation of the *Google*

*Books* functions, but sought to use its dominance of book search to fortify its overall dominance of the Internet search market and thereby profit indirectly. The Second Circuit held that "*Google*'s commercial motivation distinguishes this case from *Hathitrust*, as the defendant in that case was a non-profit entity founded by, and acting as the representative of, libraries." 804 F.3d at 218 (referencing *Authors Guild v. Hathitrust*, 755 F.3d 87 (2d Cir. 2014)). Although the Second Circuit ultimately found that the transformative nature of *Google* Books carried the day on the first factor, *Google*'s indirect commercial benefits were a countervailing factor. *Google Books*, 804 F.3d at 218–19.

In sum, the commercial/nonprofit educational use assessment is a spectrum, and the District Court erred by finding that UpCodes' use was purely noncommercial despite its collection and sale of user data and its "freemium" business model. This erroneous approach sets a potentially troubling precedent, including in the face of generative AI—which companies often offer for free with the expectation that they will convert some users to premium or paid tiers of their services, while also indirectly collecting far more valuable user data, advertising opportunities or other indirect commercial benefits.

23

## <u>CONCLUSION</u>

*Amici* urge the Third Circuit to find that the fourth factor favors the plaintiff and that the defendant's use was commercial.

Dated: January 28, 2025

Respectfully submitted,

*/s/ Linda J. Steinman*
Linda J. Steinman
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, New York 10020
Telephone: (212) 489-8230
lindasteinman@dwt.com

Mary E. Goetz
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
marygoetz@dwt.com

*Counsel for Association of American
Publishers and News/Media Alliance*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 5,736 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 Apps for enterprise, Version 2405s in 14-point Times New Roman font.

Dated:  January 28, 2025

*/s/ Linda J. Steinman*
Linda J. Steinman
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, New York 10020
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
lindasteinman@dwt.com

*Counsel for Association of American
Publishers and News/Media Alliance*

## **ELECTRONIC DOCUMENT CERTIFICATE**

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the paper copies.

The brief was scanned for viruses using Webroot Endpoint Protection v. 9.0.31.86 and no viruses were detected.

Dated:  January 28, 2025

*/s/ Linda J. Steinman*
Linda J. Steinman
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, New York 10020
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
lindasteinman@dwt.com

*Counsel for Association of American Publishers and News/Media Alliance*

## <u>CERTIFICATE OF BAR ADMISSION</u>

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that I am a

member of the bar of the United States Court of Appeals for the Third Circuit.


Dated:  January 28, 2025                     */s/ Linda J. Steinman*
                                             Linda J. Steinman
                                             DAVIS WRIGHT TREMAINE LLP
                                             1251 Avenue of the Americas
                                             21st Floor
                                             New York, New York 10020
                                             Telephone:  (212) 489-8230
                                             Facsimile:  (212) 489-8340
                                             lindasteinman@dwt.com

                                             *Counsel for Association of American*
                                             *Publishers and News/Media Alliance*

## CERTIFICATE OF IDENTICAL BRIEFS

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the electronic version of the Brief of *Amici* Curiae filed with the Court via the Court's electronic docketing system is identical to the hard-copy version of this Brief filed with the Court.

Dated:  January 28, 2025

*/s/ Linda J. Steinman*
Linda J. Steinman
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, New York 10020
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
lindasteinman@dwt.com

*Counsel for Association of American Publishers and News/Media Alliance*

## **CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on January 28, 2025, I caused the foregoing to be filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit, using the appellate CM/ECF system.  I further certify that to my knowledge all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Linda J. Steinman*
Linda J. Steinman