No. 24-2965

## In the United States Court of Appeals
## for the Third Circuit

AMERICAN SOCIETY FOR TESTING & MATERIALS, D/B/A ASTM INTERNATIONAL,
*Plaintiff-Appellant*

v.

UPCODES, INC., GARRETT REYNOLDS, AND SCOTT REYNOLDS,
*Defendants-Appellees.*

Appeal from the United States District Court for the Eastern District of
Pennsylvania, Hon. Anita B. Brody, No. 2:24-cv-01895

**BRIEF OF AMICI CURIAE AMERICAN NATIONAL STANDARDS INSTITUTE; NATIONAL FIRE PROTECTION ASSOCIATION, INC.; TELECOMMUNICATIONS INDUSTRY ASSOCIATION; NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION; ULSE INC. D/B/A UL STANDARDS & ENGAGEMENT; INTERNATIONAL CODE COUNCIL, INC.; AMERICAN SOCIETY FOR HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS; AMERICAN SOCIETY OF SAFETY PROFESSIONALS; CANADIAN STANDARDS ASSOCIATION; INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS; X12; AND INTERNATIONAL ASSOCIATION OF PLUMBING & MECHANICAL OFFICIALS IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

Kelly M. Klaus
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
Kelly.Klaus@mto.com

Rose Leda Ehler
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Rose.Ehler@mto.com

Rachel G. Miller-Ziegler
Andra Lim
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
  Suite 500E
Washington, DC 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Andra.Lim@mto.com

January 28, 2025                    *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, each *amicus* represents that it has no parent corporations and that no publicly held corporation owns 10% or more of its stock.

Dated: January 28, 2025

/s/ *Rachel G. Miller-Ziegler*
Rachel G. Miller-Ziegler

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................... i

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES ..................................................... iv

INTEREST OF AMICI CURIAE ...................................................1

INTRODUCTION ...................................................................8

ARGUMENT .......................................................................10

I.   UPCODES' "INDIRECT REFERENCE" THEORY GRAVELY
     THREATENS THE STANDARDS DEVELOPMENT SYSTEM,
     WHICH DEPENDS ON COPYRIGHT PROTECTION FOR IBR'D
     STANDARDS ...............................................................10

     A.   Governmental Bodies Rely on Voluntary Consensus Standards
          Developed by Private SDOs. ..........................................10

     B.   Private SDOs' Standard Development Work Depends on
          Copyright Protection. ................................................12

     C.   IBR Allows Governmental Bodies to Rely on Private SDOs'
          Standards While Respecting Their Copyrights. ......................15

     D.   IBR Is Distinct from "Indirect Reference." ..........................16

     E.   UpCodes' Unauthorized Copying and Publication of Standards
          Poses a Significant Threat to the Development of Private
          Standards. ...........................................................18

II.  UPCODES' "INDIRECT REFERENCE" THEORY IS SWEEPING
     AND MERITLESS .........................................................21

     A.   UpCodes' "Indirect Reference" Theory Would Result in a
          Single IBR Effectively Destroying Copyright for Hundreds of
          Standards. ...........................................................23

     B.   UpCodes' "Indirect Reference" Theory Is Wrong. .................27

          1.   UpCodes' *Per Se* Theory Is Inconsistent With the Case-
               By-Case Approach of the Fair Use Defense. ...................27

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.  Examining the Specific Facts of This Case Highlights the Erroneous Nature of UpCodes' "Indirect Reference" Theory. ..................................................................................31

CONCLUSION..........................................................................................35

CERTIFICATE OF COMPLIANCE....................................................37

CERTIFICATE OF BAR MEMBERSHIP.............................................38

LOCAL RULE 31.1(C) CERTIFICATIONS.........................................39

CERTIFICATE OF SERVICE ............................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*American Society for Testing and Materials v. Public.Resource.Org, Inc.*,
82 F.4th 1262 (D.C. Cir. 2023)......................................................28, 29

*American Society for Testing and Materials v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018)..............................................................28

*American Society for Testing and Materials v. UpCodes*,
2024 WL 4374117 (E.D. Pa. Oct. 2, 2024) ..............................20, 22, 23, 31, 33

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)............................................................................27

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*,
27 F.4th 313 (5th Cir. 2022) ................................................................30

*Benz v. Compania Naviera Hidalgo, S.A.*,
353 U.S. 138 (1957)............................................................................26

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)......................................................................18, 28

*Facility Guidelines Institute, Inc. v. UpCodes*,
677 F. Supp. 3d 955 (E.D. Mo. 2023) ..............................................19, 20

*General Elec. Co. v. Brenner*,
407 F.2d 1258 (D.C. Cir. 1968).............................................................34

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)................................................................................30

*Hachette Book Group, Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ...............................................................21

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)......................................................................29, 30

*Hudspeth v. Melville*,
127 F.2d 373 (10th Cir. 1941) ..............................................................34

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*International Code Council v. UpCodes*,
No. 17-cv-6261, 2020 WL 2750636 (S.D.N.Y. May 27, 2020)...................19, 20

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
52 F.4th 1054 (9th Cir. 2022) ...............................................................................25

**FEDERAL STATUTE**

17 U.S.C. § 107(4) ................................................................................................18

**STATE & LOCAL STATUTES**

Del. Admin. Code 701-7-1.0..................................................................................15

Fla. Admin. Code r. 62-762.501(1)(b)(2) .............................................................15

Metro Gov't of Nashville and Davidson Cnty., Tennessee Code of
Ordinances § 16.08.010 ...................................................................................26

Phila. Code ch. 4, § A-101.3 .................................................................................31

Phila. Code ch. 4, § A-102.3 ...........................................................................31, 32

Phila. Code ch. 4, § B-1.2 ...............................................................................32, 33

Phila. Code ch. 7, § P-702.1 & tbl. 702.1 ............................................................32

**FEDERAL RULE**

Fed. R. App. P. 29(a)(4)(E).....................................................................................1

**FEDERAL REGULATIONS**

47 Fed. Reg. 34,107 (Aug. 6, 1982).....................................................................16

47 Fed. Reg. 49,496 (Nov. 1, 1982).....................................................................11

78 Fed. Reg. 60,784 (Oct. 2, 2013).................................................................15, 17

79 Fed. Reg. 66,267 (Nov. 7, 2014)......................................................................17

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 104-390 ..........................................................................12

**OTHER AUTHORITIES**

Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J. L. & Pub. Pol'y 131 (2013) ......................................11

Marie Gérardy, *The Use of Copyrighted Technical Standards in the Operationalisation of European Union Law*, 13 European J. Risk Reg. 532 (2022) ....................................................................................26

National Research Council, *Standards, Conformity Assessment, and Trade: Into the 21st Century* (National Academy Press 1995), https://www.nap.edu/catalog/4921/standards-conformity-assessment-and-trade-into-the-21st-century .........................................10, 11, 12

Order re Denying Defendants' Motion for Summary Judgment and Granting Plaintiffs' Motion for Summary Adjudication, *NFPA v. UpCodes*, No. 2:21-cv-05262 (C.D. Cal. Nov. 4, 2024), Dkt. 230-1 ................18

U.S. Nuclear Regulatory Commission, Regulatory Guide 1.205, Revision 2, *Risk-Informed, Performance-Based Fire Protection for Existing Light-Water Nuclear Power Plants* (May 2021) ...........................17, 32

# INTEREST OF AMICI CURIAE[1]

American National Standards Institute, Incorporated ("ANSI") is a not-for-profit membership organization that, for more than 100 years, has administered and coordinated the voluntary standardization system in the United States. ANSI accredits the procedures of standards development organizations ("SDOs"). Accreditation by ANSI signifies that the procedures used by the standards developer in connection with the development of American National Standards meet ANSI's essential requirements for openness, balance, consensus, and due process.

The National Fire Protection Association, Inc. ("NFPA") is a self-funded non-profit devoted to reducing the risk of death, injury, and property and economic loss due to fire, electrical, and related hazards. NFPA has been developing standards since it was founded in 1896. Today, NFPA's principal activity is the development and publication of over 300 standards in the areas of fire, electrical, and building safety. NFPA's flagship work is the National Electrical Code, which is the world's leading standard for electrical safety and provides the benchmark for safe electrical

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* state that no counsel for a party authored this brief in whole or in part or made a monetary contribution to the preparation and submission of this brief, and no person other than *amici* or their counsel made such a contribution. Both parties consented to the filing of this brief.

design, installation, and inspection to protect people and property from electrical hazards.

Founded in 1988, the Telecommunications Industry Association ("TIA") develops consensus standards for a wide range of telecommunications products and equipment, such as private radio equipment, cellular towers, satellites, mobile device communications, vehicular telematics, and smart device communications. More than 1,000 individuals—representing network equipment manufacturers, service providers, government entities, and end users—currently serve on TIA's Engineering committees.

The National Electrical Manufacturers Association ("NEMA") is the association of electrical equipment manufacturers, founded in 1926. NEMA sponsors the development of and publishes over 700 standards relating to electrical products and their use. NEMA's member companies manufacture a diverse set of products focused on end-user markets in the grid, industrial, mobility and built environment sectors, including transformers, inverters, factory automation and control systems, building controls and electrical systems components, lighting systems, electric vehicle motors, and medical diagnostic imaging systems.

ULSE Inc. d/b/a UL Standards & Engagement ("UL") is an independent, not-for-profit standards developer dedicated to promoting safe living and working environments since its founding in 1894. UL's standards provide a critical

2

foundation for the safety system in the United States and around the world, while also promoting innovation and environmental sustainability. With over 120 years of experience and the development of over 1,500 standards, UL advances a safer, more sustainable world.

International Code Council, Inc. ("ICC") is a non-profit membership association dedicated to building safety. The International Codes, or I-Codes, published by ICC, provide one set of comprehensive and coordinated model codes covering all disciplines of construction including structural safety, plumbing, fire prevention and energy efficiency. All fifty states and the District of Columbia have adopted certain I-Codes at the state or other jurisdictional levels. Federal agencies including the Architect of the Capitol, General Services Administration, National Park Service, Department of State, U.S. Forest Service and the Veterans Administration also use I-Codes for the facilities that they own or manage.

The American Society for Heating, Refrigerating, and Air Conditioning Engineers ("ASHRAE") is a non-profit organization dedicated to advancing the science of heating, ventilation, air conditioning, and refrigeration in order to help humanity and promote sustainability. Founded in 1894, ASHRAE has more than 57,000 members in 132 nations. Its members volunteer their time to advance the ASHRAE mission, including through development of consensus-based standards

that represent best practices in the heating, ventilation, and air conditioning ("HVAC") industry.

Founded in 1911, the American Society of Safety Professionals ("ASSP") is a global association for occupational safety and health professionals. ASSP develops industry consensus standards that promote safe work environments, improve productivity and drive continuous improvement.

Founded in 1919, Canadian Standards Association ("CSA") is a not-for-profit, independent organization that focuses on standards, research, and education. CSA harnesses the expertise of 11,000+ volunteer members who combine technical rigor across a range of sectors with a transparent, consensus-based approach. CSA maintains a portfolio of over 3,000 standards that improve safety, health, sustainability, and economic efficiency domestically and internationally.

The Institute of Electrical and Electronics Engineers, Incorporated ("IEEE") is a not-for-profit public charity dedicated to the advancement of technology for the benefit of humanity with a 140-year history of technological innovation. The organization comprises more than 460,000 members who participate in its activities across the world in more than 190 countries. IEEE, through its Standards Association, is a globally recognized SDO that has an open and inclusive process consistent with the World Trade Organization principles on international standardization. IEEE has a portfolio of over 1,100 active standards and over 1,000

4

standards under development for a wide range of industries including: power and energy, information technology, telecommunications, information assurance, automotive and transportation, healthcare, industrial automation and manufacturing, and consumer electronics.

X12 is an ANSI-accredited, consensus-based, non-profit organization focusing on the development, implementation, and ongoing use of interoperable electronic data interchange standards.

Founded in 1926, the International Association of Plumbing & Mechanical Officials ("IAPMO") is an independent, not-for-profit membership organization dedicated to providing minimum requirements and standards for the protection of public health, safety, and welfare. IAPMO coordinates the development of plumbing and mechanical codes and standards such as the Uniform Plumbing Code ("UPC") and the Uniform Mechanical Code ("UMC") through a consensus standards development process accredited by ANSI. This process brings together volunteers representing varied viewpoints and interests to achieve consensus on plumbing and mechanical issues. IAPMO codes are used by jurisdictions in the United States and abroad.

*Amici* SDOs create high-quality and cutting-edge standards that cover a wide range of industries and consumer products, and that are critical to health and safety issues involved in numerous regulated fields. Like other creators, SDOs rely on

copyright protection to generate the revenue necessary to support their creative endeavors.  SDOs sell their copyrighted standards to industry professionals who use them as part of their work and recoup the costs through their professional fees. Those sales fund SDOs' intensive process of developing standards and updating them to keep pace with changes in knowledge and technology.

Governments often rely on standards created by SDOs instead of developing standards themselves.  When governments adopt SDOs' standards, they do so through incorporation by reference ("IBR")—*i.e.*, by referencing a standard in the text of a statute or regulation.  By referencing a standard rather than copying its contents into regulatory text, IBR respects the copyrights SDOs hold in their standards, so that SDOs can continue creating standards and governments can continue to rely on that work.

Defendants-Appellees ("UpCodes") have argued in other lawsuits that it is fair use to copy SDO standards that have been IBR'd.  In this case, UpCodes expands that argument, claiming it also is fair to copy *different* standards that simply are referred to *within* an IBR'd standard.  UpCodes further argues that it is fair to copy such an internally referenced standard *in its entirety* so long as any reference to it appears in an IBR'd standard—even if the reference is limited to a particular *part* of the referenced standard.

If accepted, UpCodes' argument that it may copy internally referenced standards in their entirety would effectively result in the loss of copyright protection for many works created by SDOs—including standards created by *amici* SDOs. Plaintiff-Appellant the American Society for Testing and Materials ("ASTM") filed a motion for a preliminary injunction to stop UpCodes' copying of its standards, which the district court denied. *Amici* have a strong interest in the reversal of the district court's order.

## INTRODUCTION

UpCodes advances an extreme theory to justify its copying of ASTM's standards, as well as numerous standards published by *amici* SDOs.  UpCodes previously focused on arguing that standards IBR'd by a government are "the law." UpCodes argued that it could copy those specifically IBR'd standards and post them on its website for the purpose of attracting paying customers, all in the guise of providing access to "the law."  But this argument has a limit that is highly inconvenient for UpCodes:  It does not support posting standards that no government has IBR'd; if UpCodes could post non-IBR'd standards, UpCodes could make even more money.

In this case, UpCodes asserts a sweeping argument to get around this limit. UpCodes says that standards referenced *inside* an IBR'd standard—even if not named in the IBR'ing statute or rule—*also* become swept up in "the law," and as "law" may be copied under the fair use doctrine.  UpCodes has relied on this "indirect reference" theory to post standards that are merely referenced in IBR'd standards and have not actually been IBR'd themselves, including (in addition to ASTM standards at issue in this lawsuit) standards published by *amici* SDOs.  The district court here became the first court to endorse UpCodes' theory that "indirect reference" instantly transforms indirectly referenced standards into "law" that anyone can copy.

UpCodes' theory would have drastic consequences for the U.S. standards development system. Some *amici* SDOs have already had their internally referenced standards posted by UpCodes; and many *amici* SDOs have internally referenced standards that could be labeled "law" and fair game for posting under UpCodes' approach. IBR'd standards may reference *hundreds* of standards (and other creative works). In UpCodes' view, a single IBR of a standard would make it fair for anyone to copy all of those internally referenced standards. And there is no stopping point to UpCodes' "indirect reference" theory: by UpCodes' logic, standards referenced inside the internally referenced standards also could fairly be copied, as could standards referenced inside those, and so on. SDOs depend on copyright protection to generate revenue to fund their publicly important standards development work. UpCodes' theory would essentially nullify such protection for an entire daisy-chain of standards upon one IBR.

UpCodes' contention that internally referenced standards are "the law" and may fairly be copied is meritless. It effectively mandates a *per se* approach: in UpCodes' view, it would always be fair for anyone to copy any internally referenced standard. But the fair use doctrine eschews such brightline rules and instead asks whether copying is fair on a case-by-case basis. UpCodes' "indirect reference" theory would wreak havoc on the fair use doctrine and the important policies it is intended to promote. Further, UpCodes' theory fails on the facts, as this case

9

illustrates. The district court concluded that ASTM's standards are "law" because the City of Philadelphia has IBR'd a standard, which in turn references ASTM's standards. The court was wrong. Consistent with longstanding IBR practice, Philadelphia's IBR made only the named standard part of the requirements of its code and in no way turned ASTM's standards into "law." This Court should reverse the district court's denial of ASTM's motion for a preliminary injunction.

## ARGUMENT

*Amici* begin by providing background on the centrality of copyright protection to SDOs' ability to create and maintain high-quality, cutting-edge standards, and how widespread loss of that protection could jeopardize the standards development system. *Amici* then address UpCodes' theory for effectively stripping "indirectly referenced" standards of copyright protection *en masse* by deeming them "law."

## I. UPCODES' "INDIRECT REFERENCE" THEORY GRAVELY THREATENS THE STANDARDS DEVELOPMENT SYSTEM, WHICH DEPENDS ON COPYRIGHT PROTECTION FOR IBR'D STANDARDS

### A. Governmental Bodies Rely on Voluntary Consensus Standards Developed by Private SDOs.

In the U.S., private SDOs create "voluntary consensus standards." National Research Council, *Standards, Conformity Assessment, and Trade: Into the 21st Century* 33 (National Academy Press 1995), https://www.nap.edu/catalog/4921/standards-conformity-assessment-and-trade-into-the-21st-century ("NRC Study").

These standards are developed with input from volunteer experts with a diversity of perspectives with the goal of achieving consensus on the contents. *Id.* Instead of creating their own standards from scratch, governments often adopt voluntary consensus standards. *Id.* at 55.

There are multiple benefits to governments relying on voluntary consensus standards. First, it "eliminates the cost to the Government of developing" standards on its own and correspondingly saves taxpayers money. *Issuance of Circular No. A-119*, 47 Fed. Reg. 49,496, 49,497 (Nov. 1, 1982).

Second, the government is able to "capitalize on considerable expertise and resources available outside government." Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J. L. & Pub. Pol'y 131, 140 (2013). For instance, private SDOs can develop standards faster than government agencies can. NRC Study 56. Reliance on private SDOs thus "supports efficient and timely development" of standards that further the public interest, meet new needs, and respond to technological change. *Id.* at 157.

Third, government reliance on voluntary consensus standards reduces regulatory burdens. Regulated parties often choose to voluntarily comply with standards that set industry best practices. Bremer, *supra*, at 140. Thus, when governments adopt those standards, it "reduces unjustifiable burdens on private firms to meet duplicative standards for both government and private markets." NRC

Study 157.  In turn, the prospect of government adoption incentivizes private SDOs to develop "stringent" standards that "satisfy public needs."  *Id.* at 56.

In sum, the United States' "unique consensus-based voluntary system has served us well for over a century."  H.R. Rep. No. 104-390, pt. VII, at 24.  Because of all those benefits, federal, state, and local governmental bodies frequently rely on voluntary consensus standards developed by SDOs.  ASTM.Br.13.

## B. Private SDOs' Standard Development Work Depends on Copyright Protection.

Copyright protection is essential to SDOs' ability to develop the voluntary consensus standards that governments rely on.  As is the case for a wide range of creative works, copyright provides SDOs with an incentive to create and publish their standards.  Without copyright protection, the U.S. standards development system would be gravely threatened.

SDOs' process of creating and updating standards requires tremendous time, effort, and resources.  NFPA's process is illustrative.  It begins when NFPA posts a notice online asking for anyone interested to submit input on the relevant standard. After the input period closes, one of NFPA's Technical Committees—consisting of thousands of volunteers from the public, government, academia, and industry— holds a public meeting to consider and respond to all input.  The Technical Committee then creates and votes on a draft standard, which is posted to NFPA's website for another round of public review and input.  The Technical Committee

12

next creates and votes on another draft of the revised standard, which is posted to NFPA's website. There is another opportunity for discussion and debate of the standard, after which the standard is sent to the NFPA Standards Council, along with any appeals. The Council decides any appeals, and if appropriate, publishes the standard. All NFPA standards undergo this process for revision and update every three to five years, and the process usually takes about two years to complete.

The process of developing standards requires significant financial investment by SDOs. *See* ASTM.Br.10 (describing costs for "administrative, technical, and other necessary support such as salary and benefits for staff, office space, meeting facilities, outreach and education efforts, and information technology"). NFPA, for instance, spent over $11 million on Technical Committee operations in 2018 alone.

SDOs are able to absorb these costs because they generate revenue from selling, licensing, and otherwise distributing their standards to industry professionals who use them in their work. Absent copyright protection, others would be free to exploit SDOs' standards by copying them and selling them or giving them away at no cost. With substitute products in the market, SDOs would lose customers and their revenue would decrease.

The loss of revenue could force many SDOs to alter their business practices in ways that harm the public (or even go out of business altogether). For example, some SDOs might respond by publishing fewer standards. SDOs often rely on a few

13

widely used standards to generate most of their revenue, similar to other creative industries that rely on a handful of copyrighted "hits" to generate revenue that supports a broader range of creative works.  Revenue from SDOs' flagship standards covers the cost of other standards that serve narrower markets and do not generate enough revenue to pay for the cost of their development.  But standards that do not turn a profit are still important:  NFPA provides many critical emergency response and responder safety standards at a significant loss.  With less revenue, such unprofitable standards might disappear entirely from the market.

Some SDOs might also respond by taking steps that erode the independence of the standards development process.  For example, SDOs might take funding from industry sources, or charge or raise fees to participate in the process, with the result being less comprehensive public participation.  Such changes could reduce the quality of SDOs' standards, with a corresponding reduction in health, safety, security, and other benefits.

If the current standards development system could not be sustained due to curtailment of copyright protection, there would be no viable replacement. Governmental bodies might attempt to fill the void, but that would burden their limited resources.  And if governmental bodies at every level (federal, state, local) began to develop standards, that would be inefficient and create massive disuniformity for a wide range of commercial activity.  Moreover, individual

14

governmental bodies are unlikely to receive the same level of input as national SDOs currently do, which would likely result in worse regulations.

### C.    IBR Allows Governmental Bodies to Rely on Private SDOs' Standards While Respecting Their Copyrights.

When governmental bodies adopt SDOs' standards, they do so through IBR. With IBR, a governmental body references a given standard in a statute or regulation, but does not include the actual text of the standard in the statute or regulation.  *See, e.g.*, 1 Del. Admin. Code 701-7-1.0 ("Each of the following Codes and Standards, published by [NFPA] . . . , are hereby adopted in their entirety" with certain exceptions).

Importantly, governmental bodies view IBR as a mechanism that allows the government to adopt a standard without depriving the standard of copyright protection.  As the Office of the Federal Register (which oversees federal IBRs) has explained, "when the Federal government references copyrighted works" such as standards, "*those works should not lose their copyright*."  *Incorporation by Reference*, 78 Fed. Reg. 60,784, 60,792 (Oct. 2, 2013) (emphasis added); *see also* ASTM.Br.15-16.  Other governmental bodies have likewise recognized that IBR'd standards retain their copyright protection.  *See, e.g.*, Fla. Admin. Code r. 62-762.501(1)(b)(2) (providing that standard is "hereby adopted and incorporated by reference and, *as a copyright protected document*, is available for inspection" (emphasis added)).

15

SDOs recognize the importance of access to IBR'd standards. Similar to other copyright holders who control access to their works, many *amici* SDOs make standards they are aware have been IBR'd publicly available for free. They do so in ways that still protect their copyrights (*e.g.*, by providing access on a website but not allowing users to download copies of standards). Some SDOs go even further: NFPA, for example, makes all standards available online for free read-only access.

### D.     IBR Is Distinct from "Indirect Reference."

UpCodes contends that a governmental body's IBR goes beyond the standard the government chooses to specifically mention in the text of the statute or regulation. UpCodes argues that, upon IBR, both the IBR'd standard *and* its internally referenced standards become "the law." But that is not how IBR works. IBR has long been understood as incorporating *only* the named standard as part of a regulation's requirements.

Federal agencies have long relied on IBR to adopt voluntary consensus standards. For decades, federal statute has permitted federal agencies to use IBR. ASTM.Br.13.

When federal agencies use IBR, they incorporate as requirements only the standards actually referenced in the text of the regulation. *See Approval Procedures for Incorporation by Reference*, 47 Fed. Reg. 34,107, 34,109 (Aug. 6, 1982) (providing that a publication is IBR'd when the agency's regulation "[i]nforms the

user that *the incorporated publication* is a requirement" (emphasis added)).  As the Office of Federal Register has explained, federal regulations do not "allow for IBR of anything but the primary standards" named in regulatory text.  *Incorporation by Reference*, 78 Fed. Reg. 60,784, 60,795 (Oct. 2, 2013); *see also Incorporation by Reference*, 79 Fed. Reg. 66,267, 66,275 (Nov. 7, 2014) (IBR covers "the primary standards" and *not* standards "referenced within" them).  The Office of Federal Register has indicated that the appropriate mechanism for requiring compliance with "second tier standards" referred to in a primary standard is to actually "*IBR . . .* those standards."  78 Fed. Reg. at 60,795 (emphasis added).  Without IBR, those standards impose no requirements on regulated parties.  *See id.*

The approach of the Nuclear Regulatory Commission ("NRC") is instructive. It recently explained that "[i]f [a] secondary reference" has not been "incorporated by reference into NRC regulations," then it is not "a legally-binding requirement" enforceable by NRC.  U.S. Nuclear Regulatory Commission, Regulatory Guide 1.205, Revision 2, *Risk-Informed, Performance-Based Fire Protection for Existing Light-Water Nuclear Power Plants* 6 (May 2021).  If, however, a "secondary reference has itself been incorporated by reference into NRC regulations as requirement, then licensees and applicants must comply with that standard as set forth in the regulation."  *Id.*

17

**E.    UpCodes' Unauthorized Copying and Publication of Standards Poses a Significant Threat to the Development of Private Standards.**

UpCodes is a for-profit company that claims to provide access to "the law." It posts to its website hundreds of copyrighted standards developed by SDOs that have been IBR'd or that have been internally referenced in an IBR'd standard. SDOs have filed suit against UpCodes to enforce their copyrights. In those other cases—which have focused on IBR'd standards—courts have uniformly recognized the potential for UpCodes' conduct to harm SDOs.

In defending against those lawsuits, UpCodes has asserted a fair use defense. One of the factors courts consider in assessing that defense is "the effect of [the infringer's] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Courts must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (citation omitted).

In *NFPA v. UpCodes*, the district court recently denied UpCodes' motion for summary judgment on its fair use defense. Order re Denying Defendants' Motion for Summary Judgment and Granting Plaintiffs' Motion for Summary Adjudication, No. 2:21-cv-05262 (C.D. Cal. Nov. 4, 2024), Dkt. 230-1. The court explained that

18

"UpCodes is a for-profit corporation aimed at achieving a $1 billion valuation." *Id.*

at 33. Even though UpCodes posts standards on a free tier, it does so to "monetiz[e]

a portion of its free-tier users by converting them to paying customers." *Id.* Thus,

"[i]n UpCodes' own words, its use of NFPA's standards 'redounds to its commercial

benefit.'" *Id.* The court determined that "if UpCodes can continue with its current

practices, or if these practices become widespread, it may be exceptionally difficult

for NFPA to compete." *Id.* at 40. The court further concluded that "[t]he resulting

revenue loss" to NFPA would "potentially imperil NFPA's self-funded, voluntary

consensus development model." *Id.* at 40-41.

Similarly, in *Facility Guidelines Institute, Inc. v. UpCodes*, the district court

determined that there was "little doubt that UpCodes' use of" the standards at issue

could "affect the market" for them. 677 F. Supp. 3d 955, 973 (E.D. Mo. 2023)

("*FGI*"). The court explained that it was common sense that if the standards "can

be obtained for free from UpCodes or any other website, there is less incentive to

purchase a copy of the [standards] from" the SDO. *Id.* And in *International Code*

*Council v. UpCodes*, the district court likewise explained that that "[w]hen an

enacted law is identical to" a standard, UpCodes offers "an effective substitute" for

the standard. No. 17-cv-6261, 2020 WL 2750636, at *28 (S.D.N.Y. May 27, 2020)

("*ICC*"). (Although the district courts in these two cases ultimately held in

UpCodes' favor on fair use, both decisions were preliminary and did not finally

resolve that defense, and both decisions involved IBR'd standards (instead of internally referenced standards).  *See FGI*, 677 F. Supp. 3d 955 (deciding preliminary injunction); *ICC*, 2020 WL 2750636 (denying UpCodes summary judgment).)

ASTM filed suit upon learning that UpCodes had posted its standards, which have not been IBR'd and are only "indirectly referenced" in IBR'd standards.  The district court initially recognized that UpCodes' copying of ASTM's standards will steal customers from ASTM.  The court stated:  "It is plain to see how UpCodes' use of ASTM's Copyrighted Standards will affect the market for the standards.  If the Copyrighted Standards can be obtained for free from UpCodes, consumers will be less incentivized to purchase the standards from ASTM for a fee." *American Society for Testing and Materials v. UpCodes*, 2024 WL 4374117, at \*15 (E.D. Pa. Oct. 2, 2024) ("*ASTM*").  Inexplicably, however, the court later concluded that the market harm factor did *not* favor ASTM.  *Id.* at \*16; *see* ASTM.Br.35-44 (describing court's mistakes).

The district court reached that erroneous conclusion in part by extolling the "public benefits of free and easy access to the law."  *Id.* at \*15 (citation omitted). *But see* pp. 31-35, *infra* (explaining why ASTM's standards are not "law").  But "any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work," so "[t]hat does not alone render the infringement lawful."

*Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 195 (2d Cir. 2024) (citation omitted).  Indeed, the purported benefit of public access may ultimately undermine the Copyright Act's purpose of incentivizing creation:  if "authors and creators knew their original works could be copied and disseminated for free, there would be little motivation to produce new works."  *Id.*  So too here:  if UpCodes may copy ASTM's standards, ASTM will lose critical revenue it relies on to fund its robust standards development process—threatening ASTM's ability to continue to develop and refine its standards.

If UpCodes is allowed to continue posting SDOs' standards on its website, such harm will become more prevalent.  As discussed, courts have already recognized that UpCodes offers substitute, competing products for SDOs' standards. The more UpCodes expands its business, the more markets it will usurp from more SDOs.  And the consequences do not end there:  as SDOs' ability to continue developing and maintaining standards is threatened, so are the government's ability to rely on SDOs' standards, and the public's ability to realize the safety and efficiency benefits that the standards development system offers.

## II.    UPCODES' "INDIRECT REFERENCE" THEORY IS SWEEPING AND MERITLESS

UpCodes justifies its posting of SDOs' standards on the ground that it is a fair use to copy "the law."  *See, e.g.*, Defendants' Opposition to Preliminary Injunction, No. 2:24-cv-01895 (Aug. 20, 2024), Dkt. 81-3 at 21 ("ASTM is not likely to succeed

on the merits of its copyright claim because UpCodes' posting of the law is fair use."). Thus, *the* essential predicate of UpCodes' fair use argument in this case is that ASTM's standards are "the law" through "indirect reference." UpCodes has the burden of showing a likelihood of success on its fair use defense. ASTM.Br.25-26. UpCodes cannot do so because its "indirect reference" theory is spurious.

Again, UpCodes—and courts addressing lawsuits against UpCodes—have previously focused on the argument that when a governmental body IBR's a standard, *that standard* may fairly be copied by UpCodes. *See* p. 18-20, *supra*. That position is incorrect. And in this case, UpCodes asserts a dramatically expanded and even more meritless "indirect reference" theory: when a governmental body IBR's a standard, UpCodes may not only fairly copy that standard, it may also copy all standards *referenced within* that standard. *See* pp. 8, 20, *supra*.

In this case, for instance, the City of Philadelphia has IBR'd the 2018 edition of the International Building Code ("IBC"), which is a copyrighted work published by *amici* SDO ICC. *ASTM*, 2024 WL 4374117, at *5. In turn, the 2018 IBC references the ten ASTM standards at issue here. *Id.* at *4. UpCodes contends that it may copy those standards because they have been made "the law" by virtue of Philadelphia referencing the IBC, which in turn references the ASTM standards. UpCodes contends the ten ASTM standards are "the law" even though the Philadelphia Code itself makes *no reference* to those ASTM standards.

22

UpCodes' "indirect reference" theory is not only breathtakingly sweeping in its application, but also entirely meritless. This Court should reject it, and reverse the district court's order denying ASTM a preliminary injunction.

## A.    UpCodes' "Indirect Reference" Theory Would Result in a Single IBR Effectively Destroying Copyright for Hundreds of Standards.

The district court conceived of UpCodes' "indirect reference" theory as involving only "two layers of incorporation": Philadelphia references the IBC, and the IBC references the ASTM standards, so UpCodes may copy the ASTM standards. *ASTM*, 2024 WL 4374117, at *5. But UpCodes' theory is not so limited. IBR'd standards can contain references to many standards developed by SDOs, which can themselves reference many other standards—and so on and so on. UpCodes' theory contains no principle for stopping at the second level of reference. If ASTM's standards are "the law" and may be copied because they are referenced in the IBC, which Philadelphia IBR'd, then it should be equally true that any standard referenced in ASTM's standards is likewise "the law"—because it too ultimately traces back to the IBC.

With no limiting principle in sight, UpCodes' "indirect reference" theory would have far-reaching consequences. For example, the 2018 IBC contains references to 528 privately developed standards. And those 528 standards themselves contain similar references. NFPA 13, Standard for the Installation of Sprinkler Systems (2016), and NFPA 2001, Standard on Clean Agent Fire

23

Extinguishing Systems (2015), are both referenced in the IBC.  NFPA 13 contains references to 129 privately developed standards and other publications, and NFPA 2001 contains 53 internal references.  Thus, the upshot of UpCodes' theory is that a single reference to the IBC effectively eviscerated copyright protection not just for the IBC and the 528 internally referenced standards (including NFPA 13 and NFPA 2001), but also standards referenced in those 528 standards (including the dozens of standards referenced by NFPA 13 and NFPA 2001), and an untold number of other standards even farther down the line.

And the copyright-destroying effects of UpCodes' theory would not be limited to standards.  IBR'd standards can—and often do—contain references to copyrighted works other than standards.  For example, one of the NFPA standards referenced in the 2018 IBC contains a reference to the Eleventh Edition of Merriam-Webster's Collegiate Dictionary.  *See* NFPA 13, Standard for the Installation of Sprinkler Systems (2016).  Under UpCodes' theory, Philadelphia's reference to the IBR would suffice to allow UpCodes to copy the contents of the dictionary.

Moreover, UpCodes' theory is expansive not only because it sweeps in an ever-increasing number of standards, but also because UpCodes would treat *any* nested reference to a standard as sufficient to allow copying of the standard *in its entirety*—even if the reference is significantly qualified.  For example, the IBC explicitly states that other "standards . . . are part of this code *to the extent of the*

*reference to the standard*." 2018 IBC, Ch. 35 (emphasis added). The 2018 IBC contains a limited reference to ASTM B209-14, one of the standards that UpCodes has copied in full. The 2018 IBC provides that aluminum used for certain purposes "shall be naturally corrosion resistant or provided with corrosion resistance in accordance with" the ASTM standard. 2018 IBC, § 1507.4.3 & tbl. 1507.4.3(1). In other words, the 2018 IBC references ASTM's standard with respect to *corrosion resistance*. Thus, by the IBC's own terms, the portions of ASTM's standard regarding other topics—such as how aluminum should be packaged for transportation, ASTM B209-14, § 21—are not "part of" the IBC, and are thus not incorporated into the Philadelphia Code. Yet, even though that material cannot plausibly be called "the law," UpCodes still copies it.

UpCodes' "indirect reference" theory would also have troubling consequences beyond the U.S. standards development system. Standards IBR'd by governmental bodies in the United States sometimes contain references to standards developed by SDOs in other countries. *See, e.g.*, 2018 IBC, Ch. 35 (referencing standards by the European Committee for Standardization and the Underwriters Laboratories of Canada). Under UpCodes' theory, it could fairly copy the copyrighted works of foreign SDOs based on Philadelphia's single reference to the 2018 IBC. *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1078 (9th Cir. 2022) (under the Berne Convention, "foreign copyright holders are

subject to the same U.S. copyright law analysis as domestic copyright holders"). Copyright protection can be just as important to foreign SDOs' business models as it is to SDOs within the United States.[2] If UpCodes (and others in the United States) can fairly copy foreign SDOs' copyrighted works, that may imperil the ability of SDOs around the globe to develop standards—and correspondingly create disruptions in the "delicate field of international relations." *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957).

In short, the improper endorsement of UpCodes' "indirect reference" theory would jeopardize copyright protection for a massive number of works. If UpCodes' arguments were correct (which they are not) Philadelphia's IBR of the 2018 IBC would singlehandedly permit UpCodes (and potentially others) to copy hundreds if not thousands of works, including but by no means limited to privately developed standards. And of course, Philadelphia is not the only government that has IBR'd a standard that in turn references numerous other standards. *See, e.g.*, Metro Gov't of Nashville and Davidson Cnty., Tennessee Code of Ordinances § 16.08.010 (IBR'ing IBC). It is inconceivable that Philadelphia or any other governmental body intended for an IBR of a particular standard to affect the copyrights of so many other works.

---

[2] *See* Marie Gérardy, *The Use of Copyrighted Technical Standards in the Operationalisation of European Union Law*, 13 European J. Risk Reg. 532, 535 (2022) ("[C]opyright protection guarantees revenues for standard-setting organisations.").

*See* pp. 31-35, *infra*.  By contrast, it is not at all difficult to understand why UpCodes advances its "indirect reference" theory.  If a single reference makes copying of many more standards "fair," UpCodes can exponentially increase the number of standards it posts on its website—and thus increase the profits it makes from appropriating SDOs' work, all in furtherance of its $1 billion goal.  *See* p. 19, *supra*.

## B.    UpCodes' "Indirect Reference" Theory Is Wrong.

In addition to being extraordinarily expansive, UpCodes' contention that posting any standard that is internally referenced in an incorporated standard is fair use is also untenable on the merits.  UpCodes' "indirect reference" theory is essentially a *per se* rule:  any internally referenced standard may fairly be copied.  This approach is irreconcilable with the case-by-case approach mandated by the fair use doctrine.  And the problems do not end there.  UpCodes' theory also fails on the facts, as this case exemplifies.

### 1.    UpCodes' *Per Se* Theory Is Inconsistent With the Case-By-Case Approach of the Fair Use Defense.

UpCodes' "indirect reference" theory—that a single IBR permits it to copy hundreds of standards—fails out of the starting gate as being flatly incompatible with the case-specific nature of the fair use defense.  "The fair use doctrine 'permits courts to avoid rigid application of the copyright statute when, *on occasion*, it would stifle the very creativity which that law is designed to foster.'"  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527 (2023) (emphasis added)

(citation omitted). To determine the particular occasions on which a defendant should not be liable for infringement, the Copyright Act "calls for a case-by-case analysis" of whether a use is fair under the four fair use factors. *Campbell*, 510 U.S. at 577.

Courts have applied the factors in a case-specific manner when assessing whether copying of IBR'd standards is a fair use. *See, e.g.*, *American Society for Testing and Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018) (explaining that "each case raising" the fair use "question must be decided on its own facts" (citation omitted)); *NFPA*, No. 2:21-cv-05262, Dkt. 230-1 at 22 (recognizing that application of fair use "may well vary depending on context" (citation omitted)). In a case before the D.C. Circuit, for example, the court found significant the fact that the copier of IBR'd standards was a non-profit. *American Society for Testing and Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1267 (D.C. Cir. 2023). The court further differentiated between types of IBR'd material. It explained that some portions of IBR'd standards are "essential to comprehending legal duties," while other portions do "not directly prescribe necessary or sufficient conditions for complying with a legal duty," such as "introductory or background material" contained in standards. *Id.* at 1269. The court explained that the particular type of material that is copied "might be dispositive" when "assessing the fair-use defense of a for-profit firm that charges customers for copies of incorporated

standards"—which is a precise description of UpCodes. *Id.* at 1270. The D.C. Circuit's fair use analysis also included a record-specific evaluation of the market harm evidence produced by the parties. *See id.* at 1271-72.

UpCodes' "indirect reference" theory would discard this case-by-case approach and "effectively destroy any expectation of copyright protection" in any referenced standard that can be linked back to an IBR'd standard. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 557 (1985). Although UpCodes superficially marches through the fair use factors, its reasoning makes plain that there can only be one result for every single internally referenced standard: copying is fair. To start, it is telling that UpCodes finds it unnecessary to examine the particulars of the way a standard is internally referenced. It does not matter to UpCodes, for instance, if only part of the standard is referenced. *All* internally referenced standards are fair game for copying in their entirety under UpCodes' theory. *See* pp. 24-25, *supra*. It is likewise telling that it does not matter who copies the referenced standard; even with a for-profit copier (UpCodes), copying is always permissible. Nor does UpCodes see a need to evaluate specific evidence of market harm; in UpCodes' words, there can never be "cognizable market harm from UpCodes' use of the law as the law." Defendants' Opposition to Preliminary Injunction, No. 2:24-cv-01895 (Aug. 20, 2024), Dkt. 81-3 at 29 (emphasis omitted). Ultimately, under UpCodes' theory, all that matters is that the IBR'd standard and

all standards referenced therein (and so on) are "the law"; as a result, UpCodes and anybody else may fairly copy each and every one of those standards. That brightline approach is irreconcilable with the context-specific nature of the fair use defense.

The case-by-case approach of fair use derives from the purposes of the Copyright Act. Because fair use is "a *context-based* check that can help to keep a copyright monopoly within its lawful bounds," it enables courts to distinguish between cases where there is a "legitimate need to provide incentives to produce copyrighted material," and cases where copyright protection "creates unrelated or illegitimate harms in other markets or to the development of other products." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22 (2021) (emphasis added). In short, courts can decide in a particular case "whether copyright law's goal of promoting creativity would be better served by allowing the use" or "preventing it." *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 325 (5th Cir. 2022). If, however, standards were *per se* "accord[ed] lesser rights" by virtue of being internally referenced in an IBR'd standard, the end result would likely be "injur[y]" to "author and public alike." *Harper & Row*, 471 U.S. at 559. After all, "[i]f every volume that was in the public interest could be pirated away by a competing publisher, . . . the public [soon] would have nothing worth reading." *Id.* (citation omitted). If all internally referenced standards may be copied, there could one day be no voluntary consensus standards to speak of.

**2.    Examining the Specific Facts of This Case Highlights the Erroneous Nature of UpCodes' "Indirect Reference" Theory.**

Even if there were any merit to UpCodes' "indirect reference" theory under applicable legal principles (there is not), that theory plainly fails on the facts—as this case illustrates.  Again, UpCodes' theory here is that Philadelphia IBR's the IBC, which in turn references the ASTM standards—so the ASTM standards are "the law," which UpCodes may fairly copy.  *See ASTM*, 2024 WL 4374117, at *4-5.  UpCodes' logical leap to the conclusion that ASTM's standards are "the law" is baseless.

Consistent with longstanding IBR practice, the Philadelphia Code's IBR of the IBC does *not* make ASTM's standards "the law."  *See* pp. 16-17, *supra* (discussing federal agencies' view of IBR).  Like many other governments, the Philadelphia Code uses IBR'ing language that makes plain that only the named standard—and not any standards internally referenced in it—is incorporated.  The Philadelphia Code provides that "[t]he codes and standards *referenced* in any of the technical codes"—including the Building Code—"shall be considered part of the requirements of such code *to the prescribed extent of each such reference*." Philadelphia Code, Ch. 4, A-102.3 (emphases added); *see id.* A-101.3 (defining "technical codes" to include the Building Code).  In turn, the Building Code references the 2018 IBC but does not reference the ASTM standards at issue here.

31

*See id.* B-1.2 (providing that the 2018 IBC "is incorporated").  Thus, under the

Philadelphia Code, the 2018 IBC—but *not* the ASTM standards—are "considered

part of [the Code's] requirements." *Id.* A-102.3.  The fact that "copies" of the 2018

IBC "are on file with the Department of Licenses and Inspections," but there is no

similar provision for ASTM standards, provides further confirmation that the latter

are not part of the Code's requirements.  *Id.* B-1.2.  If they were, then presumably

the Philadelphia Code would provide for access to them, just as it does for the 2018

IBC.[3]

    Instead of being "the law" of Philadelphia, ASTM's standards are best

understood as providing non-enforceable guidance to regulated parties.  *Cf.* NRC,

Regulatory Guide 1.205, Revision 2, *supra*, at 6 ("If the secondary reference has"

not been IBR'd, "licensees and applicants may consider and use the information in

the secondary reference, if appropriately justified, consistent with current regulatory

practice, and consistent with applicable NRC requirements").  In other words, from

Philadelphia's vantage point, the internal references to ASTM standards in the 2018

IBC give parties recommendations that they may choose whether to follow.[4]

---

[3] It is also noteworthy that the Philadelphia Code references *other* ASTM standards, *see* Philadelphia Code, Ch. 7, § P-702.1 & tbl. 702.1, but nowhere references the ASTM standards at issue in this case.

[4] The 2018 IBC states that internally referenced standards "are part of this code to the extent of the reference of the standard."  2018 IBC, Ch. 35.  Thus, a party may have to comply with an internally referenced standard (to the extent of its reference

The district court's contrary conclusion that ASTM's standards have "legal effect" is based on paper-thin reasoning. *ASTM*, 2024 WL 4374117, at *17. The court found significant that the Philadelphia Code provides that the IBC "is incorporated *as if fully set forth herein*," and the IBC then references the ASTM standards. *Id.* B-1.2 (emphasis added); *see ASTM*, 2024 WL 4374117, at *17 (discussing this language). This completely misses the point. The Philadelphia Code has made the IBC part of its requirements by providing that it is "as if" *the IBC* "is fully set forth herein"; the Code nowhere states that *the ASTM standards* referenced in the IBC should likewise be viewed "as if" they are "fully set forth herein." It is therefore not possible to think of the contents of the ASTM standards as effectively being part of the text of the Philadelphia Code, or as UpCodes puts it, "the law."

UpCodes has little to add to this. It merely asserts, *ipse dixit*, that Philadelphia enforces ASTM's standards—but it provides no real-life example of Philadelphia actually attempting to fine anyone for violating the standards. Defendants' Opposition to Preliminary Injunction, No. 2:24-cv-01895 (Aug. 20, 2024), Dkt. 81-3 at 14, 19.

---

in the 2018 IBC) to accurately represent it is in full compliance *with the 2018 IBC*. But a party does not have to comply with that standard to comply with Philadelphia "law."

There are strong policy reasons why internally referenced standards should not be deemed "the law." If internal references imposed binding obligations, "[i]t is conceivable that one researching" their obligations "might be referred throughout" a series of materials "ad infinitum." *General Elec. Co. v. Brenner*, 407 F.2d 1258, 1263 (D.C. Cir. 1968). And that could raise concerns about parties being bound by obligations that they lacked sufficient notice of. *Cf. Hudspeth v. Melville*, 127 F.2d 373, 378 (10th Cir. 1941) (Huxman, J., dissenting) (explaining it would be a problem if state law were implicitly incorporated into federal law, as "[o]ne would never know what constituted an offense against the government until he had searched not only the federal statutes but also those of the forty-eight states of the Union").

It is ironic that UpCodes—which prides itself on providing access to "the law"—takes a position that could ultimately make it significantly harder for regulated parties to ascertain their legal obligations. That underscores that UpCodes' purpose in copying SDOs' standards has nothing to do with "the law" and everything to do with profiting off the works that SDOs but not UpCodes have spent time, effort, and resources developing. *See NFPA*, No. 2:21-cv-05262, Dkt. 230-1 at 31-32 (rejecting UpCodes' argument that its purpose in copying standards is to provide access to the law, and that UpCodes' purpose is the "same . . . as NFPA's—namely,

34

to provide access to the text of NFPA's standards for AEC companies and professionals who use those standards for various reasons in their jobs").[5]

## CONCLUSION

For the foregoing reasons and those stated in the brief of ASTM, the district court's order denying ASTM's motion for a preliminary injunction should be reversed.

---

[5] If the Court analyzes each of the four fair use factors in this case—instead of rejecting UpCodes' fair use defense on the ground that its predicate "indirect reference" theory fails—it should still conclude that UpCodes has failed to show a likelihood of success on the merits.  As just discussed, UpCodes cannot show that its purpose is the transformative one of posting "the law" (factor one).  Nor can UpCodes show that its use of ASTM's standards is non-commercial (factor one).  *See* pp. 18-19, *supra*.  UpCodes also has not shown that the market harm factor (factor four) favors it.  *See* pp. 18-21, *supra*.

Dated: January 28, 2025

Respectfully submitted,

/s/ *Rachel G. Miller-Ziegler*

Kelly M. Klaus
  CA Bar No. 161091
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
Kelly.Klaus@mto.com

Rose Leda Ehler
  CA Bar No. 296523
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Rose.Ehler@mto.com

  Rachel G. Miller-Ziegler
    DC Bar No. 229956
  Andra Lim
    DC Bar No. 90012326
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
  Suite 500E
Washington, DC 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Andra.Lim@mto.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Third Circuit Rule 29.1(b), this document contains 6,494 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 29(a)(4) and Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 29(a)(4) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman.

Dated: January 28, 2025                    /s/ *Rachel G. Miller-Ziegler*
                                           Rachel G. Miller-Ziegler

## CERTIFICATE OF BAR MEMBERSHIP

In accordance with Third Circuit Rule 28.3(d), I hereby certify that I, Rachel

G. Miller-Ziegler, counsel for *amici curiae*, am a member of the Bar of this Court.

Dated: January 28, 2025                     /s/ *Rachel G. Miller-Ziegler*
                                            Rachel G. Miller-Ziegler

## LOCAL RULE 31.1(C) CERTIFICATIONS

In accordance with Third Circuit Rule 31.1(c), I certify that the electronic file of this brief has been scanned for viruses with the most recent version of a commercial virus scanning program, Netskope v.120.1.7.2216 and Forcepoint DLP Endpoint, and according to the program is free of viruses.

The text of the paper copies that *amici* will submit is identical to the text of the electronic brief.

Dated: January 28, 2025                        /s/ *Rachel G. Miller-Ziegler*
                                                         Rachel G. Miller-Ziegler

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2025, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: January 28, 2025                     /s/ *Rachel G. Miller-Ziegler*
                                            Rachel G. Miller-Ziegler