Case No. 24-2965

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

AMERICAN SOCIETY FOR TESTING AND MATERIALS, d/b/a ASTM INTERNATIONAL
*Plaintiff-Appellant*

v.

UPCODES, INC., GARRETT REYNOLDS, AND SCOTT REYNOLDS
*Defendants-Appellees*

---

Appeal from the United States District Court
for the Eastern District of Pennsylvania
Honorable Anita B. Brody, No. 2:24-cv-01895

---

## CONFIDENTIAL APPELLANT'S BRIEF
## (FILED UNDER SEAL)

---

Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700
stanley.panikowski@us.dlapiper.com

Gabrielle C. Velkes
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 335-4500
gabrielle.velkes@us.dlapiper.com

J. Kevin Fee
Jane W. Wise
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com
jane.wise@us.dlapiper.com

*Counsel for Appellant*

JANUARY 21, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, American Society for

Testing and Materials makes the following disclosure:

1. For non-governmental corporate parties please list all parent corporations:

None.

2. For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None.

3. If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.

4. In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.


Dated: January 21, 2025          /s/ J. Kevin Fee
                                 J. Kevin Fee
                                 DLA PIPER LLP (US)
                                 500 8th Street NW
                                 Washington, DC 20004
                                 Tel: (202) 799-4000
                                 kevin.fee@us.dlapiper.com


i

# TABLE OF CONTENTS

                                                                                              **Page**

I.  INTRODUCTION ...................................................................................1

II.  JURISDICTIONAL STATEMENT ................................................6

III.  STATEMENT OF RELATED CASES OR PROCEEDINGS .......................6

IV.  STATEMENT OF THE ISSUES ...............................................7

V.  STANDARD OF REVIEW ..........................................................7

VI.  STATEMENT OF THE CASE .....................................................8

    A.  ASTM And Its Copyrighted Standards ...............................8

        1.  The Public Benefit of Standardization .......................8

        2.  ASTM's Creation of Standards Depends on Robust
            Copyright Protection. ...............................................10

        3.  IBR Reflects a Public-Private Partnership that Respects
            Copyright Protection and Enables Governments to
            Benefit from SDOs' Technical Expertise. ................13

    B.  UpCodes' Infringement of ASTM's Works.......................18

        1.  UpCodes' For-Profit Serial Infringement of SDOs'
            Copyrights Will Ultimately Undermine Public Safety. ............18

        2.  UpCodes Commercially Exploits ASTM's Copyrighted
            Works. ......................................................................20

            a.  *UpCodes Uses Copies of ASTM's Standards in its*
                *Paid-for Premium Subscription Services.* .....................20

            b.  *UpCodes Commercially Exploits ASTM's*
                *Standards to Drive Traffic to Its Website and*
                *Upsell Its Paid-for Subscription Service.* .....................21

            c.  *UpCodes' Commercial Offerings Directly*
                *Compete with ASTM's Offerings and Threaten*
                *Significant Harm to ASTM.* ...........................................21

VII.  SUMMARY OF THE ARGUMENT ..............................................22

VIII.  ARGUMENT.........................................................................24

A.  UpCodes Bears the Burden of Proof on the Affirmative Defense of Fair Use When Opposing ASTM's Motion for a Preliminary Injunction..............................................................................25

B.  UpCodes is Not Likely to Succeed on Its Fair Use Defense. .............26

    1.  Factor 1: Purpose and Character of the Use ............................26

        *a.*  *UpCodes' Use is Commercial.* .......................................26

        *b.*  *UpCodes' Use is Not Transformative.*............................*30*

C.  Factor 4: Effect of the Use on the Market for the Copyrighted Work ..............................................................................................35

    1.  The District Court Erred by Ruling that Factor Four Does Not Weigh Against Fair Use....................................................35

    2.  UpCodes' Substitutional Use of ASTM's Standards Will Adversely Impact the Market....................................................36

    3.  The Public Does Not Benefit from UpCodes' Use in the Long-Term. ............................................................................42

D.  Factor 3: Amount and Substantiality of the Use ................................44

    1.  The District Court Erred in Ruling That Factor Three Weighs in Favor of Fair Use....................................................44

E.  Factor 2: Nature of the Copyrighted Work .......................................46

    1.  The District Court's Fair Use Decision Should be Reversed Even if Factor Two Weighs in Favor of Fair Use................................................................................................46

IX.  CONCLUSION............................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Soc'y of Cinematographers v. Schatz*,
No. 2:20-cv-08607-ODW-JC, 2021 WL 4352302 (C.D. Cal. May
25, 2021) ................................................................................................28

*Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*,
No. 13-CV-1215 (TSC), 2017 WL 473822 (D.D.C. Feb. 2, 2017)...................42

*Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018).............................................................46

*Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021)  .............................................25, 26, 36, 40

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)......................................................................*passim*

*August Image, LLC v. AllWrite Commc'ns Inc.*,
No. 1:23-CV-00910-SEG, 2024 WL 4505000 (N.D. Ga. Sept. 10, 2024) ........29

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ...............................................................30

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ...............................................36, 46, 47

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*,
297 F. Supp. 3d 339 (S.D.N.Y. 2017) ..............................................28

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).......................................................................*passim*

*Del. Strong Families v. Att'y Gen. of Del.*,
793 F.3d 304 (3d Cir. 2015) ...............................................................7

*Facility Guidelines Inst., Inc. v. UpCodes, Inc.*,
677 F. Supp. 3d 955 (E.D. Mo. 2023) ...............................................37

iv

*Gonzales v. O Centro Espirita Beneficente Uniao*
  *do Vegetal*, 546 U.S. 418 (2006) ................................................................25, 26

*Google LLC v. Oracle Am., Inc.*,
  593 U.S. 1 (2021)................................................................8, 25, 36, 44

*Greater Phila. Chamber of Com. v. City of Phila.*,
  949 F.3d 116 (3d Cir. 2020) ........................................................25, 26

*Hachette Book Grp., Inc. v. Internet Archive*,
  115 F.4th 163 (2d Cir. 2024) ....................................................*passim*

*Hall v. United States*,
  566 U.S. 506 (2012)........................................................................13

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)..................................................................*passim*

*Infinity Broadcast Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) ..........................................................32

*Int'l Code Council, Inc. v. UpCodes, Inc.*,
  No. 17 CIV. 6261 (VM), 2020 WL 2750636 (S.D.N.Y. May 27, 2020) ...........37

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ..............................................................7

*N. Jersey Media Grp. Inc. v. Pirro*,
  74 F. Supp. 3d 605 (S.D.N.Y. 2015) ................................................41

*Nat'l Fire Protection Assn., Inc. v. UpCodes, Inc.*,
  No. 2:21-cv-05262-SPG-E, Dkt. 230-1 (C.D. Cal. August 23, 2024) ........*passim*

*Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*,
  931 F.3d 215 (3d Cir. 2019) ..............................................................7

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)..................................................................25, 45

*United States v. Paramount Pictures*,
  334 U.S. 131 (1948)........................................................................47

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2003) ...........................................24, 25, 27, 30

**Statutes**

5 U.S.C. § 552 ...........................................................................13, 16

15 U.S.C. § 272 ................................................................................14

17 U.S.C. § 101 ...........................................................................31, 32

17 U.S.C. § 106 ................................................................................31

17 U.S.C. § 107 .........................................................................24, 25, 44

17 U.S.C. § 410(c) .............................................................................8

17 U.S.C. § 501 .................................................................................6

28 U.S.C. § 1292 ...............................................................................6

28 U.S.C. § 1331 ...............................................................................6

28 U.S.C. § 1338(a) ...........................................................................6

Pennsylvania Construction Code Act of Nov. 10, 1999, P.L. 491, No.
45 § 102.....................................................................................14

Public Law 102-245 .........................................................................14

**Other Authorities**

1 C.F.R. § 51.1 ................................................................................16

40 C.F.R. § 75.6(a)(6) ........................................................................9

79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014) ...........................................18

Administrative Conf. of the United States, 44 Fed. Reg. 1357, 1357
(Jan. 5, 1979).............................................................................15

Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63
U. KANSAS L.R. 279, 286 n.33 (2015)................................................15

Federal Participation in the Development and Use of Voluntary
    Standards, 47 Fed. Reg. 49,496 (Nov. 1, 1982) ..................................................15

H.R. Rep. No. 94-1476 (1976)...................................................................................18

Incorporation by Reference, 78 Fed. Reg. 60,784, 60,787 (Oct. 2,
    2013) (notice of proposed rulemaking) ..............................................................17

National Research Council, *Standards, Conformity Assessment, and
    Trade Into the 21st Century* (National Academy Press 1995),
    *available at* http://www.nap.edu/read/4921/chapter/1 ......................................14

OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT, *Revised
    OMB Circular No. A-119*, 81 FR 4673 (Jan. 27, 2016), *available at*
    2016 WL 7664625 ("*Revised OMB Circular A-119*") .................................15, 16

Brief for United States as Amicus Curiae, *Practice Mgmt. Info. Corp.
    v. Am. Medical Ass'n*, No. 97-1254 (1997).........................................................11

Brief for United States as Amicus Curiae, *S. Bldg. Code Cong. Int'l,
    Inc. v. Veeck*, No. 02-355 (U.S. May 2003) ......................................................13

Brief for Respondent Consumer Product Safety Commission, *Milice v.
    Consumer Product Safety Commission*, No. 21-1071, 2020 WL
    8641276 (D.C. Cir. July 2020) ..........................................................................15

Brief for Respondent Federal Communication Commission,
    *Public.Resource.Org, Inc., v. Federal Communications
    Commission*, No. 23-1311, 2024 WL 2154179 (D.C. Cir. May 13,
    2024) ...................................................................................................................11

## I.    INTRODUCTION

Copyright fair use is an affirmative defense that shields an otherwise would-be infringer from liability "'when, *on occasion*, it would stifle the very creativity which [copyright] law is designed to foster.'"  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527 (2023) (emphasis added) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  While copyright fair use "requires a case-by-case determination whether a particular use is fair," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549 (1985), it "has always precluded a use that 'supersede[s] the use of the original.'"  *Id.* at 550.

In the present case, even though the district court concluded that Defendants' copies were "an effective substitute" for the copyrighted standards, JA35, it nevertheless held that Defendants were likely to succeed on their fair use defense.  This Court should reverse that decision and reaffirm the longstanding Supreme Court precedent that copying that supersedes and effectively substitutes for the original work is not fair, especially when the copying is done for commercial purposes to directly compete with the copyright owner.

Defendant-Appellee UpCodes, Inc., and its owners, Garrett Reynolds and Scott Reynolds (collectively, "UpCodes"), built a for-profit enterprise by commercially exploiting copyrighted works created by numerous non-profit standards development organizations ("SDOs").

1

Plaintiff-Appellant American Society for Testing and Materials d/b/a ASTM International ("ASTM") is a non-profit organization that dedicates significant resources to the creation of copyrighted standards that are used to improve product quality, enhance health and safety, and build consumer confidence. ASTM moved for a preliminary injunction when it learned UpCodes started posting ASTM's copyrighted works on its commercial web service. JA261-64.

UpCodes' copies of ASTM's works unfairly compete with ASTM and rob ASTM of its primary sources of revenue—the sale and licensing of its copyrighted works. This type of infringement jeopardizes ASTM's ability to continue creating and updating standards and more broadly threatens to eradicate the entire SDO ecosystem.

UpCodes scans and posts copies of copyrighted works developed by many SDOs, including ASTM, and sells subscriptions that give its customers access to its copies of these copyrighted works. In addition, UpCodes "provide[s] the [standards] online for free to drive SEO [search engine optimization] and work to convert the visitors onto a premium tier." *Nat'l Fire Protection Assn., Inc. v. UpCodes, Inc.*, No. 2:21-cv-05262-SPG-E, Dkt. 230-1 (C.D. Cal. August 23, 2024) ("*NFPA*") (JA2517 n.19) (quoting UpCodes' co-founder). This business model, known as a freemium model, allows "users [] to use a basic product or service for free, but [they] must pay for a premium version with additional features." JA894-97. UpCodes

2

attracts all users (whether paid or free) by providing access to the copyrighted works of SDOs, including ASTM. Even UpCodes admits that its use of third parties' copyrighted works "redounds to its commercial benefit." *NFPA*, JA2517.

Initially, UpCodes copied only standards that had been incorporated by reference ("IBR'd") in a statute or regulation, including standards from various other SDOs such as International Code Council, Inc. ("ICC"), National Fire Protection Association, Inc. ("NFPA"), and Facility Guidelines Institute, Inc. ("FGI"). JA348-69. UpCodes sought to excuse its conduct by arguing that SDOs' standards may be freely copied when any governmental entity IBRs any standard in statute or regulation. JA44. UpCodes now claims that it may also freely copy any standard *referenced* in an IBR'd third-party standard (a "third party reference" or "TPR"). JA6.

The district court correctly found that ASTM had established a *prima facie* case of copyright infringement because (1) ASTM owns valid and protectable copyrights in the ten copyrighted works at issue ("Works"), JA15, and (2) UpCodes copied original elements of each of ASTM's Works without authorization. JA15-16. Nevertheless, the district court ruled that "ASTM was unlikely to succeed on the merits" of its copyright claim because, as detailed below, the district court incorrectly concluded that "UpCodes' copying satisfies the affirmative defense of fair use." JA41.

3

In reaching this conclusion, the district court committed reversable errors that, once corrected, compel a finding that UpCodes cannot meet its burden of proving that it is likely to succeed on its fair use affirmative defense.  On the first fair use factor, the purpose and character of the defendant's use, courts consider two factors—whether the defendant's use is (1) commercial and (2) transformative.  The district court erred as a matter of law by ruling that UpCodes' use was non-commercial because UpCodes is a for-profit enterprise that copied ASTM's Works to sell competing subscription services and otherwise leverage the Works for its commercial benefit.  The district court also erred as a matter of law in ruling that UpCodes' copying was transformative.  In this analysis, the "central question" is whether the defendant's use "'supersede[s] the objects' of the original" and thus serves as a substitute—"copyright's bête noire." *Warhol II,* 598 U.S. at 528 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  When the defendant's use of the work will "substitute for" or "supplan[t]" the original work, the first factor cuts against fair use.  *Warhol II*, 598 U.S. at 528, 531-33.  Here, the district court acknowledged that UpCodes' use of the Works is an "effective substitute" for ASTM's Works.  JA35.  In such a circumstance, binding Supreme Court precedent compels a finding that UpCodes' copies are not transformative.

On the fourth and most important factor (the effect of the use on the market for the copyrighted work), the district court found it "is plain to see" how UpCodes'

use will "affect the market for the standards. If the [Works] can be obtained for free from UpCodes, consumers will be less incentivized to purchase the standards from ASTM for a fee." JA34-35. Despite its finding of "plain to see" market harm, the district court held that "the fourth factor does not significantly tip the balance one way or the other." JA34. The district court cited no evidence to support this ruling. Instead, the district court relied on unsupported supposition that "ASTM may have other incentives to continue developing technical standards even if some of its standards lose their copyright protection after being enacted into law." JA35. In doing so, the district court presumed facts without evidentiary support and disregarded UpCodes' burden to show that its use would not harm ASTM's market for its works. JA35. Because the district court correctly found that UpCodes' copies are likely to adversely impact the market and value of ASTM's copyrighted works, it should have concluded that the fourth and most important fair use factor weighs against UpCodes. These errors alone compel reversal.

The district court's errors on the third fair use factor—the amount and substantiality of the copyrighted work used by the infringer—further confirm the need for reversal. Here, UpCodes took the entirety of each work for a commercially competitive, non-transformative, and substitutional purpose. And even assuming the district court correctly weighed the second factor (the nature of the copyrighted work) in favor of fair use, it rarely plays a significant role in fair use determinations

5

and cannot overcome of the other three factors here.  As a result, the Court should reverse the district court's fair use decision, find that ASTM is likely to succeed on the merits of its copyright claim, and remand for a determination on the remaining preliminary injunction factors.

## II.  JURISDICTIONAL STATEMENT

The district court had jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331 and 1338(a) because this case involves claims of copyright infringement in violation of 17 U.S.C. § 501.  On October 2, 2024, the district court issued an order and opinion denying Plaintiff's motion for a preliminary injunction.  JA261-64; JA1-52.  Plaintiff filed a timely notice of appeal on October 21, 2024.  JA52-54.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court denied Plaintiff's motion for injunctive relief.  JA51.

## III.  STATEMENT OF RELATED CASES OR PROCEEDINGS

This case has not been before this Court previously.

There are two related cases currently pending in district courts outside this Circuit: (1) *International Code Council v. UpCodes, Inc.*, 1:17-cv-6261 (S.D.N.Y.); and (2) *National Fire Protection Association, Inc. v. UpCodes, Inc.*, 2:21-cv-05262-SPG-E (C.D. Cal.).  There is a completed case outside this Circuit: *Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, No. 4:22-cv-01308-AGF (E.D. Mo.).

## IV.    STATEMENT OF THE ISSUES

Whether the district court erred in denying a preliminary injunction based on its ruling that UpCodes' copying satisfies the fair use affirmative defense to ASTM's copyright claims.  (JA41; JA2068 at JA2093-99; JA2356 at JA2379-86; JA2555-66).

## V.    STANDARD OF REVIEW

On appeal of the denial of a preliminary injunction, the Court employs a tripartite standard of review: "findings of fact are reviewed for clear error, legal conclusions are reviewed *de novo*, and the decision to grant or deny an injunction is reviewed for abuse of discretion."  *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015); *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 218 (3d Cir. 2019).  "[A]ny determination that is a prerequisite to the issuance of an injunction ... is reviewed according to the standard applicable to that particular determination."  *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004) (internal citations omitted).

"Fair use is a mixed question of law and fact."  *Harper & Row*, 471 U.S. at 560.  The "reviewing court should try to break such a question into its separate factual and legal parts, reviewing each according to the appropriate legal standard. But when a question can be reduced no further, we have added that 'the standard of review for a mixed question all depends—on whether answering it entails primarily

7

legal or factual work.'" *Google LLC v. Oracle Am., Inc.,* 593 U.S. 1, 24 (2021)

(quoting *U.S. Bank Nat. Ass'n v. Vill. at Lakeridge, LLC,* 583 U.S. 387, 396 (2018)).

## VI. STATEMENT OF THE CASE

### A. ASTM And Its Copyrighted Standards

#### 1. The Public Benefit of Standardization

ASTM is a West Conshohocken-based non-profit organization founded in

1898, JA270 ¶ 6, that has become a globally recognized leader in the development

of standards. JA270 ¶ 7. Standards are publications that contain product

specifications, installation methods, methods for manufacturing or testing materials,

recommended practices to promote safety or efficiency, or other guidelines or best

practices. They are developed by private organizations called "standards

development organizations" or "SDOs" that have technical expertise in the relevant

area. JA269-70 ¶ 5. ASTM's standards address highly technical topics, including

test methods (a procedure that produces a test result) or specifications (an explicit

set of requirements to be satisfied by a material, product, system, or service).

JA269-70 ¶ 5; JA1082 at iv. Although standards cover technical subject matter, the

expression in them is protected by copyright. *See* JA15-16 (finding that the

copyrights are presumed valid for each of the Works) (citing 17 U.S.C. § 410(c)).

To date, ASTM has developed almost 13,000 ASTM standards setting forth

specifications and methods of testing for a variety of materials, products, systems,

and services that bolster safety and performance across industries. JA270 ¶ 9.

ASTM standards are used in a wide range of fields, including construction, iron and steel products, consumer products, and more. JA270 ¶ 10. ASTM's standards provide significant benefits to the public by positively impacting public health, safety and overall quality of life. *See* JA270 ¶ 8. ASTM's standards are used by professionals and specialists, including manufacturers, trades people, engineers, and architects. JA278 ¶ 50.

In addition, legislatures and administrative agencies frequently incorporate ASTM standards by reference in statutes and regulations. For example, ASTM's standard ASTM D1072 (2006) *Standard Test Method for Total Sulfur in Fuel Gases* has been IBR'd by the federal government. *See* 40 C.F.R. § 75.6(a)(6). Although some of ASTM's works are IBR'd by the federal government, the evidence in this case suggests that none of the standards at issue have been IBR'd by any federal, state, or local legislature or administrative agency, JA279 ¶ 54.

In other instances, a jurisdiction may IBR another SDO's work that in turn references an ASTM standard, *i.e.,* a "third-party reference" or "TPR." JA279 ¶ 52; *compare* JA2536 *with* JA2537. For example, Pennsylvania IBRs the *2018 International Building Code* ("*IBC*"), a copyrighted work published by another SDO, ICC. JA279 ¶ 52. The text of the *2018 IBC* refers to certain ASTM standards, including the Works. *See, e.g.*, JA346 at 1810.3.2.3 ("Structural steel H-piles and structural steel sheet piling shall conform to the material requirements in ASTM A6.

9

Steel pipe piles shall conform to the material requirements in A252.  Fully welded

steel piles shall be fabricated from plates that conform to the material requirements

in ASTM A36, ASTM A283, ASTM A588 or ASTM A690.").  The *2018 IBC* alone

refers to hundreds of ASTM standards.  *See* JA971-1034.

ASTM has no control over whether Pennsylvania or ICC refers to ASTM's

standards.  *See* JA279 ¶ 52.  ASTM does not lobby or otherwise influence local,

state, and federal jurisdictions nor other SDOs to reference its standards.  JA279 ¶

53. Rather, for a variety of reasons, jurisdictions and other SDOs reference ASTM's

high-quality standards on their own.  JA279 ¶ 53.

## 2.    ASTM's Creation of Standards Depends on Robust Copyright Protection.

ASTM incurs substantial costs to develop its standards and maintain its

standards development infrastructure and delivery platforms, including the resources

necessary for collaboration, Technical Committee meetings, balloting, editorial,

production, distribution, and promotion of the ASTM standards.  JA276 ¶ 41;

JA967-68 131:6-132:8.  In addition to the time and expertise of ASTM's members

who participate in the standards development process, ASTM expends substantial

resources on administrative, technical, and other necessary support such as salary

and benefits for staff, office space, meeting facilities, outreach and education efforts,

and information technology, among other things.  JA276-77 ¶ 42.

To fund the costs incurred for the development of ASTM standards, ASTM uses revenue from the sale and licensing of its copyrighted standards to persons and companies who use the standards in their professional work, such as architects, engineers, and construction professionals. JA277 ¶ 43. ASTM makes its standards available to the public through its website at a reasonable cost, typically between $55 and $127, depending on the length of the standard. JA1514 (showing price range of individual standards); JA1519-50 (showing the price of the Works); *accord* JA1206, Brief for United States as Amicus Curiae at 8, *Practice Mgmt. Info. Corp. v. Am. Medical Ass'n*, No. 97-1254 (1997) (Solicitor General arguing that there is no suggestion that copyright protection interfered with reasonable access to an IBR'd work when it was available for purchase for $40-50 per copy in 1998); Brief for Respondent Federal Communication Commission, *Public.Resource.Org, Inc., v. Federal Communications Commission*, No. 23-1311, 2024 WL 2154179 at *40 (D.C. Cir. May 13, 2024) ("'reasonably available' ... requires something less than unrestricted, free access to incorporated materials."). In addition, ASTM membership only costs $115 per year, and one of the benefits of membership is access to a free volume of ASTM's Annual Book of Standards, JA1511; JA1549, which typically includes around 100 standards. JA1487-90. Organizational memberships, such as those purchased by companies, are $400 per year. JA1511. Students may become members for free. JA1511.

11

ASTM also makes its standards available through a subscription model. Dkt. JA277 ¶ 45. For example, ASTM Compass is a subscription platform that provides access to ASTM standards along with productivity tools for sharing, version comparison, and annotation. JA277 ¶¶ 45-46, JA315. ASTM also provides specialized subscription packages targeted at particular audiences. For example, ASTM offers "ASTM Standards in Building Codes," a subscription targeted at the building construction industry, that offers a collection of over 2,300 standards from ASTM and other SDOs referenced in various building codes. JA1465; JA1692-743. ASTM also offers subscriptions through its third-party licensees, who pay ASTM for the right to include ASTM's standards in their subscriptions. JA280 ¶¶ 57, 59; JA1689-90 ¶¶ 10-11; JA1552-53 (showing one of the Works available through an ASTM licensee, Accuris).

Sales and licensing of ASTM's standards account for about 70% of ASTM's total revenue. JA277 ¶ 44. In 2023 alone, ASTM's subscription revenue totaled nearly ███████. JA1688-89 ¶ 5, JA2410. ASTM also received over ██████ in subscription revenues from publishing "ASTM Standards in Building Codes," a bundle of standards that includes the Works (and all of the other ASTM standards that UpCodes appears ready to post online if not enjoined). JA2413, JA386; JA1692-743 (showing that all the Works and all ASTM standards shown as pending

12

on UpCodes' website are included in ASTM Standards in Building Codes subscription).

The revenue ASTM generates through the sale and licensing of its copyrighted works allows ASTM to continue to fund the development of its high-quality standards. JA277 ¶¶ 43, 47. The United States Solicitor General recognized that "the continued ability of private standards organizations to develop and update their materials at a high level of quality and integrity is of substantial importance to the federal government." JA1220-45, Brief for United States as Amicus Curiae at 18, *S. Bldg. Code Cong. Int'l, Inc. v. Veeck*, No. 02-355 (U.S. May 2003).

### 3.    IBR Reflects a Public-Private Partnership that Respects Copyright Protection and Enables Governments to Benefit from SDOs' Technical Expertise.

When Congress enacted the 1976 Copyright Act, it knew that copyrighted works were routinely incorporated into federal, state, and local law. *See Hall v. United States*, 566 U.S. 506, 516 (2012) (courts should "assume that Congress is aware of existing law when it passes legislation") (quotation omitted). Ten years earlier, Congress authorized federal agencies to incorporate standards into federal regulations—and the agencies did so. *See* Act of June 5, 1967, Pub. L. No. 90-23, § 552, 81 Stat. 54, 54 (codified at 5 U.S.C. § 552) (1967). All fifty states also employ the practice of incorporation by reference into local statutes and regulations.

In 1992 Congress passed Public Law 102-245, requesting the National Research Council to conduct a study on standards development.  *See* National Research Council, *Standards, Conformity Assessment, and Trade Into the 21st Century* (National Academy Press 1995), *available at* http://www.nap.edu/read/4921/chapter/1.  That study contained a detailed overview of the U.S. standards-development system, and specifically noted that many SDOs "offset expenses and generate income through sales of standards documents, *to which they hold the copyright*.  For many SDOs, publishing is a significant source of operating revenue."  *Id*. at 32 (emphasis added).  The study concluded that the "U.S. standards development system serves the national interest well" by "support[ing] efficient and timely development of product and process standards that meet economic and public interests."  *Id*. at 157. (emphasis original).

Following the study's recommendations, Congress passed the National Technology Transfer and Advancement Act of 1995 ("NTTAA"), Pub. L. No. 104-113 § 12(d), 110 Stat. 775, codified at 15 U.S.C. § 272 (Notes).  Since 1996, Congress has required "all Federal agencies and departments [to] use technical standards that are developed or adopted by voluntary consensus bodies, using such technical standards as a means to carry out policy objectives or activities."  *Id*.  Some states have similar requirements.  *See, e.g.*, Pennsylvania Construction Code Act of Nov. 10, 1999, P.L. 491, No. 45 § 102 (IBR'ing a model building code to increase

14

efficiency and improve safety).   The NTTAA codified longstanding Executive Branch policy that it is "more efficient[] and effective[]" for agencies to use voluntary standards that have been created through a consensus process by private organizations with "expertise" in an industry than it is for the government to formulate its own standard to impose upon an industry.  *See* Administrative Conf. of the United States, 44 Fed. Reg. 1357, 1357 (Jan. 5, 1979); *see also* OFF. OF MGMT. & BUDG., EXEC. OFF. OF THE PRESIDENT, *Issuance of Circular No. A-119,* FEDERAL PARTICIPATION IN THE DEVELOPMENT AND USE OF VOLUNTARY STANDARDS, 47 Fed. Reg. 49,496 (Nov. 1, 1982) ("*Original OMB Circular A-119*"); A-119 at 17-18 (2016 revised Circular); OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT, *Revised OMB Circular No. A-119*, 81 FR 4673 (Jan. 27, 2016), *available at* 2016 WL 7664625, *13 ("*Revised OMB Circular A-119*").   Governments know that protecting SDOs' copyrights is crucial to the overall public-private partnership. Governments thus have used IBR—rather than copying—in relying on those standards in their statutes and regulations.  *See* Brief for Respondent Consumer Product Safety Commission, *Milice v. Consumer Product Safety Commission*, No. 21-1071, 2020 WL 8641276, at *33 (D.C. Cir. July 2020) ("Agencies across the federal government have commonly used [IBR] to account for private copyright holders' interests."); Emily S. Bremer, *On the Cost of Private Standards in Public*

*Law*, 63 U. KANSAS L.R. 279, 286 n.33 (2015) ("Agencies often incorporate by reference to avoid infringing copyright").

Under this approach, rather than creating a new set of rules out of whole cloth, a government entity—for example, a federal agency or a state legislature—references the applicable standard as extrinsic material when drafting its statute or regulation. *See* 5 U.S.C. § 552(a)(1); 1 C.F.R. § 51.1 *et seq.* IBR saves governments (and, in turn, taxpayers) the cost and administrative burden of creating and updating their own standards and also protects the copyrights of SDOs because the governments do not reproduce the copyrighted expression authored by the SDOs. *See Revised OMB Circular A-119*, 2016 WL 7664625, at *13, 19-20. Because standards reflect best practices and often define industry norms apart from the law, the IBR process decreases "the burden of complying with agency regulation." *Id.* at *13. Further, IBR "provid[es] incentives" for private SDOs to create "standards that serve national needs … promoting efficiency, economic competition, and trade." *Id.* If SDOs cannot fund the development and updating of standards through copyright, governments will not be able to IBR up-to-date standards in their statutes and regulations.

This long-standing public-private partnership allows industries to advance with a uniform standard across multiple jurisdictions, rather than requiring each locality to develop and test their own rules for a particular field. JA278-79. In the

absence of standards, the process would be doubly inefficient, duplicating efforts on the front end and subjecting industries to multiple jurisdictions' requirements on the back end. JA278-79. The decision below threatens a public-private partnership that has made invaluable contributions to public safety and the country's economic well-being for over a century. Building codes, like the *International Building Code* on which UpCodes relies to justify its copying, reference thousands of standards. JA1455 (ASTM Standards in Building Codes subscription includes more than 2,300 ASTM standards). The district court's blanket determination that a third-party reference to a standard by an IBR'd work renders the standard free to copy for profit seriously threatens not only ASTM and its public mission, but all SDOs' ability to continue their public work.

Underscoring the need for copyright protection of standards, the federal government specifically concluded that "Federal law [does not] require[] that all IBR'd standards ... be available for free online." INCORPORATION BY REFERENCE, 78 Fed. Reg. 60,784, 60,787 (Oct. 2, 2013) (notice of proposed rulemaking); 79 Fed. Reg. at 66,267 (final rule). The Office of Federal Register explained that "[i]f we required that all materials IBR'd into the CFR be available for free, that requirement would compromise the ability of regulators to rely on voluntary consensus standards, possibly requiring them to create their own standards, which is contrary to the NTTAA and the OMB Circular A-119." INCORPORATION BY REFERENCE,

Announcement of Final Rule, Office of the Federal Register ("OFR Rule Announcement"), 79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014); *see also id.* at 66,275 ("our regulations have never contained any provision to allow for IBR of anything but the primary standards" in rejecting the notion that standards referenced in IBR'd standards would also need to be made available for free).  This recognition helps preserve the delicate public-private partnership between SDOs and the government, which ultimately benefits the public.  Congress carefully weighed the competing policy goals of making incorporated works publicly available while also preserving the incentives and protections granted by copyright, and it weighed in favor of preserving the copyright system.  *See* H.R. Rep. No. 94-1476, at 60 (1976) (stating that under Section 105 "use by the Government of a private work would not affect its copyright protection in any way").

## B.    UpCodes' Infringement of ASTM's Works

### 1.    UpCodes' For-Profit Serial Infringement of SDOs' Copyrights Will Ultimately Undermine Public Safety.

Brothers Garrett and Scott Reynolds formed UpCodes, a for-profit corporation, in 2016.  JA348-53; JA2224 at 110:9-11.  UpCodes describes itself as "all-in-one compliance and product research platform for AEC [architecture, engineering, and construction] professionals."   JA367-75.  In 2017, UpCodes launched a searchable database of building codes based on the copyrighted works of SDOs beginning with ICC and later, in or around 2020, various other SDOs such as

NFPA and FGI.[1]  JA348-53.  UpCodes now boasts over 750,000 monthly active users and over 6,000,000 sections of code.  JA377-80.

ASTM is the latest victim of UpCodes' serial infringement.  At least as early as October 2023, UpCodes began posting grayed-out titles of the Works.  JA382-83. At that time, the grayed-out title icons did not link to any underlying content. However, in April 2024, UpCodes started to display the Works.  JA386.  UpCodes' library of unauthorized ASTM works grew day-by-day, and now UpCodes has posted 10 ASTM standards ("Works")[2] with additional grayed-out ASTM standards. JA883-85 (excerpt from JA885 below); JA2477.



UpCodes intends to continue posting ASTM standards referenced in model building codes.  JA2238-39 at 256:16-257:14.

---

[1] ICC, NFPA and FGI separately filed lawsuits against UpCodes alleging copyright infringement.  *See ICC v. UpCodes, Inc*., Case No. 1:17-cv-6261 (S.D.N.Y.); *NFPA v. UpCodes, Inc.,* Case No. 2:21-cv-05262 (C.D. Cal.); *FGI v. UpCodes, Inc.,* Case No. 4:22-cv-1308 (E.D. Mo.).  ICC's and NFPA's lawsuits remain pending, while FGI voluntarily dismissed its case.

[2] The infringing copies of the Works that UpCodes has posted on its website are attached to the Wise Declaration.  JA426-881.

UpCodes posts the entirety of each of the Works. JA30; JA426-881; JA2115-215. UpCodes does so even though each Work contains portions that are expressly non-mandatory or supplementary, such as explanatory notes, supplementary materials, appendices, and annexes. JA180; JA2243 281:6-19; *see* JA2115-215.

To the best of ASTM's knowledge, no governmental authority has IBR'd the Works, JA279 ¶ 54, and UpCodes has never cited any statute or regulation that does so. UpCodes nevertheless claims it is entitled to copy each of the Works without ASTM's consent because each of them is referenced in the *IBC*, and the *IBC* has been IBR'd in many jurisdictions in the United States. JA6.

### 2. UpCodes Commercially Exploits ASTM's Copyrighted Works.

#### a. *UpCodes Uses Copies of ASTM's Standards in its Paid-for Premium Subscription Services.*

UpCodes includes identical or nearly identical copies of ASTM's Works in its paid-for subscription services. JA2258 at 343:4-6. UpCodes' subscription services enable users to view, search, annotate, and bookmark each of the Works at issue in this case. JA910. These services allow UpCodes to make money directly from its unauthorized copies of ASTM Works. *Id.* UpCodes' paid-for subscription services directly compete with ASTM's Compass subscription which also enables its users to view, search, annotate, and bookmark ASTM standards, including the Works. JA270 ¶ 11. UpCodes' paid-for subscription also competes with the

20

subscription services of some of ASTM's licensees.  JA270, 280 ¶¶ 10-11, 59, JA1552-53.

> **b.**  *UpCodes Commercially Exploits ASTM's Standards to Drive Traffic to Its Website and Upsell Its Paid-for Subscription Service.*

UpCodes' freemium business model has been built by free riding on the investment of SDOs to create codes and standards.  JA892; JA2256 341:20-22.  UpCodes provides free access to its "code library" where users can view, copy, and print a significant portion of the Works.  JA900-908.  Unlike some of the other content available on the UpCodes website, UpCodes requires users to create an account to access the content of the Works.  JA916; JA2541.  UpCodes' account requirement ensures that third parties cannot collect this content from UpCodes' website, JA2227 168:14-24, JA2228-29 173:22-174:10, and enables UpCodes to collect additional information from potential customers.  JA2229-30 174:18-175:2; JA2543.  As one court explained, "UpCodes generates revenue by attracting users to its website, offering some [SDO] content for free to funnel prospective customers to its platform, and monetizing a portion of its free-tier by converting them to paying customers."  *NFPA*, JA2518.

> **c.**  *UpCodes' Commercial Offerings Directly Compete with ASTM's Offerings and Threaten Significant Harm to ASTM.*

UpCodes' posting of ASTM's standards on its site had an immediate impact.  Only a few months after UpCodes posted its versions of ASTM's Works, almost

15% of the individuals who accessed the Works on UpCodes' website were also paid

ASTM subscribers.[3]  JA2474; JA2401-409.  An additional 20% of UpCodes' users

who accessed ASTM Works work at companies where their employer subscribed to

ASTM's services.  JA2474; JA2401-409.

UpCodes has received multiple inquiries about whether UpCodes offers the

same standards as ASTM or its licensees.  JA2424-41.  One potential UpCodes

customer explained that "our current codes/standards subscription is with

MADCAD [an ASTM licensee].  We are interested in exploring whether UpCodes

can provide the codes and standards access we need."  JA2432-36 (attaching a list

of standards included in their current subscription that included multiple ASTM

standards, including "ASTM Selected Standards from Building Codes Package").

That customer's inquiry is hardly surprising.  All things being equal, consumers

prefer to pay less for access to ASTM standards.  JA34-35.

## VII.    SUMMARY OF THE ARGUMENT

The district court erred in ruling ASTM was unlikely to succeed on the merits

of its copyright claim because UpCodes' copying of the entirety of the Works meets

---

[3] These calculations exclude users with email addresses associated with the law firms involved in this case.  These calculations do not include overlap with the customers of ASTM's licensees because ASTM does not have access to its licensees' customer lists.  As a result, the overlap is between UpCodes' users and authorized sources of ASTM standards is likely to be significantly greater.

the affirmative defense of fair use.  In reaching this conclusion, the district court made multiple reversible errors in evaluating the fair use "factors."

Under the first fair use factor, the district court made two material legal errors. First, the district court's finding that UpCodes' use was non-commercial is legal error.  As a for-profit enterprise that copied ASTM's Works to sell competing subscription services and otherwise leverage the Works for its commercial benefit, UpCodes' use is plainly commercial.  Second, because UpCodes concedes that it adds no criticism, commentary, or other expression to the Works and the district court acknowledged that UpCodes' use of the Works is an "effective substitute" for ASTM's Works, the district court erred in ruling that UpCodes' use of the Works is transformative.

The district court also committed legal error by not weighing the fourth factor against UpCodes after finding UpCodes' copies were substitutional and likely to adversely impact the market and value for the Works.  Instead, the district court ignored UpCodes' burden to show that its use would not harm the market for ASTM's Works and assumed (without evidence) that ASTM could offset that market harm even if UpCodes' use became widespread.

Finally, the district court's errors on the first and fourth fair use factors materially tainted its analysis of the third factor, which assesses the reasonableness of the extent of UpCodes' use of the Works.  The weight of authority and common

23

sense requires the third factor to weigh against fair use when the defendant copies all or virtually all of a work for a commercial, non-transformative, substitutional use. As a result, the district court erred in concluding that UpCodes' use of entire copies of the Works was fair use.

Once these errors are corrected, UpCodes cannot meet its burden to show that its fair use defense is likely to negate ASTM's likelihood of success on its copyright claims. Accordingly, because the district court correctly ruled that ASTM established a *prima facie* case of copyright infringement, ASTM is likely to succeed on the merits of its claims. This Court should reverse the district court's ruling on likelihood of success and remand the case for consideration of for the remaining preliminary injunction factors.

## VIII.    ARGUMENT

Copyright fair use asks courts to analyze four statutory factors: (1) the purpose and character of the use, including whether the use is for commercial or nonprofit purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 198 (3d Cir. 2003), *abrogated on other grounds by TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019); 17 U.S.C. § 107.

"[T]he fair use doctrine has always precluded a use that 'supersede[s] the use of the original.'" *Harper & Row*, 471 U.S. at 550. As a result, "wholesale copying aimed at creating a market substitute is presumptively unfair." *Google*, 593 U.S. at 1199 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)). The district court's ruling that UpCodes' substitutional use of the entirety of ASTM's Works is fair use contravenes this well-settled fair use jurisprudence.

### A.    UpCodes Bears the Burden of Proof on the Affirmative Defense of Fair Use When Opposing ASTM's Motion for a Preliminary Injunction.

"A fair use, although not specifically defined by the statute, is one made 'for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research.' It is an affirmative defense for which the alleged infringer bears the burden of proof." *Video Pipeline*, 342 F.3d at 197 (quoting 17 U.S.C. § 107); *Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 49 (2d Cir. 2021), *aff'd*, 598 U.S. 508 (2023) ("*Warhol I*") ("Fair use is an affirmative defense; as such, the ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by the party asserting the defense: the secondary user."). At the preliminary injunction stage, it is UpCodes' burden to show that this defense negates ASTM's likelihood of success on its copyright claims. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("the burdens at the preliminary injunction stage track the burdens at trial"); *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020)

25

(same).    Where, as here, a plaintiff establishes a *prima facie* case, JA16, the defendant must show that it is likely to establish its affirmative defense, otherwise plaintiff "must be deemed likely to prevail" on the merits for purposes of a preliminary injunction.  *See Gonzales*, 546 U.S. at 428-29; *Greater Phila. Chamber of Com.*, 949 F.3d at 133.  UpCodes, thus, bears the burden of proof with respect to its fair use affirmative defense.

### B.    UpCodes is Not Likely to Succeed on Its Fair Use Defense.

#### 1.    Factor 1: Purpose and Character of the Use

In assessing the first fair use factor, courts consider two sub-factors: (i) whether the secondary use is commercial in nature and (ii) the extent to which the secondary use is transformative.  *Warhol I*, 11 F.4th at 37.  The analysis requires assessment of each specific use of a copyrighted work alleged to be an infringement. *Warhol II,* 598 U.S. at 533.  "If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying" because such use "undermines the goal of copyright."  *Warhol II*, 598 U.S. at 532-33.

##### a.    *UpCodes' Use is Commercial.*

"The crux of the profit/nonprofit distinction," "is not whether the sole motive of the use is monetary gain[,] but whether the user stands to profit from exploitation

of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.  Under this standard, UpCodes' use of the Works is commercial.

Here, UpCodes uses copies of the Works for monetary gain in at least two different contexts: (1) its paid-for premium service, and (2) its freemium business model.  The district court's conclusion that UpCodes' "use of the Copyrighted Standards is largely noncommercial," JA21, ignores the unrebutted evidence that UpCodes sells subscription services that include access to the Works, JA388-881, JA910-16.  In fact, the district court never mentions UpCodes' paid-for subscription services in its analysis regarding the commercial nature of UpCodes' use.  JA21-22.  Not surprisingly, UpCodes admits that it created the paid subscription service "with the intention of making money."  JA2258 at 343:4-6.  And this Court's precedent already establishes that charging fees for access to copies of works serves a commercial purpose.  *See Video Pipeline*, 342 F.3d at 198 (finding streaming provider of movie trailer clips commercial because it "charges a fee to stream the clip previews").

UpCodes' use of the Works in connection with its freemium business model is also commercial.  The Central District of California's decision on summary judgment in *National Fire Protection Association, Inc. v. UpCodes, Inc.*, is persuasive.  Case No. 2:21-cv-05262-SPG-E, Dkt. 230-1, JA2485-2526 (C.D. Cal. Aug. 23, 2024).  The court examined UpCodes' use of the copyrighted works of

another SDO and found that UpCodes' unlicensed use of standards on both its free and paid tier served an objectively commercial purpose: "making money." JA2517. To reach this conclusion, the court found that the copied standards serve an important function of UpCodes' "freemium" business strategy. JA2517. Under that strategy, "UpCodes generates revenue by attracting users to its website, offering some content for free to funnel prospective customers to its platform, and monetizing a portion of its free-tier users by converting them to paying customers." JA2517. Therefore, even when the standards are made available for free, the purpose of UpCodes' use is to grow the funnel of users that feeds its paid tier. This use is "indisputably commercial." JA2517. Additionally, "the number of free users helps attract financial investment and provides UpCodes' sales team with leads for account expansion." JA2517. The *NFPA* court's ruling that UpCodes' use is commercial properly applies the law and is common sense.

Likewise, other courts have persuasively explained that using a copyrighted work to drive subscriptions serves a commercial purpose. *Am. Soc'y of Cinematographers v. Schatz*, No. 2:20-cv-08607-ODW-JC, 2021 WL 4352302, at *3 (C.D. Cal. May 25, 2021) ("while [non-profit] ASC did not sell the Photograph or include it in its magazine, ASC did use the Photograph as a means to promote and garner subscriptions ... [therefore,] its use is commercial."); *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 353 (S.D.N.Y. 2017) (explaining that

the defendant's use of copyrighted photographs was commercial in nature because it "lure[d] traffic" to the defendant's website, notwithstanding that the website was "unprofitable"); *August Image, LLC v. AllWrite Commc'ns Inc.*, No. 1:23-CV-00910-SEG, 2024 WL 4505000, at *6 (N.D. Ga. Sept. 10, 2024) (finding use of copyrighted photographs commercial because the defendant "stood to gain from the visitors that the photographs attracted to its website."). As the Solicitor General explained, "the fair-use doctrine does not permit copying of valuable parts of a work to attract fans to a competing commercial product." JA1272.

Moreover, the only parties that UpCodes considers in selecting its content are customers who pay for UpCodes' subscription services. In fact, UpCodes' "ideal user" is a large company or architectural firm. *NFPA*, JA2490 (explaining that UpCodes refers to individual users or 1-2 person firms as "anti-users."). UpCodes determines what standards to post on its website by contacting paid-tiered subscribers to ask what products they would most like to see on UpCodes' platform. One UpCodes' customer, ███████████, requested "ASTMs referenced in the model codes." JA2415-22. In response, UpCodes asked ███████████ which specific ASTM codes so that it could "prioritize the important ones asap." JA2417. Then, UpCodes asked ███████████ to purchase a more expensive license fee. UpCodes also asked other companies what standards they were licensing from ASTM's licensees like MADCAD to lure customers to UpCodes. JA2424-30.

Further, UpCodes did not pay the customary fee for reproducing ASTM's standards for UpCodes' business.[4]  JA2234 at 232:9-16 (admitting did not seek a license to display any of the Works); JA280 ¶ 58.  It is undisputed that there is a robust, royalty-bearing market for reproducing ASTM standards in commercial databases, and UpCodes' competitors, including MADCAD and Accuris, pay a royalty to ASTM to include copies of ASTM standards in their paid-for subscription services.  JA270 ¶¶ 10-11, JA1552-53; JA280 ¶¶ 57-59.  UpCodes' failure to pay these license fees also makes its use commercial under longstanding Supreme Court precedent, *Harper & Row*, 471 U.S. at 562, and gives UpCodes an unfair market advantage.

UpCodes' use of the Works is plainly commercial.

> b.    *UpCodes' Use is Not Transformative.*

To be transformative, a use must do "something more than repackage or republish the original copyrighted work."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014); *see also TD Bank,* 928 F.3d at 278 (affirming finding that a use was not transformative when it "did not imbue the prior work with 'new expression, meaning, or message'").  Here, the record is clear that UpCodes merely republishes the Works on its website.  JA35 ("UpCodes specifically identifies the

---

[4] Rather, UpCodes purchased the very copies of ASTM's standards at issue from unauthorized sources. *See e.g.,* JA281 ¶¶ 60-61; JA1036-60; JA2265-68.

[Works] as ASTM standards and allows its users to filter their searches on the UpCodes website based on ASTM's authorship."). Accordingly, UpCodes' use is not transformative, and the district court erred as a matter of law in concluding otherwise.

The "'central' question" is whether the defendant's use "supersedes the objects of the original" and thus serves as a substitute—"copyright's bête noire." *Warhol II,* 598 U.S. at 528 (quoting *Campbell*, 510 U.S. at 579). When the defendant's use of the work will "substitute for" or "supplant" the original work, the first factor cuts against fair use. *Warhol II*, 598 U.S. at 528, 532-33; *Harper & Row*, 471 U.S. at 550. That is the case here. Even the district court acknowledged in connection with the fourth factor that "'it is fair to say' that UpCodes' copies are 'an effective substitute' for the Copyrighted Standards," JA35. The Supreme Court's recent decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith* makes clear that use of a work is not transformative in this circumstance. *Warhol II,* 598 U.S. at 544-45.

The district court's ruling also cannot be squared with the Supreme Court's holding that "the degree of transformation required to make 'transformative' use of an original work must go beyond that required to qualify as a derivative."[5] *Warhol*

---

[5] One of the six exclusive rights of copyright owners in 17 U.S.C. § 106 is the "right to prepare derivative works, defined in § 101 of the Copyright Act to include 'any other form in which a work may be recast, transformed, or adapted.'" *Warhol II,*

*II,* 598 U.S. at 529.   UpCodes does not deny that it adds nothing new to the expression of ASTM's Works or that it merely repackages and republishes the original.   JA2259-62 at 344:4-347:4.   Likewise, UpCodes admits that it does not offer any criticism or commentary on ASTM's Works.   JA2259-62 at 344:4-347:4.   Merely changing the medium of a work, however, is a derivative use rather than a transformative one.   *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 181 (2d Cir. 2024) (citing *Warhol II*, 598 U.S. at 529); *see Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 n.2 (2d Cir. 1998) ("[A] change in format ... is not technically a transformation.").   Simply scanning and reproducing copyrighted works "solely to convey the original text to the reader without adding any comment or criticism" is not transformative.   *Hachette*, 115 F.4th at 181.   Yet that is all UpCodes has done with the Works.   On these undisputed facts, the district court erred as a matter of law in ruling that UpCodes' use is transformative.   *See Warhol II,* 598 U.S. at 529; *accord Hachette*, 115 F.4th at 181 ("To construe [defendant]'s use of the Works as transformative would significantly narrow—if not entirely

---

598 U.S. at 529.  A "derivative work" is a work "based upon one or more preexisting works," such as a translation of a text into another language or an adaptation of a novel into a movie.  17 U.S.C. § 101.  If even the adaptation of a novel into a movie falls within the scope of a derivative work, then UpCodes' verbatim copying of the Works surely does not "go beyond that required to qualify as a derivative," *Warhol II,* 598 U.S. at 529.

eviscerate—copyright owners' exclusive right to prepare (or not prepare) derivative works.").

Additionally, *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith* makes clear that an author may have several purposes or uses for his or her work. There, the Court recognized that the copyright owner licensed her photos to illustrate stories in magazines and she also licensed her photos to serve as a reference or to create stylized derivatives of her works. *Warhol II,* 598 U.S. at 533-45. Here, there are multiple purposes and uses for ASTM's standards, one of which is to provide access to the public to a subscription collection of standards that are referenced in building codes. JA1487-90 (describing ASTM Standards in Building Codes subscription); JA270 ¶ 10, JA278 ¶ 50, JA280 ¶ 59. UpCodes' purpose is, likewise, to offer access to the public to a subscription collection of standards referenced in building codes. JA22-23. Thus, ASTM and UpCodes have this same purpose in using the Works. JA367-68; JA371.

The district court erred in reaching the opposite conclusion. JA22; *Hachette*, 115 F.4th at 181 (finding defendant's "digital books serve the same exact purpose as the originals: making authors' works available to read"). The district court claimed that UpCodes' purpose in posting "standards that have been enacted into law" is "distinct" from ASTM's purpose in "providing information to the architecture, engineering, and construction communities." JA22-23; JA371

33

(UpCodes describing itself as an "all-in-one compliance and product research platform for AEC [architecture, engineering, and construction] professionals."). In doing so, the district court improperly accepted UpCodes' asserted subjective purpose of making the "law" more available, rather than recognizing that an objective inquiry shows that both parties share an identical purpose of making the Works available to the public, including the architecture, engineering, and construction communities, on a subscription basis. JA278 ¶ 50; JA1487-90; JA367-69; JA371; *see NFPA*, JA2525 n.23 ("[T]here is no meaningful distinction between posting codes as codes and posting codes as law, especially when the infringer is engaged in a commercial enterprise"). UpCodes' claimed subjective purpose of providing additional access to so-called "enacted law" is irrelevant to the transformative use analysis. *See Warhol II,* 598 U.S. at 545 ("Whether the purpose and character of a use weighs in favor of fair use is, instead, an *objective inquiry* into what use was made, *i.e.*, what the user does with the original work.") (emphasis added); *NFPA*, JA2516 ("UpCodes' purported intent to publish 'the law' with a 'socially useful purpose' does not make its use of NFPA's standards transformative").

As the *NFPA* court explained, "there is no daylight between UpCodes' commercial use of the standards and NFPA's use" including because "UpCodes' use shares the same overriding purpose as NFPA's—namely, to provide access to

the text of NFPA's standards for AEC companies and professionals who use those standards for various reasons in their jobs." *NFPA*, JA2515; JA278 ¶ 50.  The district court erred in requiring complete identity between the parties' purposes, rather than objectively analyzing whether Defendants' actual use shares *a purpose* with any of ASTM's purposes, including providing access to its standards.

For these reasons, the district court erred in ruling that factor one weighed in favor of fair use.  Rather, factor one weighs against fair use because of UpCodes' commercial, non-transformative use of copies of the Works acts as a substitute for ASTM's offerings of the Works.

## C.    Factor 4: Effect of the Use on the Market for the Copyrighted Work

### 1.    The District Court Erred by Ruling that Factor Four Does Not Weigh Against Fair Use.

The district court correctly found that UpCodes' use was substitutional and would adversely impact ASTM's market for the Works.  JA34-35.  These findings suffice to establish that the fourth factor weighs against fair use.  The district court also disregarded UpCodes' burden to show an absence of market harm—a burden that UpCodes did not come close to meeting here.  Thus, the district court's ultimate ruling that the fourth factor "does not significantly tip the balance one way or the other" is wrong as a matter of law.  JA37.

2.    **UpCodes' Substitutional Use of ASTM's Standards Will Adversely Impact the Market.**

The fourth fair use factor—market harm—"is undoubtedly the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, in part because "the fair use doctrine has always precluded a use that 'supersede[s] the use of the original.'" *Id.* at 550. Accordingly, this factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the [unauthorized] copy [rather than] the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015) ("*Google Books*"); *Google*, 593 U.S. at 35 ("'verbatim copying of the original in its entirety for commercial purposes' may well produce a market substitute for an author's work") (quoting *Campbell*, 510 U.S. at 591).

The "burden of proving that the secondary use does not compete in the relevant market is ... borne by the party asserting the defense." *Hachette*, 115 F.4th at 189 (quoting *Warhol I*, 11 F.4th at 49); *Campbell*, 510 U.S. at 590; *id.* (noting that a silent record on the fourth factor "disentitled the proponent of the defense" to summary judgment). Accordingly, it was UpCodes' burden to show that "unrestricted and widespread conduct of the sort engaged in by the defendant ... would [not] result in a substantially adverse impact on the potential market' for the original." *See Campbell,* 510 U.S. at 590 (quoting 3 Melville B. Nimmer & David

36

Nimmer, NIMMER ON COPYRIGHT § 13.05[A][4] (1993)).  As the Supreme Court explained, "[s]ince fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590.

Here, UpCodes failed to offer any such evidence.  Accordingly, the district court correctly recognized that UpCodes' use *would* adversely impact the market for ASTM's Works and that "consumers will be less incentivized to purchase the standards from ASTM for a fee." JA34-35.  It also found that "UpCodes' copies are an effective substitute for the [the Works]."  JA35 (internal quotations and citation omitted).  Based on these factual findings, and the absence of countervailing evidence from UpCodes, the district court erred as a matter of law by not weighing the fourth factor against fair use.

Courts, including the district court, have consistently recognized that UpCodes' copies act as a substitute for the originals.  JA34-35; *NFPA*, JA2524-26 ("[I]f UpCodes can continue with its current practices, or if these practices become widespread, it may be exceptionally difficult for NFPA to compete."); *Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, 677 F. Supp. 3d 955, 973 (E.D. Mo. 2023) ("There is little doubt that UpCodes' use of the FGI Guidelines can affect the market for the FGI Guidelines"); *Int'l Code Council, Inc. v. UpCodes, Inc.*, No. 17 CIV. 6261 (VM), 2020 WL 2750636, at *28 (S.D.N.Y. May 27, 2020) ("it is fair to say"

37

that UpCodes' posting was "an effective substitute for the model code itself"); *see also Hachette*, 115 F.4th at 190 (the defendant "offers effectively the same product as Publishers—full copies of the Works—but at no cost to consumers or libraries. At least in this context, it is difficult to compete with free."); *id.* at 193 ("Though Publishers have not provided empirical data to support this observation, we routinely rely on such logical inferences where appropriate in assessing the fourth fair use factor.")

Here, despite finding that UpCodes' copies were "effective substitutes" for ASTM's Works and were likely to adversely impact the market for ASTM's works, JA34-36, the district court tried to justify its conclusion that factor four was neutral, JA34, by incorrectly crediting speculation offered by amicus curiae, Electronic Frontier Foundation that:

> ASTM *may* have other incentives to continue developing technical standards even if some of its standards lose their copyright protection after being enacted into law. ASTM *may* still be incentivized to create by its mission of promoting product quality and public safety, its professional interest in being recognized as a global leader in standard development, and other monetary benefits that it *may* derive after its standards are incorporated into law, like profits derived from marketing its own compliance-focused training materials.

JA35-36 (emphasis added). The district court concluded, without any supporting evidence, that "there is reason to believe that ASTM will still be incentivized to create its standards" even if UpCodes is permitted to make unauthorized copies of its Works for free. JA37. UpCodes bore the burden of demonstrating that its

38

commercial exploitation of identical or near-identical copies of the Works would not have an adverse impact on the market for ASTM's Works. *See Campbell*, 510 U.S. at 590-91. UpCodes did not meet that burden, and the district court did not identify any evidence that would satisfy UpCodes' burden. JA34-36.

In contrast, ASTM offered unrebutted evidence that its standards development process is resource-intensive and requires significant funding to continue developing and maintaining the full breadth of its 13,000 standards. JA270 ¶¶ 9-10, JA276-78 ¶¶ 41-43. Sales and licensing of ASTM's standards account for about 70% of ASTM's total revenue. JA277 ¶ 44. UpCodes offered no evidence to suggest that ASTM could recoup the significant revenue loss if UpCodes' continued providing unauthorized copies of ASTM standards. Nor could it, for "in a landscape where [ASTM] shoulders all of the costs to develop the standards and UpCodes (and copycats) pay nothing, [ASTM] would be at an unsustainable competitive disadvantage." *NFPA,* JA2524 (finding UpCodes had not met its burden on factor four). This is particularly true where ASTM and UpCodes share the "same target market" and "compete for the same customers and sales." JA2525. At the time of ASTM's motion, UpCodes' versions of the Works had been available for only a few months. In that time, almost 15% of the individuals who accessed the Works on UpCodes' website were also paid ASTM subscribers. JA2474 *with* JA2401-09. An additional 20% of UpCodes' users who accessed ASTM Works work at companies

where their employer subscribed to ASTM's services. JA2474 *with* JA2401-409. And emails produced by UpCodes show that customers are looking to switch to UpCodes from ASTM and its licensees. JA2424-40. UpCodes offered no evidence to show that its continued use of the Works would not harm the market for ASTM's standards.

Even if ASTM had other incentives, UpCodes at least needed to show that similar uses—if they became widespread—would not adversely impact ASTM's market for the Works or the value of the Works. *Campbell*, 510 U.S. at 590. As the *NFPA* court explained, the impact of UpCodes' posting identical copies for free would result in a tremendous loss of revenue: "The resulting revenue loss would potentially imperil NFPA's self-funded, voluntary consensus development model." *NFPA*, JA2524-25; *see also Hachette*, 115 F.4th at 193 ("Thus, we conclude it is 'self-evident' that if IA's use were to become widespread, it would adversely affect Publishers' markets for the Work in Suit.") (quoting *Warhol I*, 11 F.4th at 50).

The district court assumed that ASTM could use "profits derived from marketing its own compliance-focused training materials" to continue its mission. Op. at 10. But ASTM generates 70% of its revenue from the sale and licensing of its copyrighted works, JA277 ¶ 44, and no evidence suggests that ASTM can recoup that amount of revenue from "marketing its own compliance-focused training materials." JA35-36. To the contrary, the unrebutted evidence confirms that

ASTM's public service mission cannot continue to fund itself without the ability to sell its standards as a means of recouping its costs.  JA277 ¶ 47, JA281 ¶¶ 62-63.

Simply put, there is no evidence in the record that one (or all) of the interests the district court speculated about could be sufficient to fund the creation and maintenance of thousands of ASTM standards.  Moreover, the fourth fair use factor requires courts to consider what would happen if the infringing use became widespread.  *See Campbell,* 510 U.S. at 590.  Even if ASTM wanted to continue developing standards, if UpCodes' use becomes widespread, ASTM will not be able to develop standards in the same manner as it has in the past if it loses 70% of its revenue.  JA277 ¶¶ 44, 47.  Such infringement would also embolden others, including potentially ASTM's existing licensees to do the same.  JA281 ¶ 62; *see N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 623 n.20 (S.D.N.Y. 2015) ("the court's role with respect to the fourth factor is to 'look at the impact on *potential* licensing revenues for traditional, reasonable, or likely to be developed markets'") (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)) (emphasis in original).  Because there are thousands of ASTM standards referenced in building codes, and those standards reference other ASTM standards, the potential for massive loss of meaningful copyright protection posed by UpCodes is existential to ASTM's business.  JA281 ¶ 63.  UpCodes has not offered any evidence that ASTM could recoup that 70% of revenue elsewhere or that ASTM

could somehow do the same amount of development work for 30% of the current costs.

### 3.     The Public Does Not Benefit from UpCodes' Use in the Long-Term.

"Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work," *Harper & Row*, 471 U.S. at 569, but "[t]hat does not alone render the infringement lawful," *Hachette*, 115 F.4th at 195 (rejecting argument that enhancing public access outweighs the copyright owner's right to protect its works). The Copyright Act reflects a considered judgment that "'the Progress of Science and useful Arts' is best promoted by laws that protect the authors' original works and permit authors to set the terms of engagement, at least for a limited time." *Hachette*, 115 F.4th at 195.

The district court assumed, without evidence, that standards IBR'd by state and local governments are less available because, unlike federal IBR regulations, there "does not appear to be any corresponding law requiring that state and local governments make copies of incorporated standards available for review." JA7. UpCodes uses this unfounded myth of an "access" problem to post the entirety of ASTM's Works. But the Works are available to any member of the public for purchase at a reasonable cost, JA1514, and ASTM is unaware of any person who has been unable to access the Works. *Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-CV-1215 (TSC), 2017 WL 473822, at *11

(D.D.C. Feb. 2, 2017), *rev'd in part on other grounds,* 896 F.3d 437 (D.C. Cir. 2018) ("*ASTM I*") ("there is no evidence that [ASTM's] standards are unavailable to the public").  UpCodes failed to identify evidence that any person or entity lacks access to the Works, much less that any harm resulted from this lack of access.  There is no evidence that any journalist, union members, or other citizens have had any difficulty obtaining access to ASTM's Works.  And UpCodes acknowledges that ASTM provides standards for free when it learns someone cannot afford to purchase the standard.  JA2341 118:1-11; JA2283 n.1.  Despite this, the district court made the unsupported determination that "incorporation by reference creates serious notice and accountability problems."  JA8 (without citation to evidence).

In sum, although it does not bear the burden, ASTM demonstrated that if UpCodes' current practices continue or become widespread, ASTM's market for its Works will be harmed.  *Campbell*, 510 U.S. at 590; *NFPA*, JA2524-525 (same); JA277 ¶¶ 43-44; JA386; JA1692-743 (showing that all the Works and all pending UpCodes standards are included in ASTM Standards in Building Codes subscription).  As companies leave ASTM and its licensees for free versions of the same standards, it will become impossible for ASTM to recoup the lost funds.  *See* JA281 ¶¶ 62-63.  Accordingly, any short-term benefits of UpCodes' free copies of the current Works are outweighed by the long-term detriments society may suffer if

ASTM (and similar SDOs) cannot fund the maintenance and development of high-quality standards.

Given the record in this case, the district court erred by not weighing factor four against fair use.

### D.     Factor 3: Amount and Substantiality of the Use

#### 1.     The District Court Erred in Ruling That Factor Three Weighs in Favor of Fair Use.

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). As the district court correctly observed, the test for this factor is whether "the amount and substantiality of the portion used is 'reasonable in relation to the purpose of the copying,'" *i.e.*, the first factor. JA29 (quoting *Campbell*, 510 U.S. at 586-87 ("[T]he extent of permissible copying varies with the purpose and character of the use.")); *accord Google*, 593 U.S. at 34. On this basis, the district court ruled that "the amount and substantiality of UpCodes' copying is 'tethered' to UpCodes' transformative purpose [under factor one], *Google LLC*, 593 U.S. at 34, and the factor weighs in favor of fair use." JA30. Given the district court erred in ruling that UpCodes' use is transformative under factor one, its related factor three ruling is also wrong as a matter of law.

Although not as important as the first and fourth fair use factors, the third factor is intertwined with both. As the Supreme Court in *Campbell* explained, if "'a

substantial portion of the infringing work was copied verbatim' from the copyrighted work ... it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth." *Campbell*, 510 U.S. at 587. And "a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original." *Campbell*, 510 U.S. at 587-88; *see also Hachette*, 115 F.4th at 187-88.

Applying these settled principles of fair use, courts routinely conclude that the third factor weighs against fair use when, as here, an infringer copies the entirety of a work and such copy substitutes for the original work. *See Hachette*, 115 F.4th at 187-89 (finding third factor weighed in favor of copyright owner where the defendant's free copies of the plaintiffs' books served as a substitute for the books) (collecting cases); *NFPA*, JA2522-23 (finding that third factor "not to weigh in favor of fair use" given UpCodes' competing use under the first factor); *see also Sony*, 464 U.S. at 449-50 (explaining that reproducing the entirety of a work typically militates against a finding of fair use). Under the correct analysis of factors one and four above, factor three must also weigh against fair use given that "UpCodes copied the entirety of ASTM's Copyrighted Standards" and "UpCodes' copies are 'an effective substitute' for the Copyrighted Standards." JA30, JA35.

Moreover, even if UpCodes had a credible argument—which it does not—that making the Works available to users was justified under factor one, UpCodes still bore the burden to show that the amount and substantiality of its taking was necessary in relation to the specific manner of the Work's incorporation. *Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, 896 F.3d 437, 452 (D.C. Cir. 2018) ("*ASTM II*"). With respect to IBR'd standards, the D.C. Circuit recognized that "where the incorporation merely makes reference to an external standard, but that standard does not govern any conduct, perhaps the copier's purpose could be achieved with only a paraphrase or a summary." *Id*. UpCodes offered no analysis to explain why copying the entirety of each Work (including the expressly non-mandatory portions of the Works), was necessary to achieve its purpose. JA276 ¶ 40; *see, e.g.,* JA449-503.

The district court thus erred in finding that factor three weighed in favor of fair use.

### E.    Factor 2: Nature of the Copyrighted Work

#### 1.    The District Court's Fair Use Decision Should be Reversed Even if Factor Two Weighs in Favor of Fair Use.

The second fair use factor—the nature of the copyrighted work—"rarely play[s] a significant role in the determination of a fair use dispute," *Google Books*, 804 F.3d at 220, and should not do so here.

46

The district court ruled that "ASTM's Copyrighted Standards [the Works]—having been incorporated by reference into law—fall at the outer edge of copyright's protective purposes, and the second factor weighs in favor of fair use." JA29. ASTM disagrees with this ruling—because, among other reasons, the Works are not IBR'd into law but instead are referenced in third party standards that have been IBR'd, *see supra* Section VI(A)(1),[6] and the Works' content supports copyright's core purpose to "Promote the Progress of Science," Article I, § 8, cl.8; *United States v. Paramount Pictures,* 334 U.S. 131, 158 (1948) ("the primary object" of copyright law lies "in the general benefits derived by the public from the labors of authors.").

But even assuming factor two favors fair use, it cannot outweigh the first, third, and fourth factors here. *See Google Books*, 804 F.3d at 213-14 ("[T]he Supreme Court has made clear that some of the statute's four listed [fair use] factors are more significant than others" with those more important factors being factors one and four) (citing *Campbell*, 510 U.S. at 591, for the importance of the first factor and quoting *Harper & Row,* 471 U.S. at 566, for the proposition that the fourth factor "is undoubtedly the single most important element of fair use," *id.*). Accordingly, the district court's fair use ruling should be reversed outright and need not be remanded for a reweighing of the fair use factors. The only task on remand should

---

[6] No court has ever held that a third-party reference to a standard that is later IBR'd results in the loss of copyright protection or even suggests it is a close call.

be to consider the remaining preliminary injunction factors, with ASTM's likelihood of success on the merits of its copyright claims having already been established.

## IX.    CONCLUSION

The district court erred as a matter of law in concluding that UpCodes' copying is fair use and that ASTM is therefore unlikely to succeed on the merits of its copyright claims.  The Court should reverse this ruling, hold that UpCodes is unlikely to succeed on its fair use defense, and remand for consideration of the other factors governing ASTM's motion for preliminary injunction.

Dated: January 21, 2025

/s/ J. Kevin Fee
J. Kevin Fee
Jane W. Wise
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com
jane.wise@us.dlapiper.com

Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700
stanley.panikowski@us.dlapiper.com

Gabrielle C. Velkes
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
gabrielle.velkes@us.dlapiper.com

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d) and Local Rule 46.1(e), I hereby certify that

I, J. Kevin Fee, am admitted as an attorney and member in good standing of the bar

of the United States Court of Appeals for the Third Circuit.

Dated: January 21, 2025        */s/ J. Kevin Fee*

J. Kevin Fee
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 31.1, I certify the following:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,112 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

3.    This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies and because Windows Defender Antivirus Version 1.1.19600.3 was run on the file containing the electronic version of this brief and no viruses were detected.

Dated: January 21, 2025                /s/ J. Kevin Fee
                                       _____
                                       J. Kevin Fee
                                       DLA PIPER LLP (US)
                                       500 8th Street NW
                                       Washington, DC 20004
                                       Tel: (202) 799-4000
                                       kevin.fee@us.dlapiper.com

# CERTIFICATE OF SERVICE

I certify that, on January 21, 2025, I caused this brief to be served on all

counsel of record listed on the CM/ECF Service List.

Dated: January 21, 2025                    */s/ J. Kevin Fee*
                                           J. Kevin Fee
                                           DLA PIPER LLP (US)
                                           500 8th Street NW
                                           Washington, DC 20004
                                           Tel: (202) 799-4000
                                           kevin.fee@us.dlapiper.com