NO. 24-2965

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

AMERICAN SOCIETY FOR TESTING & MATERIALS, D/B/A ASTM INTERNATIONAL,

PLAINTIFF -APPELLANT,

V.

UPCODES, INC.; GARRETT REYNOLDS; SCOTT REYNOLDS,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
2:24-cv-01895
Honorable Anita B. Brody, United States District Judge

## BRIEF OF AMICI CURIAE PUBLIC.RESOURCE.ORG, WATCH DUTY, IFIXIT, INC., AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF RESEARCH LIBRARIES, PUBLIC KNOWLEDGE AND LIBRARY FUTURES IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Corynne McSherry
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

Samuel W. Silver, PA Bar No. 56596
Abigail T. Burton, PA Bar No. 334450
WELSH & RECKER, P.C.
306 Walnut Street
Philadelphia, PA 19106
(267) 764-5492; 5498

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: March 31, 2025                    _s/ Samuel W. Silver_
                                         Attorney

**TABLE OF CONTENTS**

Corporate Disclosure Statement ...............................................................i

Table of Contents ........................................................................... ii

Table of Authorities .......................................................................iv

Statement of Interest of *Amici Curiae* ....................................................1

Introduction and Summary of Argument...................................................4

Argument...................................................................................5

I.   The Court Should Affirm Summary Judgment for UpCodes Because Private Parties Cannot Own the Law................................................5

    A. Courts Have Consistently Affirmed That the Public Must Have an Unfettered Ability to Read and Speak the Law, Including Regulations Incorporated By Reference .............................................6

       1. The Government Edicts Doctrine Forbids Copyright Restriction on Law................................................................................6

       2. The Government Edicts Doctrine Encompasses Laws Incorporated by Reference .........................................................8

       3. Full Ability to Speak and Share the Law Is Particularly Important Where That Law Is Incorporated By Reference ..........10

       4. Standards Incorporated by Reference Affect Multiple Constituencies and Read-Only Access Does Not Suffice .............11

          a. Standards Incorporated Into Law Are Important Legal Mandates ..........................................................................11

          b. Read-only Access Does Not Suffice....................................14

    B. The Plain Text of the Copyright Act and the Merger Doctrine Also Exclude Standards Incorporated into Law ..........................................16

    C. The Public Needs Equal Access to *All* Standards Necessary to Comprehend Legal Obligations .......................................................18

II.  In the Alternative, the Court Should Affirm That Upcodes' Publication of a Comprehensive Database of Law Is a Lawful Fair Use ................................................................................19

    A. Factor One Can Favor Fair Use Even If the Secondary User Does Not Comment on the Original Work.....................................................19

    B. Factor Two Should be Central to the Fair Use Analysis...................21

C.   ASTM Misconstrues the Relevant Licensing Market and Ignores Decades of Real World Evidence ......................................................21

D.   The Purposes of Copyright Are Better Served by Permitting the Use Than Forbidding It ....................................................................24

Conclusion ............................................................................................25

# TABLE OF AUTHORITIES

*Cases*

*ASTM v. Public.Resource.Org*, 896 F.3d 437 (D.C. Cir. 2018) ............................21

*ASTM v. Public.Resource.Org*, 82 F.4th 1262 (D.C. Cir. 2023) ...................*passim*

*Authors Guild v. Google, Inc.,* 804 F.3d 202 (2d Cir. 2015) ..................................19

*Banks v. Manchester*, 128 U.S. 244 (1888) ...........................................................7

*Bellwether Props., LLC, v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462 (Ind. 2017) ........................................................................................................13

*Bldg. Offs. & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730 (1st Cir. 1980) .................................................................................................................9

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...................................19

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) ......................23

*Canadian Standards Association v. P.S. Knight Co., Ltd.*, 112 F.4th 298 (5th Cir. 2024) ....................................................................................................9, 10

*Computer Associates Int'l v. Altai, Inc.*, 982 F.2d 693 (2d. Cir. 1992) .................17

*Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600 (1st Cir. 1988) ...................................................................................................17

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ..............................................................16

*Feist Publications, Inc. v Rural Telephone Service Co.*, 499 U.S. 340 (1991) ........................................................................................................23

*Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255 (2020)..........................*passim*

*Getty Petroleum Mktg., Inc. v. Cap. Terminal Co.*, 391 F.3d 312 (1st Cir. 2004) ..........................................................................................................13

*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) ...............................19, 23

*Howell v. Miller*, 91 F. 129 (6th Cir. 1898) ...........................................................7

*International Code Council, Inc. v. Upcodes*, 2020 WL 2750636 (S.D.N.Y May 27, 2020) .................................................................................17

*Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881 (9th Cir. 2005) ........................5, 6

*Veeck v. Southern Building Code Congress International*, 293 F.3d 791 (5th Cir. 2002) ...................................................................................9, 18, 23

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ............................................................................................... 19

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834) .................................... 6, 7

**Statutes & Regulations**

17 U.S.C. § 102 ............................................................................................ 16

Pub. L. No. 74-220, ch. 417, 49 Stat. 500-503 (July 26, 1935) .............. 10

1 C.F.R. § 51.1 ............................................................................................ 21

**Other Authorities**

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989) ............................................................................................ 25

Erwin N. Griswold, *Governance in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198 (1934) ................................................................................................... 10

Jodi L. Short, *The Political Turn in American Administrative Law: Power, Rationality, and Reasons*, 61 Duke L.J. 1811 (2012) ........... 10

Kimberly Kindy, *In Trump era, lobbyists boldly take credit for writing a bill to protect their industry*, WASH. POST, (August 1, 2017) ............. 8

L. Ray Patterson & Craig Joyce, *Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719 (1989) ................................................................ 17

"Law," Legal Info. Inst., Cornell L. Sch., https://www.law.cornell.edu/wex/law .............................................. 17

Nina A. Mendelson, Private Control Over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards, *112 Mich. L. Rev. 737, 772 (2014)* ......................................................... 11

*Oil Suit Dismissed in Supreme Court*, N.Y. Times, Oct. 2, 1934 ........... 11

Victoria F. Nourse & Jane S. Schacter, *The Politics of Legislative Drafting: A Congressional Case Study,* 77 N.Y.U. L. Rev. 575 (2002) ............. 8

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Public.Resource.Org ("Public Resource") is a nonprofit organization dedicated to making all government information, including law, easily and freely available online. Not long ago, that would have seemed impossible; today, it is not just possible but critically important. Thanks in part to Public Resource's work, the public can access judicial opinions, state and federal statutes, and the Federal Register, online, for free, without needing to waive any rights or surrender personal information, and with the full ability to study and share what they learn. Public Resource was the defendant in *Georgia v. Public Resource*, where the Supreme Court held that the government edicts doctrine allowed the organization to post the Official Code of Georgia Annotated online; and in *ASTM v. Public.Resource.Org*, where the D.C. Circuit Court of Appeals held that Public Resource's publication of standards incorporated by reference into law was a lawful fair use. Given its mission and long experience with efforts to use copyright claims to inhibit the public's ability to read, share, and comment on law in all of its forms, Public Resource believes it can help the Court understand the full array of public interests at issue in this case.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

Watch Duty is a nonprofit, nonpartisan organization focused on disseminating public safety information in real-time from verified sources. Our service is powered by real people – active and retired firefighters, dispatchers, and first responders – who diligently monitor radio scanners and collaborate around the clock to share up-to-the-minute life saving information. Our mission is to publish only the facts that provide true situational awareness in case of emergency, without editorialization or prediction. We honor integrity and correctness over speed or sensationalism so we can build and maintain trust with not only our community but our first responders. Watch Duty joins this brief to help assist the Court's understanding of how first responders and the communities they serve rely on standards incorporated into law.

iFixit, Inc. ("iFixit") is the world's largest free repair manual, with 117,329 step-by-step repair guides as of March 2025, for everything from toasters to tractors, many of them consisting of complicated electronics. These devices are governed by thousands of standards, and being able to understand the mandatory standards for the safety of electronic devices is important to repair professionals and enthusiasts worldwide. iFixit has also been directly involved in standards development, in keeping with its mission to make products more repairable and recyclable. Unfettered access to these standards increases the potential adoption of repairability best practices, which could reduce waste, limit unnecessary

manufacturing, and benefit consumers worldwide through lower repair costs and greater repair availability.

The American Library Association ("ALA"), established in 1876, is a nonprofit professional organization of about 50,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society. The Association of Research Libraries ("ARL") is an association of 127 research libraries in the United States and Canada. ARL promotes equitable access to and effective use of recorded knowledge in support of teaching and research. ALA and ARL work collaboratively on copyright issues through the Library Copyright Alliance. Collectively, ALA and ARL represent over 100,000 libraries in the United States. They share a strong interest in the balanced application of copyright law to digital uses.

Library Futures is a nonprofit organization dedicated to uncovering and confronting the fundamental policy issues that threaten libraries in the digital age.

Public Knowledge is a consumer rights organization that defends the rights of internet users, as well as libraries, archives, and cultural institutions, including their ability to freely access the law and other public materials. Public Knowledge promotes intellectual property policies that serve the public interest by ensuring

that the rights granted to authors and other creators are balanced with the public's

need to access information.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Copyright is nothing if not an exclusive right to restrict access to, and use of,

protected works. Where the work in question is a legal mandate, recognizing, much

less enforcing, such a right creates an untenable conflict between the Copyright

Act and the Bill of Rights. Accordingly, from the first Supreme Court copyright

decision onwards, courts have held that private parties cannot use copyright claims

to restrict the public's ability to speak and share the law. It would be sadly ironic

if, as ASTM and its supporting *amici* contend, the only exception to this rule

applied to the laws that most directly affect our everyday lives: regulations that

ensure our homes, workplaces, devices, and many other products, are safe and fit

for purpose.

Fortunately, neither the Constitution nor the Copyright Act support that

theory. *Amici* urge the Court to affirm summary judgment for UpCodes because

incorporation into law promotes a work to the public domain, whether that work is

draft statutory text or a model code. A ruling on this basis would foster legal

certainty, rather than requiring those who wish to speak the law to "roll the dice

with a potential fair use defense," which would inevitably cause the "less bold

among us" to "think twice before using official legal works." *Georgia v.*

*Public.Resource.Org, Inc.*, 590 U.S. 255, 275 (2020).

If this Court concludes instead that UpCodes must roll the dice on fair use, the odds should weigh heavily in UpCodes' favor. *Amici* will not recapitulate the fair use analysis already found in UpCodes' briefing, but we urge the Court to expressly reject ASTM's expansive interpretation of the Supreme Court's Factor One guidance in *Andy Warhol Found. for the Visual Arts, Inc.  v. Goldsmith*; its glib dismissal of the relevance of Factor Two; and its cramped reading of the public interests at issue in this case.

## ARGUMENT

### I.    The Court Should Affirm Summary Judgment for UpCodes Because Private Parties Cannot Own the Law

The internet has democratized access to law, making it easier than ever for the public – from journalists to organizers to safety professionals to ordinary concerned citizens – to understand, comment on, and share the myriad regulations that bind us. That work is particularly essential where those regulations are crafted by private parties and made mandatory by regulators with limited public oversight and increasingly limited staffing. As the Supreme Court has explained: "Every citizen is presumed to know the law, and it needs no argument to show that all should have free access" to it. *Georgia*, 590 U.S. at 265 (cleaned up).

ASTM and its *amici* claim the Copyright Act says otherwise. But copyright, while authorized by the Constitution, is still nothing more or less than a bundle of

statutory incentives. It cannot trump fundamental constitutional rights. *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 883–84 (9th Cir. 2005). Accordingly, standards incorporated into law are ineligible for copyright protection, following a consistent thread from the very first Supreme Court copyright decision, *Wheaton v. Peters*, through its recent guidance in *Georgia v. Public.Resource.Org.*; the reasoning of several circuit court decisions that have directly addressed the question; and the Copyright Act itself.

### A.   Courts Have Consistently Affirmed That the Public Must Have an Unfettered Ability to Read and Speak the Law, Including Regulations Incorporated By Reference

Decades of U.S. jurisprudence protects unfettered access to the law, including standards incorporated by reference into law. This case should be no exception.

### 1.   The Government Edicts Doctrine Forbids Copyright Restriction on Law

In 2020, the Supreme Court held that annotations to Georgia's official statutory code, as government edicts, were free from copyright. *Georgia*, 590 U.S. 255. The Court explained that officials who "speak with the force of law" cannot claim copyright in the works they create in the course of their official duties. *Id.* at 259.

This holding reflected an unbroken line of case law dating to the Court's first copyright decision: *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834). In that

case, one of the Court's official reporters claimed copyright in his annotated collection of the Court's opinions. The Court declared it was "unanimously of opinion, that no reporter has or can have any copyright in the written opinions delivered by this Court." *Wheaton,* 33 U.S. (8 Pet.) at 668. That conclusion "apparently seemed too obvious to adorn with further explanation." *Georgia*, 590 U.S. at 264.

Fifty years later, in *Banks v. Manchester*, 128 U.S. 244 (1888), the Court rejected a similar copyright claim by a court reporter of the Ohio Supreme Court. "The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute." *Id.* at 253; *see also Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) ("[A]ny person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book . . . .").

Relying on this history, in *Georgia v. Public.Resource.Org* the Supreme Court rejected the state of Georgia's copyright claim in annotations to Georgia's official statutory code. The Court held that the written output of judges and legislators, or others acting as "an arm" of those officials, and that arises from their judicial and legislative duties, is not copyrightable. *Georgia*, 590 U.S. at 265-67.

### 2.    The Government Edicts Doctrine Encompasses Laws Incorporated by Reference

The central thread in all of these cases, from *Wheaton* to *Georgia*, is the basic principle that "no one can own" law because "'all should have free access' to its contents." *Georgia*, 590 U.S. at 265 (quoting *Nash v. Lathrop*, 142 Mass. 29, 35 (1886)).

The fact that some laws are incorporated by reference does not change the analysis. The words of our statutes and regulations are frequently composed by private parties: constituents, lobbyists, industry associations, law professors, other state and foreign officials, uniform law commissions, and groups like the American Legislative Exchange Council. *See* Victoria F. Nourse & Jane S. Schacter, *The Politics of Legislative Drafting: A Congressional Case Study,* 77 N.Y.U. L. Rev. 575, 583 (2002); Kimberly Kindy, *In Trump era, lobbyists boldly take credit for writing a bill to protect their industry*, WASH. POST, (August 1, 2017).[2]

When a legislature or a regulator adopts these words in its official capacity, however, those works become government edicts. If courts allowed private parties to claim copyright in those edicts, "there would be 'no outer limit on claims of copyright prerogatives by nongovernmental persons who contribute to writing "the

---

[2] Available at https://www.washingtonpost.com/powerpost/in-trump-era-lobbyists-boldly-take-credit-for-writing-a-bill-to-protect-their-industry/2017/07/31/eb299a7c-5c34-11e7-9fc6-c7ef4bc58d13_story.html.

law",' such as lobbyists or law professors.…An individual who drafted a statute or amendment later adopted by Congress could claim copyright in the text." Amicus Br. of United States at 15, *S. Bldg. Code Cong. Int'l, Inc. v. Veeck*, 539 U.S. 969 (2003) (No. 02-355) (*en banc*)).[3]

Multiple circuit courts have recognized the problem. Presented with facts similar to those at issue here, the First Circuit observed.:

> [I]t is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder.…

*Bldg. Offs. & Code Adm. v. Code Tech., Inc.,* 628 F.2d 730, 736 (1st Cir. 1980).

The Fifth Circuit has also addressed virtually identical facts. In *Veeck v. Southern Building Code Congress International,* 293 F.3d 791 (5th Cir. 2002), a private citizen posted online model building codes that two Texas towns had adopted by reference. The organization that developed the codes sued for copyright infringement. Sitting *en banc*, the Fifth Circuit rejected the claim, using language that presaged the Supreme Court's analysis in *Georgia*:

> The very process of lawmaking demands and incorporates contributions by "the people," in an infinite variety of individual and organizational capacities…In performing their function, the lawmakers represent the public will, and the public are the final "authors" of the law.

---

[3] Available at https://www.justice.gov/sites/default/files/osg/briefs/2002/01/01/2002-0355.pet.ami.inv.pdf.

*Id.* at 799.

The court revisited the issue last year, in *Canadian Standards Association v. P.S. Knight Co., Ltd.*, 112 F.4th 298 (5th Cir. 2024). The plaintiff in that case also developed model codes, some of which were incorporated by reference into Canadian law. Defendants published copies of those incorporated codes. Applying Canadian law to the question of copyrightability, the court agreed that model building codes may be copyrightable in Canada. Applying U.S. law to the question of infringement, however, the court held that once those codes were incorporated into law, they were no longer protected under the Copyright Act. Because defendants published only model codes that had become law, their use was not infringing. *Id.* at 304–05 (citing *Veeck*, 293 F.3d at 800).

### 3.      Full Ability to Speak and Share the Law Is Particularly Important Where That Law Is Incorporated By Reference

The public cannot blindly rely on the agencies that adopt private standards into law to ensure that those decisions serve the public interest. Instead, the public must be able to access and share that law so it can hold regulators accountable for their decisions. *See* Jodi L. Short, *The Political Turn in American Administrative Law: Power, Rationality, and Reasons*, 61 Duke L.J. 1811, 1821 (2012).[4] As

---

[4] Indeed, one of the principal historical events leading to the Federal Register Act (Pub. L. No. 74-220, ch. 417, 49 Stat. 500-503 (July 26, 1935)) was a government action to enforce an administrative oil quota rule that, it turned out, did not exist.

Professor Nina Mendelson notes:

> [R]egulatory standards . . . are among the longest-lasting, highest-impact exercises of power by government. They cover virtually every area of governmental power, apply to entire classes of entities and individuals, and have prospective, legally binding effect until the government takes further action to repeal them. . . . Accountability is thus critical to deterring agency violations of law and arbitrariness, to safeguarding against "capture" or the undue influence of any particular subgroup, to inhibiting reliance on inadequate or biased information, and to addressing a range of other governance problems.

Nina A. Mendelson, *Private Control Over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 772 (2014).

Recent events underscore the point. As federal agencies are being radically restructured, regulations rewritten or reversed, and the personnel available to determine which standards should be incorporated into new regulations drastically reduced, the need for public oversight and accountability is acute.

### 4. Standards Incorporated by Reference Affect Multiple Constituencies and Read-Only Access Does Not Suffice

#### a. Standards Incorporated Into Law Are Important Legal Mandates

Of course, the public also needs unfettered access to understand and enforce myriad legal obligations. For example, amicus Watch Duty has seen how fire

---

*Oil Suit Dismissed in Supreme Court*, N.Y. Times, Oct. 2, 1934, at 6; *see also* Erwin N. Griswold, *Governance in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198 (1934) (arguing for creation of a federal register).

safety professionals and residents in fire-prone regions, such as the California
communities that have been repeatedly ravaged by wildfires in recent years,
depend on building regulations. Indeed, in a time when federal agency staffing is
being drastically reduced, communities who are concerned about fire risk
mitigation, and professionals in the field fighting fires and cleaning up afterwards,
may find it more necessary than ever to do their own research into regulatory
compliance – beginning with understanding what those regulations *are*.

Fire safety professionals might want to be sure their equipment is up to code,
or that they are correctly disposing of toxic chemicals in the wake of a fire. A
person renovating an old structure may need to know not just current building or
energy standards but those in effect at the original time of construction or
modification. Their neighbors may want to know whether they are complying with
current regulations or have gotten a waiver that allows them to adhere to earlier
standards instead.

Renters, for their part, might have an acute interest in understanding whether
their landlords are violating electricity regulations (potentially increasing the risk
of fire). In California, those tenants have limited options: (1) pay $271 for a print
copy of the California Electrical Code; (2) find a library with a copy, limiting their
ability to highlight relevant sections or refer back to it later; or (3) create a user
account and access it in an online reading room that will not allow them to search

for, bookmark, print, or copy and paste relevant selections.

Courts need full access to regulatory mandates as well—and they have not always had it. In 2017, for example, the Indiana Supreme Court was unable to obtain a safety code that lay at the heart of a dispute before it because of publisher-imposed limitations on access to the code. *Bellwether Props., LLC, v. Duke Energy Indiana, Inc.,* 87 N.E.3d 462, 467–69 (Ind. 2017). The court ultimately found a copy of the standard that had been posted on the Internet Archive by amicus Public Resource, and issued an opinion that highlighted the problem of public access to the law caused by restrictions on material incorporated by reference. *See id.* at 467–69.

A similar dilemma arose in a dispute that turned on application of the 1987 edition of a standard that had been incorporated into the Rhode Island Building Code. *Getty Petroleum Mktg., Inc. v. Cap. Terminal Co.*, 391 F.3d 312, 316 (1st Cir. 2004). The complaining party asked the trial court to take judicial notice of the state building code. The court required the complaining party to introduce the standard into evidence, but counsel were unable to locate the correct edition of the standard (they could only find the 2000 edition). *Id.* at 317. The trial court could not find it either. *Id.* at 321. The court granted judgment as a matter of law against the complaining party for failure to prove the content of the relevant regulation. *Id.* at 318. The First Circuit affirmed, ruling the district court was not obliged to take

13

judicial notice of a regulation it could not review. *Id.* at 321.

### b. Read-only Access Does Not Suffice

So-called "reading rooms" do not fix the problem. For example, to gain access to incorporated standards through ASTM's online portal, a user must create an account, providing their full name and email address, and agree to allow their data to be used for marketing purposes. *See Reading Room*, ASTM Int'l, https://www.astm.org/products-services/reading-room.html (clicking "Open Reading Room" prompts user to create an account); *Privacy Policy*, ASTM Int'l, https://www.astm.org/privacy-policy (providing that ASTM may use collected personal data for marketing purposes). After creating an account, the user cannot enter the reading room until they agree to ASTM's terms of use—which, among other things, require the user's consent to personal jurisdiction in Pennsylvania for any related disputes and forbid *any* copying of the incorporated standards without ASTM's express permission. True to those restrictions, the functionality of the reading rooms is limited, with no options to copy and paste, print, or annotate key text for personal use.

As the NAACP noted in a brief it filed in the *ASTM v. Public.Resource.Org* litigation, where several standards organizations had alleged that a nonprofit infringed their copyrights by posting standards that had been incorporated into law, that level of access falls well short of public needs. Amicus Br. of the National

Assoc. for the Advancement of Colored People, *ASTM v. Public.Resource.Org*, 82

F.4th 1262 (D.C. Cir. 2023) ("*ASTM IV*"). For example, organizers who seek to

educate under-resourced communities about housing regulations to help them

understand their rights and advocate for reform need to be able to download, print,

and annotate copies of standards incorporated into those regulations:[5]

> Organizers, many of whom are volunteers, must be able to access the
> applicable laws and regulations in myriad contexts, including meetings
> where internet access is often unavailable. They must also be able to
> forward that information by email, download and print it, copy and
> paste relevant sections into multiple documents, bring copies to
> community meetings, and distribute them widely. The reading rooms
> permit none of those things…. [Further] families in financial distress,
> who are in legal disputes with their landlords over housing conditions,
> or who are under threat of eviction, often struggle to pay for home
> internet. This "digital divide" can make access to the reading rooms
> difficult or impossible for those who might need it most. In these cases,
> community members need to rely on NAACP volunteers or staff to
> conduct research on their behalf, and print or copy the relevant sections.

*Id.* at 23-24.

Other *amici* shared similar concerns. Print-disabled people explained that

reading rooms are essentially inaccessible. Amicus Br. of Prime Access

Consulting, *ASTM IV,* 82 F.4th 1262.[6] Journalists explained that they frequently

provide news coverage related to these standards, and full access is essential to

informing their work, and in turn to educating the public. Amicus Br. of Rptrs.

---

[5] Available at https://www.eff.org/files/2022/12/12/2022-12-12_naacp_amicus.pdf

[6] Available at https://www.eff.org/document/amicus-brief-prime-access-consulting

Comm. for Freedom of the Press et al. at 8–10, *ASTM IV,* 82 F.4th 1262.[7] Union

members explained that unfettered access to mandatory standards helps them

advocate and negotiate for safe working conditions. Amicus Br. of Am. Fed'n of

State, Cnty. & Mun. Emps. at 5–8, *ASTM IV*, 82 F.4th 1262.[8] Library associations

explained that full access to legal information helps them fulfill their missions,

noting in particular the increasing number of pro se litigants among their patrons.

Amicus Br. of Library Futures Inst. et al. at 3–4, *ASTM IV*, 82 F.4th 1262.[9]

Against this background, ASTM's claims that the prices it charges for the

Works at issue are "reasonable," and that it doesn't know of any person who has

been unable to access them, miss the point entirely. Op. Br. at 42. The question is

whether ASTM should be permitted to erect *any* barriers in the first place where a

work has become a part of a legal mandate. And the answer is *no.*

### B.   The Plain Text of the Copyright Act and the Merger Doctrine Also Exclude Standards Incorporated into Law

One of copyright's necessary "built-in First Amendment accommodations"

*Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003), the idea/expression dichotomy, can

---

[7] Available at https://www.eff.org/document/amicus-brief-reporters-committee-freedom-press-et-al-0

[8] Available at https://www.eff.org/document/amicus-brief-american-federation-state-county-municipal-employees.

[9] Available at https://www.eff.org/document/amicus-brief-library-futures-everylibrary-institute-authors-alliance-public-knowledge.

help resolve the conflict this case presents. As recognized in the Copyright Act, copyright does not reach "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

Law, including components incorporated by reference, falls easily within this category. It is a "*system* of rules that regulate the conduct of a community and is often enforced by a controlling authority through penalties." *See* "Law," Legal Info. Inst., Cornell L. Sch., https://www.law.cornell.edu/wex/law; *see generally* L. Ray Patterson & Craig Joyce, *Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719, 777 (1989).

And to the extent that standards contain creative expression, incorporation into law causes those expressive elements to merge with the "idea" of the law as enacted, because there is then only one way to express the rule that binds people in a jurisdiction. *Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988) ("When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression."); *see also Computer Associates Int'l v. Altai, Inc.*, 982 F.2d 693, 708 (2d. Cir. 1992) ("[W]hen specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their

later use by another will not amount to infringement."). Thus, in *International Code Council, Inc. v. Upcodes,* for example, the court found that "copying a model code that has been adopted in full would be protected by merger if done for the purpose of expressing the identically-worded law." 2020 WL 2750636, at *21 (S.D.N.Y May 27, 2020).

Put another way, incorporation by reference transforms the incorporated text into an uncopyrightable legal fact. After all,

> It should be obvious that for copyright purposes, laws are 'facts': the U.S. Constitution is a fact; the Federal Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less 'facts' than the products of more august legislative or regulatory bodies.

*Veeck*, 293 F.3d at 801.

### C.    The Public Needs Equal Access to *All* Standards Necessary to Comprehend Legal Obligations

The fact that the standards at issue in this case were not themselves directly incorporated into law does not change the analysis. They are essential components of the standards that *are* so incorporated, and therefore necessary to understand those standards. As such, they are equivalent to statutory definitions that give meaning to the statute as a whole. Restrictions on their access and use means those who cannot afford "first class" access must make do with an incomplete, economy-class version of the law. *See Georgia*, 590 U.S. at 275.

## II.    In the Alternative, the Court Should Affirm That Upcodes' Publication of a Comprehensive Database of Law Is a Lawful Fair Use

*Amici* will not burden the Court by replicating Upcodes' own fair use

arguments. However, we urge the Court to reject ASTM's mischaracterization of

Factors 1, 2, and 4.

### A.    Factor One Can Favor Fair Use Even If the Secondary User Does Not Comment on the Original Work

ASTM mistakenly suggests that, after *Andy Warhol Foundation for the

Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ("*Warhol*"), transformativeness

turns primarily on whether the secondary user has commented on or criticized the

original work. Op. Br at 32. In fact, the Court's opinion in that case repeatedly

referred to criticism as a *nonexclusive* example of a favored use. 598 U.S. at 530,

532, 544-45, 557. The Court also discussed approvingly numerous fair uses that

involved no commentary or criticism, including scanning and storing the full text

of books, *Authors Guild v. Google, Inc.,* 804 F.3d 202 (2d Cir. 2015), and copying

portions of a programming interface to use them in a new operating system,

*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021). The Court even engaged

in such non-critical fair use itself, by reproducing Prince commemorative magazine

covers as evidence of a competitive market for Prince portraits on magazine

covers. *Warhol,* 598 U.S. at 521.

Rather than adopting a narrow view of Factor 1, *Warhol* describes the first

factor analysis as an inquiry into "the justification for the use." Thus, the "'central' question under the first factor" is still "whether the new use served a purpose distinct from the original, or instead superseded its objects." *Warhol,* 598 U.S. at 542 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). As the Court recognized, its prior *Campbell* decision established the general framework for approaching the first factor, *see* 510 U.S. at 581, and its analysis was an application of this general framework, not a replacement.

The D.C. Circuit addressed a similar argument in *ASTM v. Public.Resource.Org*. Both the plaintiffs and defendant published standards incorporated into law, including some online (albeit in very different formats—in contrast to the SDOs reading rooms, standards in Public Resource's database are fully accessible and downloadable). Citing *Warhol*, the court held:

> Public Resource's use is transformative because it serves a different purpose than the plaintiffs' works. . . The plaintiffs seek to advance science and industry by producing standards reflecting industry or engineering best practices. Public Resource's mission in republishing the standards is very different—to provide the public with a free and comprehensive repository of the law. This distinction is fundamental: Public Resource publishes only what the law is, not what industry groups may regard as current best practices. And although the standards at issue have been superseded or withdrawn as private standards, they remain important to someone trying to figure out what the law is (or, in the case of standards prospectively repealed or amended as law, what law governs disputes about past conduct).

*ASTM IV*, 82 F.4th at 1268.

As the district court explained, the same is true in this case. *ASTM v. UpCodes*, 2024 WL 4374117, at \*11 (E.D. Pa 2024). This Court should reject ASTM's invitation to create a circuit split as to whether publishing standards *as law*, as opposed to "best practices," favors fair use.

### B.    Factor Two Should be Central to the Fair Use Analysis

ASTM's claim that Factor 2 should not play a significant role in this case, Op. Br. at 46, is flatly incorrect; the nature of the works at issue is the heart of the case.

Even before incorporation, the works at issue are primarily technical descriptions of objective facts, e.g., methods of safety testing. Op. Br. at 8. As such, they stand at the outer edge of copyrightability at best. Indeed, the standards would hardly have been incorporated into law if a regulator thought they were creatures of whimsy.

Further, the status of the works as legal mandates fundamentally changes the analysis. If "no one can own the law," *Georgia*, 590 U.S. at 265 (collecting cases), then "the express text of the law falls plainly outside the realm of copyright protection." *ASTM v. Public.Resource.Org*, 896 F.3d 437, 451 (D.C. Cir. 2018) ("*ASTM II*"). When federal agencies incorporate specifically identified documents or portions of documents using the procedure established in 1 C.F.R. § 51.1, that text becomes the express text of the law. State agencies follow similar procedures

with the same legal effect. When that occurs, there is an "easy substitution" of documents incorporated by reference for expressly copying the text into a statute, *ASTM II*, 896 F.3d at 452, and the second factor weighs "heavily" in favor of fair use. *Id.*

### C.    ASTM Misconstrues the Relevant Licensing Market and Ignores Decades of Real World Evidence

As an initial matter, there cannot be a cognizable market in licensing law. Given that UpCodes only offers access to standards that have been incorporated into law *specifically*, rather than the myriad other standards ASTM develops, any licensing market theory for standards *generally* does not apply. The customary price for the legal right to reproduce, disseminate, and provide access to the law is zero.

Moreover, the Court should not give undue weight to ASTM's speculation as to future market harm, given that standards organizations have been making similar claims for more than two decades, since the *Veeck* decision. Despite numerous rulings limiting their expansive claim to copyrights in standards incorporated into law, these organizations continue to thrive, perhaps because most of their revenue comes from marketing standards that have not been incorporated into law, as well as ancillary trainings and other materials.

In *ASTM v. Public.Resource.Org*, for example, the plaintiffs insisted that Public Resource's publication of standards incorporated into law would decimate

their markets. After ten years of litigation, however, they were unable to muster a smidgen of actual evidence of any harm. Both the district court and the D.C. Circuit found it "telling" that the plaintiffs could "not provide any quantifiable evidence, and instead rel[ied] on conclusory assertions and speculation long after [Public Resource] first began posting the standards." *ASTM IV*, 82 F.4th at 1272 (quoting *ASTM v. Public.Resource.Org*, 597 F.Supp.3d 213, 240 (D.D.C. 2022) ("*ASTM III*")).

The Supreme Court has stressed that "copyright 'should not grant anyone more economic power than is necessary to achieve the incentive to create.'" *Google*, 593 U.S. at 21. Accordingly, courts must focus on market effects that would "frustrate the purposes of copyright by materially impairing [rightsholders'] incentive to publish the work." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014).

Here, "it is difficult to imagine an area of creative endeavor in which the copyright incentive is needed less." *Veeck*, 293 F.3d at 806. Appellant concedes that its primary contribution to standards development is the time and labor required to convene the many volunteers who actually draft those standards. Op. Br. at 10. But copyright is not intended to reward that kind of work, however valuable. *See Feist Publications, Inc. v Rural Telephone Service Co*., 499 U.S. 340, 359-60 (1991) (noting that "originality, not 'sweat of the brow,' is the touchstone

of copyright protection"). And there is no reason to believe that the volunteers are motivated by the possibility of copyright royalties, assuming they even receive them. Rather, they do the work to help promote public safety, energy efficiency and other public interests. In some cases, they may also be motivated by concern for their own business interests, professional interest in garnering recognition or experience, or their role as government officials and in service of the public interest.

Given these incentives, the public policy favoring unrestricted access to the subset of standards incorporated by reference into law does not conflict with the public policy favoring the development of technical standards. Everyone has ample motivation to continue that work.

### D.    The Purposes of Copyright Are Better Served by Permitting the Use Than Forbidding It

As noted above, *supra* Section I, the public benefits of unimpeded access to law are clear.  Against those interests, ASTM points to the benefits of the "public-private partnership," claiming that private development of legal mandates saves the government time and money. Op. Br. at 8-9, 13. While that claim may be true on the "development" side of the coin, governments hardly get off scot-free. To the contrary, public officials in jurisdictions large and small must still pay to acquire copies of legally mandated standards, so they can know the rules they are required to enforce. In 2019, for example, one county alone spent almost $400,000 on

copies of model codes.[10] That amounts to a significant drain on tax dollars that is necessarily replicated in thousands of counties around the country. Moreover, the county and its citizens are not permitted to make full use of those codes, such as by creating a database that easily cross references the multiple regulations that may apply to a single system or type of equipment.

In an era when technology could support greater access to and understanding of the law, copyright should not be read to impede it.

## CONCLUSION

"Rudimentary justice requires that those subject to the law must have a means of knowing what it prescribes." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989). Copyright in the law inevitably creates gatekeepers to that knowledge. *Amici* urge this Court to join its sister circuits in rejecting the idea that any private party can own the law or ration access to it.

---

[10] Available at https://www.eff.org/document/amicus-brief-county-sonoma

Dated: March 31, 2025                    Respectfully submitted,

*s/ Samuel W. Silver*

Samuel W. Silver, PA Bar No. 56596
Abigail T. Burton, PA Bar No. 334450
WELSH & RECKER, P.C.
306 Walnut Street
Philadelphia, PA 19106
(267) 764-5492; 5498

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

*Counsel for Amici Curiae*

# CERTIFICATIONS

I hereby certify the following:

      1.     I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit. 3d Cir. L.A.R. 28.3(d).

      2.     This brief complies with the type-volume limitation of F.R.A.P. 29(a)(5) and 32(a)(7)(B) because this brief contains 5,784 words, excluding the parts of the brief exempted by F.R.A.P. 32(f) and 3d Cir. L.A.R 29.1(b).

      3.     I certify that the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system and that service will be accomplished by the appellate CM/ECF system.

      4.     The text of the electronic brief is identical to the text in the paper copies. 3d Cir. L.A.R. 31.1(c).

      5.     The Huntress virus protection program, version 01.13.158, has been run on this file and no virus was detected. 3d Cir. L.A.R. 31.1(c).

      6.     This brief complies with the typeface and type-style requirements of F.R.A.P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman font.

Dated: March 31, 2025                        *s/ Samuel W. Silver*
                                           Samuel W. Silver