**No. 24-2965**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

American Society for Testing and Materials d/b/a ASTM International,

*Plaintiff-Appellant*,

v.

UpCodes, Inc., Garrett Reynolds, and Scott Reynolds,

*Defendants-Appellees.*

Appeal from the United States District Court for the Eastern District of
Pennsylvania, No. 2:24-cv-01895, Hon. Anita B. Brody

**BRIEF OF PROPOSED AMICUS CURIAE
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
IN SUPPORT OF APPELLEES**

Paula Knudsen Burke
*Counsel of Record*
Lisa Zycherman*
Gabriel Rottman*
Mara Gassmann*
*Of counsel
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
pknudsen@rcfp.org
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26, the Reporters Committee for Freedom of the Press certifies that it is an unincorporated association of reporters and editors with no parent corporation and no stock.

## **RULE 29(a)(4)(E) CERTIFICATION**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the Reporters Committee certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than amicus, its members, or counsel—contributed money that was intended to fund preparing or submitting the brief.

ii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

RULE 29(a)(4)(E) CERTIFICATION........................................................... ii

TABLE OF CONTENTS............................................................................ iii

TABLE OF AUTHORITIES ....................................................................... iv

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ..........1

SUMMARY OF ARGUMENT .....................................................................3

ARGUMENT ...........................................................................................5

I.      By compiling and publishing incorporated legal standards free of charge, UpCodes enables the press to access and disseminate binding law to the public.............................................................................5

II.     Depriving the press and public of the opportunity to freely review and republish incorporated standards would harm the public interest and is inconsistent with the other legal protections providing for robust access to similar material....................................................................13

        A.      The District Court's conclusion is supported by the reasoning underpinning both the fair use and government edicts doctrines. ......13

        B.      The First Amendment establishes a right of access by the press and public to a wide variety of governmental activities, and the incorporated text of privately drafted standards should be freely accessible for similar reasons..........................................................17

CONCLUSION......................................................................................21

COMBINED CERTIFICATIONS................................................................23

CERTIFICATE OF SERVICE ...................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988)...............11

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262
   (D.C. Cir. 2023) ................................................................................ 7, 13

*Banks v. Manchester*,
   128 U.S. 244 (1888)..................................................................................16

*Building Officials & Code Administration v. Code Technology, Inc.*,
   628 F.2d 730 (1st Cir. 1980) ....................................................................15

*Canadian Standards Ass'n v. P.S. Knight Co.*,
   112 F.4th 298 (5th Cir. 2024),
   *cert. denied*, No. 24-537, 2025 WL 247484 (U.S. Jan. 21, 2025).......................16

*Detroit Free Press v. Ashcroft*,
   303 F.3d 681 (6th Cir. 2002) ...................................................................19

*Garrison v. Louisiana*,
   379 U.S. 64 (1964)....................................................................................17

*Georgia v. Public.Resource.Org, Inc.*,
   590 U.S. 255 (2020) ........................................................ 3, 6, 7, 11, 17, 20, 21

*Harper & Row Publishers v. Nation Enterprises*,
   471 U.S. 539 (1985)..................................................................................14

*Mills v. Alabama*,
   384 U.S. 214 (1966)....................................................................................6

*NYCLU v. N.Y. City Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012)......................................................................19

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971)..................................................................................20

*Press-Enterprise Co. v. Superior Court*,
   464 U.S. 501 (1984)..................................................................................21

iv

*Press-Enterprise Co. v. Superior Court,*
  478 U.S. 1 (1986) ...................................................................................21

*Publicker Indus., Inc. v. Cohen,*
  733 F.2d 1059 (3d Cir. 1984) .................................................................19

*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) ................................................................ 17, 18, 19, 20

*Saxbe v. Wash. Post Co.,*
  417 U.S. 843 (1974) .............................................................................. 6, 18

*Sony Corp. of America v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ...............................................................................14

*United States v. Grimaud,*
  220 U.S. 506 (1911) ...............................................................................21

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,*
  896 F.3d 437 (D.C. Cir. 2018) ...............................................................21

*Wheaton v. Peters,*
  33 U.S. 591 (1834) .............................................................................. 20, 21

*Whitney v. California,*
  274 U.S. 357 (1927) ...............................................................................12

**Statutes**

17 U.S.C. § 102 ...........................................................................................21

5 U.S.C. § 552(a)(1) ...................................................................................16

Ohio Fire Code 1301:7-7-09 .......................................................................9

**Other Authorities**

49 C.F.R. § 192.7(b) ....................................................................................9

Amici Curiae Br. of Reporters Comm. & 25 Media Orgs., *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255 (2020)  (No. 18-1150),
  2019 WL 5305477 .......................................................................................1

v

Amici Curiae Br. of Reporters Comm. & 11 Media Orgs., *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) (No. 22-7063), 2022 WL 17602831 ..................................................................1

Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U. Chi. L. Rev. 1175 (1989) .................................................................................................................5

*ASTM F963-11 Standard Consumer Safety Specification for Toy Safety*, ASTM Int'l, https://perma.cc/TJZ6-XCL2 ...............................................................10

Brian Lopez, *Texas Education Agency's New School Library Standards Push for More Scrutiny and Parental Input*, The Texas Tribune (Apr. 11, 2022), https://perma.cc/5B9N-DYJ2 .......................................................................19

Chalmers Rogland, *Greer Factory Where Man Disappeared Fined over $30k by SC OSHA.  Here Are the 12 Violations*, Herald Journal (Nov. 3, 2022), https://perma.cc/P494-LM9Y ........................................................................8

David Shepardson, *Democratic Senators Press U.S. Auto Agency on Safety Rules*, Reuters (Nov. 15, 2022), https://perma.cc/86FY-S9C6 .....................................18

Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J.L. & Pub. Pol'y 131 (2013) .................................................................7

Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 Kan. L. Rev. 279 (2015) .....................................................................................................7

Jim Mackinnon, *Victim Identified After Timber Top Apartment Units Evacuated for Carbon Monoxide*, Akron Beacon Journal (Oct. 21, 2022), https://perma.cc/32JQ-47V2 .........................................................................9

Nina A. Mendelson, *Private Control Over Access to the Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737 (2014).................................................. 6, 7, 8, 10, 19, 20

O'Tressmass Tree (@twatts_up), Twitter (Oct. 24, 2022, 8:04 AM), https://perma.cc/4V3K-XUN7 .......................................................................9

Peter L. Strauss, *Private Standards Organizations and Public Law*, 22 Wm. & Mary Bill of Rts. J. 497 (2013) .................................................................. 9, 10

Ronda Kaysen, *How Do I Know if My Apartment Building is Unprepared for a Fire?*, N.Y. Times (Feb. 5, 2022), https://perma.cc/TR9W-Z9L4 .......................8

vi

Sarah Lynch, *Oath Keepers Founder Guilty of Sedition in U.S. Capitol Attack Plot*, Reuters (Nov. 29, 2022), https://perma.cc/K3XB-JGQM ...................................14

*Standards Incorporated by Reference (SIBR) Database*, Standards.gov, https://sibr.nist.gov/ .................................................................................7

*The Roots of Access Rights*, Reporters Comm. for Freedom of the Press (last visited Nov. 27, 2022), https://perma.cc/UC2E-XGJR ........................................14

vii

## <u>STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE</u>

The Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Reporters Committee has a powerful interest in ensuring the public availability of government documents, especially those that hold the force of law. This interest extends to materials that were initially drafted by private entities and subsequently incorporated by reference into statutes and regulations. The Reporters Committee has filed in other cases involving claims of copyright infringement over model codes enacted as laws or annotations thereto. *See* Amici Curiae Br. of Reporters Comm. & 25 Media Orgs., *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255 (2020) (No. 18-1150), 2019 WL 5305477; Amici Curiae Br. of Reporters Comm. & 11 Media Orgs., *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) (No. 22-7063), 2022 WL 17602831.

1

Incorporated standards have been widely adopted by all levels of government and impose various obligations on product manufacturers, landlords, employers, and many other groups. Journalists frequently provide news coverage related to these standards, and access is essential to informing their work. That, in turn, allows journalists to educate members of the public about the laws that govern their lives. The Reporters Committee therefore has an interest in ensuring that copyright law is not interpreted to limit public access to these materials.

Appellees consent to the filing of this amicus brief. Proposed amicus did not receive a response with its position in time for filing. *See* Fed. R. App. P. 29(a)(2).

## SUMMARY OF ARGUMENT

The Supreme Court in *Georgia v. Public.Resource.Org, Inc.* articulated the common sense principle that "no one can own the law." 590 U.S. 255, 265 (2020). In so holding, it foreclosed the possibility that private entities, compiling and publishing the law at the direction of government agencies, could invoke copyright law to prevent others from republishing the law. Yet new questions arise as private entities continue to take on the responsibility of drafting significant portions of federal, state, and local regulations—and specifically, when they draft proposed standards, such as the technical building requirements copyrighted here, that lawmakers and regulators subsequently incorporate by reference into regulations. The text of the incorporated standards is not required to be reproduced in the codes or regulations, but the words still carry the force of law. Since *Georgia* was decided five years ago, several federal courts have rejected efforts by these private entities to sue others who reprint these legal standards for copyright infringement, as the District Court correctly did here.

The press has a significant interest in reporting on what these standards say, and this interest would be undermined if copyright law could be interpreted to prevent Appellees (together, "UpCodes") from compiling and sharing the text of incorporated standards. This is because incorporated standards impose wide-ranging legal obligations—setting various safety requirements that bind product

manufacturers, real estate developers, landlords, employers, among many other classes of individuals and entities. And the press relies on access to these standards to inform the public as to what these standards require and when they may have been violated. Indeed, the role the press plays in facilitating public understanding of the law and the operations of government is heightened here, as individual citizens would be unable to reasonably access every standard on their own. By compiling and sharing incorporated standards in one place, providing search functionality, and allowing users to download the standards, organizations like UpCodes enable the press to carry out this valuable reporting.

Any individual copyright interest held in an incorporated standard should not outweigh the press and public's critical interest in freely accessing, commenting on, and sharing the specific language that operates as binding law. There are many legal bases for arriving at this conclusion, as the cases invoking a range of complementary rationales show. For example, as the District Court, drawing on several sister courts and the U.S. Court of Appeals for the District of Columbia Circuit, held, the 17 U.S.C. § 107 factors support a finding of fair use here. And courts that have adopted or incorporated principles from the government edicts doctrine have recognized that similar legislative materials, including statutory annotations drafted by private entities, are per se uncopyrightable. Moreover, the access provided by UpCodes serves the same

4

transparency purposes that other areas of the law advance as well. For instance, the First Amendment requires public access to trials and other governmental functions to preserve the ability of the press and public to oversee government action.

Regardless of the theory chosen, all roads lead back to a principle that is as intuitively true as it is, as a policy matter, important: The public must be free to republish, and thus able to access, the law, which necessarily includes those promulgated standards incorporated by reference in statutes and regulations. *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989) ("Rudimentary justice requires that those subject to the law must have the means of knowing what it prescribes."). This Court should affirm the decision of the District Court to preserve valuable rights of public access to the law and important public interest reporting that is made possible by that access.

## **ARGUMENT**

**I.  By compiling and publishing incorporated legal standards free of charge, UpCodes enables the press to access and disseminate binding law to the public.**

The press conveys information about the workings of government to the public in many forms—from routine updates on policy changes to larger exposés on government misconduct. Collectively, this has a profound effect: "An informed public depends on accurate and effective reporting by the news media . . .

5

[because the press] is the means by which the people receive that free flow of information and ideas essential to intelligent self-government." *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 863 (1974) (Powell, J., dissenting).  Reporting on government action—and the political discussion this reporting informs—is core to First Amendment protections, as "there is practically universal agreement that a major purpose of that Amendment [is] to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  Reporting on government thus promotes debate on matters of public importance and an informed electorate.

One way in which the press provides this oversight is by routinely publishing information regarding statutes and regulations enacted at all levels of government.  Historically, the government directly relied on the press to distribute laws to the broader public, and "[p]rior to 1795, at least three newspapers in each state were responsible for printing authentic copies of laws and regulations."  Nina A. Mendelson, *Private Control Over Access to the Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 764 (2014).  Recognizing the important role the press fulfilled, Congress even "provided for newspapers to be carried in the mail at rates far lower than for letters, specifically for 'the diffusion of knowledge,' including public information" through the 1792 Post Office Act.  *Id.*  The Supreme Court has also recognized that judicial opinions

and certain legislative materials like legislative annotations—even if drafted by private entities—do not qualify for copyright protection, allowing the news media and the wider public to freely access and publish commentary on the substance of the law. *See Georgia*, 590 U.S. at 274 (explaining that "non-binding" statutory annotations can indicate if certain provisions in the official code may have been held unconstitutional, and access to this material is necessary for a citizen to "learn[] his legal rights and duties"); *see also Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1270 (D.C. Cir. 2023) (explaining that annotations and background materials, just like legislative history, "may prove similarly important for resolving ambiguities in the portions of standards that set forth the directly binding legal obligations").

Today, lawmakers and agencies at both the state and federal level increasingly rely on incorporation by reference to give privately drafted rules and safety standards the force of law. It is a common practice in which government agencies "codif[y] material published elsewhere by simply referring to it in the text of a regulation." Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J.L. & Pub. Pol'y 131, 133 (2013). In particular, technical and safety standards developed by private sector, usually non-profit entities, like those at issue in this case, are frequently the subject of incorporation. Many of these standards are thereafter owned by private standards-developing

7

organizations and "may be available to the public only by purchase from a private organization."  Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 Kan. L. Rev. 279, 286 (2015).  The price of access to these standards can vary widely, and at times be prohibitively expensive for news organizations, particularly cumulatively.  *See* Mendelson, *supra*, at 743–44 ("Prices that [standards-developing organizations] charge for a variety of [incorporated] standards range from fifty to several thousand dollars for the prescription drug compendia incorporated in Medicare rules.").  For example, the cost of a PDF copy of a toy safety standard developed by the American Society for Testing and Materials ("ASTM") is $125.00 (up from $76 in 2015 and $103 in 2022).  *See ASTM F963-11 Standard Consumer Safety Specification for Toy Safety*, ASTM Int'l, https://store.astm.org/f0963-23.html (last updated Oct. 13, 2023); *see also* https://perma.cc/TJZ6-XCL2 (last updated May 24, 2022).  For example, when it was available, it cost more than $400 to acquire Underwriters Laboratories' "Standard for Manual Signaling Boxes for Fire Alarm Systems," a standard incorporated by reference in numerous municipal codes.  Peter L. Strauss, *Private Standards Organizations and Public Law*, 22 Wm. & Mary Bill of Rts. J. 497, 509 (2013).

ASTM here states that it provides the incorporated materials free of charge to persons or entities who contact it and represent to ASTM that they would not

8

otherwise be able to access the standards.  Even assuming a member of the press or public knows it may be able to petition ASTM for a free copy, protecting access here requires more than a party's claimed willingness to waive fees on a case-by-case basis.  Obtaining and reviewing many of these standards would be difficult for most citizens, and it is often the press that scrutinizes the text of proposed regulations and notifies the public of potential issues.  *See, e.g.*, David Shepardson, *Democratic Senators Press U.S. Auto Agency on Safety Rules*, Reuters (Nov. 15, 2022), https://perma.cc/86FY-S9C6; Brian Lopez, *Texas Education Agency's New School Library Standards Push for More Scrutiny and Parental Input*, The Texas Tribune (Apr. 11, 2022), https://perma.cc/5B9N-DYJ2.[1]

Despite the hurdles to public access, incorporated standards still impose potentially wide-ranging legal obligations upon the public.  Accordingly, the press frequently reports stories involving safety standards with provisions incorporated by reference.  To give just two examples, such coverage may expose workplace safety issues when incorporated standards are violated.  *See, e.g.*, Chalmers Rogland, *Greer Factory Where Man Disappeared Fined over $30k by SC OSHA.*

---

[1]    In some instances, such for standards incorporated by reference in the Code of Federal Regulations, hard copies of the standards are required to be made available for public inspection in government agency depositories.  But those facilities are typically located in or around Washington, D.C.  *See* Strauss, *supra*, at 507 (citing 49 C.F.R. § 192.7(b) (1993)).  And not all states and localities have the same requirement in any event.

*Here Are the 12 Violations*, Herald Journal (Nov. 3, 2022), https://perma.cc/P494-LM9Y.  And press reports have examined whether residential landlords are adhering to fire codes.  *See, e.g.*, Ronda Kaysen, *How Do I Know if My Apartment Building is Unprepared for a Fire?*, N.Y. Times (Feb. 5, 2022), https://perma.cc/TR9W-Z9L4 (explaining that a fire in an apartment building that claimed the lives of seventeen people was "exacerbated by malfunctioning fire doors," and "exposed the risks of poor building maintenance").  This reporting informs members of the public about regulatory standards that directly impact their lives.

The harm from a lack of public visibility into these standards is not abstract or speculative.  For example, two years ago, a woman died, and others were hospitalized, after a carbon monoxide leak occurred in an apartment building; the landlord reportedly had not installed carbon monoxide detectors in the building. Jim Mackinnon, *Victim Identified After Timber Top Apartment Units Evacuated for Carbon Monoxide*, Akron Beacon Journal (Oct. 21, 2022), https://perma.cc/32JQ-47V2.  A Twitter user subsequently observed that by failing to install detectors the landlord had potentially violated the law and appended a screenshot of Ohio's Fire Code,[2] a regulation which designates and incorporates substantial portions of the

---

[2]    O'Tressmass Tree (@twatts_up), Twitter (Oct. 24, 2022, 8:04 AM), https://perma.cc/4V3K-XUN7.

International Code Council Fire Code, as well as other privately created standards, over which the owners claim copyright. Ohio Fire Code 1301:7-7-09 (providing in a notice of copyright claim information that the International Code Council "asserts a copyright of [the incorporated] portions"). This incident is just one demonstration of the importance of access to safety standards. Journalists, in particular, must be able to obtain and disseminate the text of the standards to do their jobs. A decision that would prevent a service from compiling and hosting free of charge the contents of incorporated standards online would severely hamper the ability of journalists in Pennsylvania and elsewhere to engage in this valuable reporting.[3]

The opportunity for the press to scrutinize the complete text of privately drafted standards is particularly significant, as the public is not guaranteed any input into their creation. Courts, including the U.S. Supreme Court, have observed the risk of agency capture or other outsized influence by trade organizations without proper oversight. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988) (discussing concerns raised by widespread adoption across states and localities of national electrical code, "imposed by persons

---

[3]    Many standards-developing organizations "continue to claim a copyright and the entitlement to revoke access at any time," which may create issues following the publication and distribution of a news story. Mendelson*, supra*, at 753.

unaccountable to the public and without official authority, many of whom have personal financial interests in restraining competition"). Private organizations that issue standards are not held to any particular procedures for developing standards that will later be incorporated by reference. While some standards-developing organizations (such as ASTM) have open proceedings and information sharing, they are not bound by agency regulatory processes (notice and comment). *See* Mendelson, *supra*, at 780. Even when organizations "aim, ambitiously, to provide a balance of viewpoints" when drafting standards, "[r]ealistically . . . one may have to 'pay to play' in SDO processes." *Id*. And requiring commenters to purchase the draft standard being revised in order to review and meaningfully contribute "often represents a substantial financial obstacle to participation." *Id.* at 780–81.

When public stakeholders are not able to meaningfully engage with the creation of standards, the standards are more likely to only reflect the viewpoints of the industries subject to the regulation, not those whom the regulation is created to benefit or protect. In fact, while some standards-developing organizations are composed of experts or professionals, some "may be organized expressly to protect regulated industry interests." *See id.* at 779.

In sum, the press relies on access to these incorporated standards that carry the force of law, and the "public benefits are substantial" when these standards are

12

accessible, allowing journalists to review and scrutinize them. *Am. Soc'y for Testing & Materials*, 82 F.4th at 1272.

## II.    Depriving the press and public of the opportunity to freely review and republish incorporated standards would harm the public interest and is inconsistent with the other legal protections providing for robust access to similar material.

### A.    The District Court's conclusion is supported by the reasoning underpinning both the fair use and government edicts doctrines.

The District Court here, like many courts confronting this issue under similar facts, concluded that UpCodes' publication of the standards is a fair use. *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 752 F. Supp. 3d 480, 497 (E.D. Pa. 2024). It employed an analysis similar to that of the D.C. Circuit in a recent decision. There, the court explained that with respect to whether a use was "fair" under the Copyright Act, "[t]he distinction between standards as best practices and standards as law matters." *Am. Soc'y for Testing & Materials*, 82 F.4th at 1268. For example, with respect to transformativeness, the copier's "message ('this is the law') is very different from the plaintiffs' message ('these are current best practices for the engineering of buildings and products')." *Id.* Moreover, the court observed, if a law or regulation set forth the exact language of the standard from which it was borrowing, there is no question a copyright infringement action would be precluded under *Georgia*. The result should be no different simply because the government body incorporates by reference that

borrowed language instead of copying it word for word. *Id.* Ultimately, where "the standards at issue have been incorporated and thus have the force of law," this "strongly supports fair use." *Id.* at 1269. Indeed, to hold otherwise would elevate form over substance.

It also bears emphasis that adjudication of fair use defenses against copyright claims "is notoriously fact sensitive and often cannot be resolved without a trial." *Georgia*, 590 at 275. When copyright disputes involve legislative and administrative materials, this specter of trial could lead "[t]he less bold among us . . . to think twice before using official legal works that illuminate the law we are all presumed to know and understand." *Id.* Potential disputes could delay publications and constrain valuable reporting, as "[over]zealous defense of the copyright owner's prerogative will . . . stifle the broad dissemination of ideas and information copyright is intended to nurture." *Harper & Row Publishers v. Nation Enterprises*, 471 U.S. 539, 579 (1985) (Brennan, J., dissenting). The clear rule adopted by the District Court lessens this lurking threat to the free exchange of ideas and information.

Further, the Supreme Court has acknowledged that a fair use argument may be "buttressed" by a use that "yields societal benefits." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 454 (1984) (noting that "expand[ing] public access to freely broadcast television programs" achieves such a benefit).

14

The Court further recognized that copying done "to help [citizens] make a decision on how to vote" has clear societal value. *Id*. at 455 n.40. In this case, UpCodes' compilation and publication of standards incorporated by reference provides just such a societal benefit, allowing for the press and public to have reasonable and meaningful access to materials that carry the force of law. *See Building Officials & Code Administration v. Code Technology, Inc.*, 628 F.2d 730, 736 (1st Cir. 1980) ("It is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder.").

Similarly, the rationale underpinning the government edicts doctrine cleanly applies to UpCodes' work to compile and share these materials. This doctrine operates to exclude certain materials from copyright protection altogether, rather than tipping the scales of a fair use analysis, and a decision recognizing that incorporated standards constitute government edicts would strongly benefit the public interest. In *Georgia*, the Supreme Court reaffirmed the government edicts doctrine—a per se rule against assertion of copyright over materials that officials empowered to speak with the force of law create in the course of their official duties. 590 U.S. at 259. The justification behind this doctrine similarly applies to

15

materials drafted by private organizations that are subsequently incorporated into law or regulation by government bodies.

The Supreme Court first articulated the government edicts doctrine in an opinion rejecting a claim of copyright in judicial opinions, *Wheaton v. Peters*, 33 U.S. 591, 668 (1834), and the Court later explained that the doctrine also bars assertion of copyright in the headnotes and syllabi that judges create. *Banks v. Manchester*, 128 U.S. 244, 253 (1888). The principle underlying these rulings is that "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Id.* In essence, "*no one can own the law*." *Georgia*, 590 U.S. at 265 (emphasis added); *Canadian Standards Ass'n v. P.S. Knight Co.*, 112 F.4th 298, 304 (5th Cir. 2024), *cert. denied*, No. 24-537, 2025 WL 247484 (U.S. Jan. 21, 2025) (applying analytical principles of government edicts doctrine to dismiss copyright claim).

This doctrine provides that copyright law cannot be a vehicle for diminishing the public's ability to access the laws that govern our conduct. Indeed, because "[e]very citizen is presumed to know the law, it needs no argument to show . . . that all should have free access to its contents." *Id.* That proposition will be wholly undermined if journalists and entities such as UpCodes are not free to compile and share the contents of incorporated standards that carry the force of

16

law. Not only does the government edicts doctrine demonstrate an analogous societal benefit for the purposes of a fair use analysis, but it also provides an independent justification to reject the copyright claim here—as incorporated standards constitute binding law, they cannot be copyrighted.

This Court should affirm the District Court, in recognizing that the republication of incorporated standards constitutes fair use or is otherwise uncopyrightable pursuant to the government edicts doctrine.

**B.      The First Amendment establishes a right of access by the press and public to a wide variety of governmental activities, and the incorporated text of privately drafted standards should be freely accessible for similar reasons.**

"[A] fundamental principle of the American government" is "that public discussion is a political duty." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). This is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). Accordingly, the Supreme Court has recognized that the First Amendment requires a right of access by the press and public to various governmental functions, as citizens cannot "accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980).

In *Richmond Newspapers*, the Supreme Court first recognized this access right with respect to criminal trials. *Id*. at 567–69. The Court relied heavily on the

17

history of open access to trials in coming to this decision, referring often to the origins of English and early American trials. *Id.* Both traditions placed a high value on openness to provide a check on the fairness of courts, and on discouraging "perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Id.* at 569. This access additionally benefited citizens by facilitating understanding of the legal system and its workings in a case, allowing "a strong confidence in judicial remedies [to be] secured which could never be inspired by a system of secrecy." *Id.* at 572 (internal quotation marks omitted).

These benefits are not enjoyed only by those physically present in the court room, as the press often "function[s] as surrogates for the public." *Id*. at 573. "No individual can obtain for himself the information needed for the intelligent discharge of his political responsibilities. . . . [T]he press therefore acts as an agent of the public at large." *Saxbe*, 417 U.S. at 863 (Powell, J., dissenting). People rely on journalists to acquire information about trials, placing an increased emphasis on the importance of the press's access to courts to ensure public awareness. *See, e.g.*, Sarah Lynch, *Oath Keepers Founder Guilty of Sedition in U.S. Capitol Attack Plot*, Reuters (Nov. 29, 2022), https://perma.cc/K3XB-JGQM (reporting on a prosecution related to the January 6, 2021, assault on the U.S. Capitol).

While the right of access originated with respect to criminal trials, it has been subsequently applied to other court proceedings and governmental operations.

18

Indeed, "[e]very federal court of appeals to have considered whether the First Amendment guarantees a qualified right of access to civil trials and to their related proceedings and records has concluded that it does." *The Roots of Access Rights*, Reporters Comm. for Freedom of the Press (last visited Mar. 25, 2025), https://perma.cc/UC2E-XGJR; *see, e.g.*, *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984).

Further, the First Amendment right of access extends beyond the courtroom. For instance, the Second Circuit recognized in *NYCLU v. N.Y. City Transit Authority* that certain administrative functions can be subject to a right of access similar to the constitutional guarantee regarding court hearings. 684 F.3d 286, 290 (2d Cir. 2012) ("The public's right of access to an adjudicatory proceeding does not depend on which branch of government houses that proceeding."). Similarly, the Sixth Circuit has also read *Richmond Newspapers* broadly, noting that "[t]he *Richmond Newspapers* two-part test has also been applied to particular proceedings outside the criminal judicial context, including administrative proceedings." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695 (6th Cir. 2002) (holding that deportation proceedings were subject to the right of access).

The interests promoted by *Richmond Newspapers* and subsequent cases are directly implicated in the case at bar. "[O]penness ensures that government does its job properly; that it does not make mistakes." *Id*. at 704. Free access to

19

incorporated standards promotes transparency and accountability. It makes incorporated standards—which have the force of law—open to public assessment and more accessible for reporting, and allows the press and public to view, evaluate, and comment on the law.

By the same token, obscuring incorporated standards from public access undermines governmental legitimacy. It directly inhibits the public "from observing" lawmaking institutions and the press from facilitating this observation. *Richmond Newspapers*, 448 U.S. at 572; *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 724 (1971) (Douglas, J., concurring) ("Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors."). Recognizing a robust fair use principle allowing for free and open access to incorporated standards bolsters the legitimacy of the regulatory process and thus serves the same purpose as the right of access to judicial records and proceedings guaranteed by the First Amendment.

Indeed, failure to extend the logic of the First Amendment right of access to the materials at issue could lead to absurd results. For example, when Congress grants an agency the power to promulgate criminal regulations, that agency may adopt such regulations through incorporation by reference.[4] And the federal

---

[4]    Under *United States v. Grimaud*, 220 U.S. 506 (1911), executive agencies may adopt regulations that are punishable as crimes. And under the Administrative

government could enforce the regulations in criminal court, where journalists and the public would have a right of access to several components of any proceeding. *See Richmond Newspapers*, 448 U.S. at 575–76 (providing for access to criminal trial); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 511 (1984) (providing for access to jury selection); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10 (1986) (providing access to preliminary hearings).  But the press and public's understanding would be severely constrained without free access to the underlying incorporated standard that may have been violated.  Even if a member of the press paid for a copy in order to report on the proceeding, they would still "have to think twice" before republishing those standards or else risk a copyright-infringement suit that would likely require a full trial on the facts to resolve.  *See Georgia*, 590 U.S. at 275.  Such a state of affairs would stanch the flow of information that the First Amendment guarantees, and undermine the ability of the press to report on the government.

## <u>CONCLUSION</u>

For the reasons set forth above, the Reporters Committee respectfully submits that this Court should affirm the District Court's decision.

Dated:  March 31, 2025

---

Procedure Act, agencies may promulgate regulations by incorporating private standards by reference.  *See* 5 U.S.C. § 552(a)(1).

21

Respectfully submitted,

 */s/ Paula Knudsen Burke*
Paula Knudsen Burke
 *Counsel of Record*
Lisa Zycherman*
Gabriel Rottman*
Mara Gassmann*
 *\*Of counsel*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
pknudsen@rcfp.org

22

## COMBINED CERTIFICATIONS

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7) because the brief contains 4,704 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3.      At least one of the attorneys whose names appear on this brief, including the under-signed, is a member of the bar of this Court, as required by Local Rule 28.3(d).

4.      The text of the electronic version of this brief is identical to the text of the paper copies to be filed with the Court.

5.      The electronic version of this brief filed using the CM/ECF system was virus-checked using Avast Antivirus, and no virus was detected.

Dated:  March 31, 2025
        Washington, D.C.                          *s/ Paula Knudsen Burke*

                                                  Paula Knudsen Burke
                                                  *Counsel for Amicus Curiae*

23

## **CERTIFICATE OF SERVICE**

I certify that March 31, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the Third Circuit using the CM/ECF system. Appellant and Appellees are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

*/s/ Paula Knudsen Burke*

Paula Knudsen Burke
*Counsel for Amicus Curiae*

Dated: March 31, 2025