# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-2965

AMERICAN SOCIETY FOR TESTING & MATERIALS,
d/b/a ASTM International,

Appellant

v.

UPCODES, INC.; GARRETT REYNOLDS; SCOTT REYNOLDS

———————————————

Appeal from the U.S. District Court, E.D. Pa.
Judge Anita B. Brody, No. 2:24-cv-01895

Before: RESTREPO, MCKEE, and SMITH, *Circuit Judges*
Argued Sep. 17, 2025; Decided Apr. 7, 2026

———————————————

OPINION OF THE COURT

RESTREPO, *Circuit Judge*. American Society for Testing and Materials d/b/a ASTM International ("ASTM") is a non-profit organization that publishes technical standards for a variety of industries. Legislatures and administrative agencies frequently incorporate ASTM's standards into statutes and regulations. UpCodes, Inc. ("UpCodes") is an online research platform that offers a searchable database of

building codes. UpCodes publishes on its website several copyrighted ASTM standards that are referenced in the International Building Code, which has been adopted by Philadelphia and other jurisdictions. ASTM sued UpCodes for copyright infringement and moved for a preliminary injunction. The District Court denied the motion, reasoning that ASTM was unlikely to succeed on the merits because UpCodes' copying constitutes fair use. ASTM challenges the denial and argues that UpCodes directly replicates ASTM's standards for a commercial purpose, which cannot constitute fair use. We agree with the District Court that UpCodes is likely to succeed on the merits of its fair use defense. Thus, we will affirm the denial of the preliminary injunction.

## I. FACTS & PROCEDURAL HISTORY

### A. Factual Background

ASTM is a non-profit organization and a recognized leader in the standard development industry. It develops and publishes technical standards that prescribe best practices, methods, and product specifications for a variety of industries. Industry professionals—such as manufacturers, tradespeople, engineers, architects, and construction experts—use these standards to bolster safety and performance in their work. ASTM aims to develop technical standards that "positively impact[] public health and safety, consumer confidence, and overall quality of life." JA270. All ASTM standards undergo multiple rounds of voting and peer review before they are

2

officially approved.  Standards are reviewed on a five-year schedule and are either reapproved, revised, or withdrawn.

ASTM funds its operations by selling and licensing its standards as individual documents or by subscription.  It sells a subscription package titled *ASTM Standards in Building Codes* ("*SIBC*") that contains over 2,300 construction standards referenced in building codes, including the standards at issue in this case.  Sales of ASTM's standards account for about 70% of its total revenue.

ASTM standards are frequently incorporated by reference into federal, state, and local law.  When a legislature incorporates a standard by reference, it references the standard by name in the text of a law but does not reproduce the standard's content.  Incorporation by reference saves significant government resources and infuses laws and regulations with valuable subject-matter expertise.  It can also cause notice and accountability issues.  Regulated entities may face repercussions for violating a technical standard incorporated by reference, even though the text of the standard cannot be found in the public code.

Governments can also *indirectly* incorporate ASTM's standards into law.  "Indirect" incorporation by reference, or "third-party reference," occurs when a law incorporates or adopts another publication, such as a model building code, that

3

in turn incorporates a standard by reference.[1]  In this scenario, the law does not directly reference, much less reproduce, the standard.

UpCodes is a for-profit startup founded in 2016.  Its mission is to "help members of the public access and comply with the laws that govern their built environment."  JA1667. UpCodes provides a searchable online library of building codes, including technical standards that, in UpCodes' view, have been incorporated into law.

UpCodes users can search for laws by jurisdiction or for incorporated standards by original publisher.  If users take the latter approach, they are shown a list of jurisdictions that have incorporated a given standard; to view the standard, they must choose a jurisdiction and view that jurisdiction's incorporated version of the standard.  If a jurisdiction has amended a technical standard, UpCodes displays the amended version on its website, not the original version.  If a publisher updates a standard after it has been incorporated into law, UpCodes displays the historical version that is incorporated into law, not the updated version.  Pursuant to its policy to publish only the law, UpCodes does not publish unincorporated standards.

UpCodes uses a "freemium" business model.  Any user who makes an account on UpCodes' website can view and

---

[1] We use the term "incorporated" throughout this opinion to refer to both direct and indirect incorporation by reference.

4

copy building codes and incorporated standards for free. UpCodes also offers an optional paid subscription that provides access to bookmarking, annotation, automation, and artificial intelligence tools.

In April 2024, UpCodes began publishing copyrighted ASTM standards on its website without securing a license to do so. UpCodes' online library includes ten copyrighted ASTM standards related to steel and aluminum used in construction (the "Works"). Each of the Works contains "mandatory" text that outlines technical requirements and "non-mandatory" or supplemental text, such as explanatory notes, supplemental materials, appendices, and annexes. UpCodes publishes the entirety of the Works on its website, including the mandatory and non-mandatory portions.

The International Building Code ("IBC")—a copyrighted work published by the International Code Council—incorporates by reference all ten Works at issue in this appeal. IBC Chapter 35 instructs that standards referenced in the IBC "are part of this code to the extent of the reference to the standard." JA1298.

Numerous jurisdictions, including the City of Philadelphia, have adopted the IBC as governing law. The Philadelphia Building Code provides that "[t]he '2018 International Building Code' . . . is hereby adopted as the Philadelphia Building Code." Phila. Code ch. 4-200 § B-1.1. Neither the Philadelphia Building Code, nor the IBC, have amended the Works.

5

For nine of the ten Works, ASTM has published updated versions of the standards at issue since the Works were incorporated into the 2018 IBC. UpCodes displays the versions of these nine standards that were incorporated into the IBC, not the newer, current versions.

## B. Procedural History

ASTM sued UpCodes for copyright and trademark infringement[2] in the Eastern District of Pennsylvania. ASTM moved for a preliminary injunction, asking the District Court to enjoin UpCodes from posting ASTM's copyrighted standards on its website. After limited discovery and a hearing, the District Court denied the motion. It reasoned that ASTM could not show a likelihood of success on the merits of its copyright infringement claim because UpCodes was likely to succeed in proving the affirmative defense of fair use. ASTM timely appealed.

## II. JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). We have jurisdiction under 28 U.S.C. § 1292(a)(1).

---

[2] ASTM's trademark infringement claims are not at issue on appeal.

6

### III.    STANDARD OF REVIEW

We apply a "tripartite standard of review" to the denial of a preliminary injunction. *Del. Strong Fams. v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015) (quoting *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,* 710 F.3d 99, 105 (3d Cir. 2013)).  We review the District Court's findings of facts for clear error, its legal conclusions de novo, and the decision to grant or deny an injunction for abuse of discretion.  *Id.*  "At this early stage, we review deferentially because the 'denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing that is the responsibility of the district judge.'"  *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 198 (3d Cir. 2024) (quoting *Marxe v. Jackson*, 833 F.2d 1121, 1125 (3d Cir. 1987)).

"Fair use is a mixed question of law and fact."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).  Reviewing courts must endeavor to "break such a question into its separate factual and legal parts, reviewing each according to the appropriate legal standard." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021).  The ultimate question of whether copying amounts to fair use is a legal question to be decided de novo. *Id.*

### IV.  ANALYSIS

This appeal concerns only the first prerequisite for a preliminary injunction: whether the movant can show "a reasonable probability of eventual success in the litigation."

7

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). The sole issue is whether the District Court erred in ruling that ASTM was not likely to succeed on the merits of its copyright infringement claim because UpCodes' copying likely constitutes fair use.

Article I of the Constitution grants Congress the power to enact copyright laws "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl.8. In line with this goal, the Copyright Act of 1976 entitles copyright owners to certain exclusive rights related to their works, including the rights to "reproduce the copyrighted work," "prepare derivative works," and "distribute copies . . . to the public by sale." 17 U.S.C. § 106. To establish a prima facie case of copyright infringement under the Copyright Act, a plaintiff must demonstrate ownership of a valid copyright and copying of original elements of the plaintiff's work. *Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222, 1231 (3d Cir. 1986); *see In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 66–67 (3d Cir. 2018) (clarifying the elements of a prima facie claim for copyright infringement). The District Court found that ASTM could establish a prima facie case, but Upcodes was likely to succeed in showing fair use.

The fair use doctrine is "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Google*, 593 U.S. at 18

8

(quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). As codified at 17 U.S.C. § 107, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." Fair use is an affirmative defense, and the party asserting it bears the burden of proof. *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 197 (3d Cir. 2003), *abrogated on other grounds by TD Bank N.A. v. Hill*, 928 F.3d 259 (3d Cir. 2019).[3]

The Copyright Act provides four nonexclusive factors that courts must consider when deciding whether a particular use is "fair." 17 U.S.C. § 107; *Harper & Row*, 471 U.S. at 560–61. These factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

---

[3] Burdens at the preliminary injunction stage track the burdens at trial. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

All factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 306 (3d Cir. 2011) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)). Fair use is highly fact dependent, and "its application may well vary depending upon context." *Google*, 593 U.S. at 20. As the Supreme Court has cautioned, "[t]he task is not to be simplified with bright-line rules." *Campbell*, 510 U.S. at 577 (citing *Harper & Row*, 471 U.S. at 560).

We analyze the four factors in turn and determine that the District Court did not err in holding that UpCodes is likely to succeed in showing fair use.[4]

### A. The Purpose and Character of the Use

The first fair use factor considers "the reasons for, and nature of, the copier's use of an original work." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508,

---

[4] Because the issue of fair use is dispositive of this appeal, we do not address UpCodes' alternative grounds for affirmance.

10

528 (2023); *see* 17 U.S.C. § 107(1).  We ask "whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose or different character."  *Warhol*, 598 U.S. at 528 (quoting *Campbell*, 510 U.S. at 579); *see Video Pipeline*, 342 F.3d at 198; *Murphy*, 650 F.3d at 306.  This is an "objective inquiry into what use was made, *i.e.*, what the user does with the original work" and is not dependent on subjective intent. *Warhol*, 598 U.S. at 545.  A use with a further purpose or different character is described as "transformative."  *Id.* at 529; *see Google*, 593 U.S. at 29.  Transformativeness is a "matter of degree."  *Warhol*, 598 U.S. at 529.  The "degree of difference must be weighed against other considerations" under the first factor, like the extent to which the use is commercial or nonprofit.  *Id.* at 525; *see* 17 U.S.C. § 107(1) (requiring courts to consider whether a copy "is of a commercial nature or is for nonprofit educational purposes").

In *Warhol*, the Supreme Court emphasized that the first factor, with its focus on purpose, necessarily relates to the "justification" for the use.  598 U.S. at 531.  Broadly, a use with a distinct purpose is "justified" because it is more likely to further the goals of copyright without lessening the incentive to create.  *Id.*  More narrowly, whether a use has a compelling "independent justification" for copying—like needing to mimic a song to create a parody—is relevant under the first factor, particularly when the original and the copy "share the same or highly similar purposes."  *Id.* at 532 (citing *Campbell*, 510 U.S. at 580).

11

*1. Transformative Use*

The District Court correctly concluded that UpCodes' use is transformative because it "achieves the distinct objective of making the law freely accessible and educating the public on the contents of binding laws." JA22. To reach this conclusion, the District Court looked to the recent and factually similar D.C. Circuit decision in *ASTM v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) ("*ASTM II*").[5] There, ASTM and two other standard development organizations sued Public.Resource.Org ("Public Resource"), a non-profit group that disseminates legal materials, for copyright infringement. 82 F.4th at 1266. Public Resource had posted on its website hundreds of copyrighted technical standards. *Id.* On cross-

---

[5] In the D.C. Circuit litigation, the district court initially entered summary judgment in favor of ASTM and issued a permanent injunction against Public Resource. *ASTM v. Public.Resource.Org, Inc.*, No. 13-cv-1215, 2017 WL 473822 (D.D.C. Feb. 2, 2017). The D.C. Circuit reversed and remanded for consideration of the fair use defense on a fuller factual record. *ASTM v. Public.Resource.Org., Inc.*, 896 F.3d 437 (D.C. Cir. 2018) ("*ASTM I*"). On remand, the district court held that posting incorporated standards was fair use and entered summary judgment in Public Resource's favor as to those standards. *ASTM v. Public.Resource.Org, Inc.*, 597 F. Supp. 3d 213 (D.D.C. 2022). ASTM appealed, resulting in *ASTM II*.

12

motions for summary judgment, the district court held that it was fair use for Public Resource to copy 184 standards that were directly incorporated by reference into law. *Id*. ASTM appealed, and the D.C. Circuit affirmed. As to the first factor, the D.C. Circuit reasoned that Public Resource's use was transformative because it "serve[d] a different purpose than the plaintiffs' works." *Id.* at 1267. Whereas plaintiffs sought "to advance science and industry by producing standards reflecting industry or engineering best practices," Public Resource's mission was "very different—to provide the public with a free and comprehensive repository of the law." *Id.* at 1268. Public Resource's distinct purpose was evident in how it "publishe[d] only what the law is," including incorporated standards that had been superseded or withdrawn by the standard development organizations. *Id.*

Like the District Court, we find the D.C. Circuit's reasoning persuasive and apply it here. UpCodes' use has a different purpose than ASTM's. ASTM publishes technical standards to "positively impact[] public health and safety, consumer confidence, and overall quality of life." JA270. Its rigorous standard development process and five-year review schedule—as well as the fact that it has updated nine of the ten Works since they were incorporated into the IBC—demonstrate its commitment to publishing standards that reflect current industry consensus and best practices. UpCodes' stated mission, on the other hand, is to "help members of the public access and comply with the laws that govern their built environment." JA1667. In line with this

13

mission, UpCodes only publishes versions of standards that have been incorporated into law, even if those versions have been superseded by newer versions. It displays standards under the headings of the building codes in which they are incorporated, asking users to choose a jurisdiction to view a standard and integrating jurisdiction-specific amendments when applicable. And, unlike ASTM, UpCodes makes the standards available for free.

Although UpCodes is not a nonprofit with a purely educational mission, it mirrors Public Resource in this key respect: it publishes ASTM's works to convey "only what the law is," not to inform industry professionals of "current best practices." *ASTM II*, 82 F.4th at 1268. This "fundamental" distinction renders UpCodes' use transformative. *Id.* Our conclusion rests not on UpCodes' subjective intent, but on an objective inquiry into what it actually *"does* with the original work." *Warhol*, 598 U.S. at 545 (emphasis added). UpCodes' company practices demonstrate that it publishes the Works as law, not as technical standards.

ASTM's arguments to the contrary are not convincing. ASTM asserts that UpCodes' use cannot be transformative because it republishes the Works without alteration. This position overlooks the first factor's focus on purpose, not merely expressive similarity. *See Warhol*, 593 U.S. at 542 (stating that "whether the new use serve[s] a purpose distinct from the original, or instead supersede[s] its objects. . . . is[] the 'central' question under the first factor" (quoting *Campbell*, 510 U.S. at 579)); 4 Melville B. Nimmer & David Nimmer,

14

Nimmer on Copyright § 13F.05[B][2] (2026).  To that end, we agree with our sister circuits that a secondary work "can be transformative in function or purpose without altering or actually adding to the original work."  *ASTM II*, 82 F.4th at 1268 (quoting *ASTM I*, 896 F.3d at 450); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009).

For similar reasons, the degree of transformation in UpCodes' use goes beyond that required to qualify as a derivative.  *See Warhol*, 598 U.S. at 529.  The Copyright Act defines "derivative work" as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization . . . or any other form in which a work may be recast, transformed, or adapted."  17 U.S.C. § 101; *Warhol*, 598 U.S. at 529.  While a derivative work may be a "transformed" version of the original, the degree of difference is not sufficient to render it "transformative."  *See Warhol*, 598 U.S. at 529.

ASTM relies on *Hachette Book Group, Inc. v. Internet Archive*, which involved a "paradigmatic" example of a derivative work.  115 F.4th 163, 181 (2d Cir. 2024) (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215 (2d Cir. 2015)).  In that case, Internet Archive ("IA") provided free digital copies of publishers' copyrighted books and marketed itself as a free alternative to print books and eBook licenses.  *Id.* at 175–76.  The Second Circuit held that this use was derivative, not transformative, because "IA's digital books serve[d] the same exact purpose as the originals: making

15

authors' works available to read." *Id.* at 181.    Although digitizing copies of written works involved a change in medium, it was not accompanied by a corresponding change in purpose and character.  *Id.*  We cannot say the same here. Whereas IA's purpose was limited to the publishers' original purpose, UpCodes' use has a distinct purpose: to disseminate the law.

To be sure, both ASTM and UpCodes make the Works available to architecture, engineering, and construction professionals interested in compliance.[6]  ASTM sells the *SIBC* publication, which includes the copyrighted standards at issue here.  But we are mindful that "'transformativeness' is a matter of degree."  *Warhol*, 598 U.S. at 529.  We have never held that some overlap in audience or general aim is necessarily fatal to a fair use defense.  Our analysis requires "go[ing] further and examin[ing] the copying's more specifically described 'purpose[s]' and 'character.'"  *Google*, 593 U.S. at 30 (quoting

---

[6] ASTM argues that both parties share an identical purpose of making the Works available to the public on a subscription basis.  This characterization is not supported by the record. First, ASTM does not make the Works available to the public; it makes them available to those who pay for them.  Second, UpCodes does not make the Works available on a subscription basis; it makes the Works available to all users, regardless of subscription status, and offers a paid subscription for advanced features.

16

17 U.S.C. § 107(1)) (holding that challenged use was transformative while acknowledging that Google copied portions of Sun Java's code "in part for the same reason that Sun created those portions, namely, to enable programmers to call up implementing programs that would accomplish particular tasks"). On this record, UpCodes' use is transformative.[7]

---

[7] As for the *SIBC* publication, we lack information on this record to determine whether UpCodes' use shares the same purpose as the publication and is likely to "substitute for, or 'supplan[t]'" it. *Warhol*, 598 U.S. at 528 (quoting *Campbell*, 510 U.S. at 579). The parties have not detailed the content and format of the *SIBC* publication, including whether it (1) contains the versions of ASTM standards incorporated into building codes, even if outdated; and (2) is formatted to situate the standards within the context of the building codes in which they are incorporated. Although ASTM describes the *SIBC* publication as containing the "Works," record evidence describes it as containing "[*t*]*he latest versions* of 2,300+ ASTM construction standards," JA1465 (emphasis added), which presumably would not include the nine outdated Works at issue here. Other evidence suggests that some but not all *SIBC* subscribers have access to historical standards. *See* JA1455 (stating that "online basic users have access only to active ASTM standards" but "online plus users have access to

17

Moreover, this analysis of UpCodes' purpose reveals two ways that its use may be "justified." *Warhol*, 598 U.S. at 531. First, by having a transformative purpose, UpCodes' use has the capacity to further the goals of copyright—including advancing public knowledge—without diminishing ASTM's incentive to create. *See id.* We return to this question of diminished incentives when analyzing the fourth factor. Second, UpCodes has a particularly compelling independent justification for copying. *See id.* at 532 (citing *Campbell*, 510 U.S. at 580–81). It cannot achieve its purpose of disseminating the law without copying the law itself, which, as discussed in more detail under the third factor, includes standards incorporated by reference. These conclusions also counsel in favor of fair use.

### 2. *Commercial Nature*

Another element of the first statutory factor is the commercial nature of the work. "If a new work is used commercially rather than for a nonprofit purpose, its use will less likely qualify as fair." *Video Pipeline*, 342 F.3d at 198. The "crux" of this distinction "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying

---

all available ASTM standards documents, including . . . historical and withdrawn standards").

18

the customary price." *Harper & Row*, 471 U.S. at 562. Commerciality is only one consideration under the first factor and does not alone determine whether a use is fair. *Campbell*, 510 U.S. at 584–85; *Video Pipeline*, 342 F.3d at 198. While "a finding that copying was not commercial in nature tips the scales in favor of fair use[,] . . . the inverse is not necessarily true." *Google*, 593 U.S. at 32. "[M]any common fair uses are indisputably commercial." *Id.*

The District Court considered that UpCodes makes the Works available for free; receives no "direct monetary profit" from publishing the Works but may derive "tangential benefits"; and is a commercial actor rather than a non-profit. JA21–22. Based on these facts, it construed UpCodes' use as "largely noncommercial" and weighed this element in favor of fair use. *Id.* We conclude that the commerciality inquiry does little to help either party.

Contrary to ASTM's assertion, the District Court did not clearly err in finding that UpCodes "derives no *direct* monetary profit" from publishing the Works. JA22 (emphasis added). UpCodes does not charge users for access to the Works. Any internet user who opens an account on UpCodes' website can access the Works for free. In this way, UpCodes' use differs from that in *Video Pipeline*, where we held that the defendant's use was commercial because it charged a fee to stream the plaintiff's works. 342 F.3d at 198.

Yet unlike Public Resource, the defendant in *ASTM II*, UpCodes is a for-profit entity. *See ASTM II*, 82 F.4th at 1266.

19

It derives revenue from its paid subscription tier, which grants users access to premium features and automation tools. Although the commerciality inquiry concerns the specific "use" at issue, *see* 17 U.S.C. § 107(1), we agree with ASTM that a party's for-profit status is relevant to discerning the commercial or noncommercial nature of the use, *see Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 921–22 (2d Cir. 1994) (considering defendant's for-profit status as relevant to the fair use analysis because doing otherwise would be "overly simplistic"). It is not dispositive, however. *See, e.g.*, *Bouchat v. Balt. Ravens Ltd. P'ship*, 619 F.3d 301, 314 (4th Cir. 2010) (holding that a for-profit sports team's use of a former logo in its corporate headquarters had "no clear-cut commercial purpose"). Here, the significance of UpCodes' for-profit status is moderated by the fact that users pay for access to UpCodes' proprietary tools and technology, not for access to the Works.

We also consider that UpCodes may reap "tangential benefits" from copying that could indirectly bolster the company's commercial performance. JA22. Such indirect commercial advantage is also relevant to assessing commerciality, but it carries less weight than evidence of direct profit. *See Texaco*, 60 F.3d at 921 (distinguishing between "a direct commercial use" and a "more indirect relation to commercial activity"); *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000) (holding that the first factor favored fair use where the commercial use "was an intermediate one, and thus was only indirect or derivative"

20

(citation modified)); *Hachette*, 115 F.4th at 185 (declining to characterize defendant's use as commercial based only on an "attenuated" link between copying and commercial profit).

Common sense supports that UpCodes reaps some commercial benefit from copying, but the manner and extent of that benefit remain unclear. ASTM argues that UpCodes' "freemium" business model inherently relies on free access to the Works to attract customers to its site and grow its paid user base.[8] It also points to an email exchange that shows UpCodes' interest in a paying customer's need for certain ASTM standards. While such evidence suggests that copying may lead to increased website traffic or improved customer

---

[8] ASTM relies on factual findings from *National Fire Protection Ass'n v. UpCodes, Inc.*, where the court found that UpCodes "generates revenue by attracting users to its website, offering some content for free to funnel prospective customers to its platform, and monetizing a portion of its free-tier users by converting them to paying customers." 753 F. Supp. 3d 933, 961 (C.D. Cal. 2024). However, ASTM provides no insight into the evidentiary basis for these findings. Further, that case involved a different plaintiff and set of technical standards, and it addressed UpCodes' motion for summary judgment on the issue of fair use. *Id.* at 942–44. Therefore, unlike here, the district court was construing the evidence and drawing all reasonable inferences in the plaintiff's favor. *Id.* at 945.

21

satisfaction, which could in turn increase sales, the record is far from definitive.

Although UpCodes' use has commercial and noncommercial elements, it does not amount, at this juncture, to "exploitation" for commercial profit. *Harper & Row*, 471 at 562. Therefore, the District Court reached the correct conclusion under the first factor. Regardless of whether the commerciality inquiry weighs minimally in favor of or against fair use, the commercial elements of UpCodes' use do not outweigh its transformative nature. The first factor favors UpCodes.

## B. The Nature of the Work

The second fair use factor concerns the "nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "recogni[zes] that some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. "Fictional, creative works come closer to this core than do primarily factual works." *Video Pipeline*, 342 F.3d at 200 (citing *Harper & Row*, 471 U.S. at 563). Thus, fair use is easier to establish for primarily factual works. *See Campbell*, 510 U.S. at 586.

The District Court properly concluded that this factor strongly supports fair use. The Works constitute technical standards related to steel and construction. As the D.C. Circuit reasoned, technical standards "fall at the factual end of the fact-fiction spectrum, which counsels in favor of finding fair use."

*ASTM II*, 82 F.4th at 1268 (quoting *ASTM I*, 896 F.3d at 451). Furthermore, it is fair to say that once the Works were incorporated by reference into law—which occurred before UpCodes' copying—they moved even further to the periphery of copyright's core protection. ASTM fails to explain why the fact that the Works are indirectly incorporated by reference into building codes, as opposed to directly, should change this outcome.

## C. The Amount and Substantiality of the Portion Used

Next, courts consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor asks whether the extent of copying is "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586.

We agree with the District Court that this factor also favors fair use. UpCodes reproduced the entirety of the Works, which would ordinarily "militat[e] against a finding of fair use." *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 450 (1984). But the third factor relates back to the first factor—it will "generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative, purpose." *Google*, 593 U.S. at 34. Applying these principles, the D.C Circuit reasoned in *ASTM II* that "[i]f an agency has given legal effect to an entire standard, then its entire reproduction is reasonable in relation to the purpose of the copying, which is to provide the public with a free and comprehensive repository of the law." 82 F.4th at 1269.

23

Similar reasoning applies here. The IBC specifies that referenced standards are incorporated into the code "to the extent of the reference." JA1298. UpCodes argues through example that the IBC incorporates the Works in their entirety. It points to IBC § 1810.3.2.3, which provides that "[s]teel pipe piles shall conform to the material requirements in ASTM A252." JA346. As the District Court reasoned, the IBC neither specifies that only certain provisions of the standard are incorporated, nor identifies the specific provisions that are related to compliance. *See also ASTM v. Public.Resource.Org, Inc.*, 597 F. Supp. 3d at 237. To identify the material requirements in A252 and how to comply with them, one needs access to the entire standard. Philadelphia and other jurisdictions adopt the IBC as governing law, *see* Phila. Code. ch. 4-200 § B-1.1, thereby giving legal effect—via indirect incorporation by reference—to the entirety of A252. To the extent a similar analysis applies to the rest of the Works (which ASTM makes little effort to dispute), UpCodes reasonably copied the entirety of the Works. It cannot fulfill its purpose of disseminating the law without copying standards that have been incorporated in full into the law.[9]

---

[9] We do not suggest that it would be permissible for UpCodes to copy the entirety of any technical standard "merely referenced" in the IBC. Br. for Am. Nat'l Standards Inst. et al. as Amici Curiae Supp. Appellants ("ANSI Br.") 8, Dkt. No. 41. The scope of the reference controls the extent of

24

It makes no difference that UpCodes copied "non-mandatory" portions of incorporated Works.  In arguing that UpCodes has not justified copying non-mandatory portions, ASTM relies on a passage from *ASTM I* stating that the third factor "would weigh strongly in favor of finding fair use" if Public Resource limited its copying to material of "legal import," as opposed to material that "does not govern any conduct."  896 F.3d at 452.  But the D.C. Circuit did not hold that copying the latter type of material was antithetical to fair use.  *See ASTM II*, 82 F.4th at 1269.  In *ASTM II*, it clarified that "the most important question is what material counts as 'law,'" and "because law is interpreted contextually, even explanatory and background material" in an incorporated standard "will aid in understanding and interpreting legal duties."  *Id.* (citation modified); *cf. Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 274 (2020) ("Georgia minimizes the [state code] annotations as non-binding and non-authoritative, but that description undersells their practical significance.").

Standard A252 illustrates this point.  The mandatory portion of the standard provides that "wall thickness shall not be more than 12.5% under the specified nominal wall thickness."  JA477.  But to actually determine the minimum permissible wall thickness based on various nominal wall

incorporation into the IBC, and thus the extent of incorporation into a building code that adopts the IBC.

25

thicknesses, one consults a "non-mandatory" table in the standard's appendix. JA501. It is reasonable for UpCodes to copy non-mandatory portions of a standard incorporated in full, as such portions still have legal effect and may prove integral to understanding the standard's material requirements. A contrary ruling would be blind to the realities of how people interpret and use law.

### D. The Effect on the Market for the Copyrighted Work

The fourth statutory factor examines "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "must take [into] account not only . . . harm to the original but also . . . harm to the market for derivative works." *Video Pipeline*, 342 F.3d at 202 (quoting *Campbell*, 510 U.S. at 590). Courts must consider "the extent of market harm caused by the particular actions of the alleged infringer," as well as the potential market ramifications of "unrestricted and widespread conduct of the sort engaged in by the defendant." *Campbell*, 510 U.S. at 590 (citation modified). "But a potential loss of revenue is not the whole story." *Google*, 593 U.S. at 35. When relevant, courts should also examine "the source of the [economic] loss" and "the public benefits the copying will likely produce." *Id.* The Supreme Court has cautioned that "[s]ince fair use is an affirmative defense, its proponent [will] have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590.

26

The District Court viewed the fourth factor as equivocal. On one hand, it found that UpCodes' copies are "an effective substitute" for the Works, and it is "plain to see" how UpCodes' copying will affect the market for the Works. JA34–35 (citation modified). On the other hand, it reasoned that ASTM may have other incentives to create technical standards even if some incorporated standards lose copyright protection, and "the countervailing public benefits of UpCodes' copying are substantial." *Id.* at 35–36. Thus, "the fourth factor '[did] not significantly tip the balance one way or the other.'" *Id.* at 37 (quoting *ASTM II*, 82 F.4th at 1272).

The District Court correctly concluded that the fourth factor is equivocal, but we reach this outcome for different reasons. In assessing market harm, the relevant market is that in which ASTM operates and sells the Works—the market for technical standards—and the relevant source of the loss is substitution. *See Campbell*, 510 U.S. at 591 (describing "cognizable" market harm as "affect[ing] the market for the original . . . by acting as a substitute for it"); *Hachette*, 115 F.4th at 189 ("We ask not whether the second work would *damage* the market . . . but whether it *usurps* the market." (citation modified)).

Under this framework, it is significant that UpCodes makes the entirety of the Works available on its website for free. As the District Court found, "if the [Works] can be obtained for free from UpCodes, consumers will be less incentivized to purchase the [Works] from ASTM for a fee." JA34–35. Such loss from substitution is the exact type of loss

27

cognizable under the fourth factor. This led the District Court to conclude that UpCodes' copies are effective substitutes for and likely to affect the market for the Works. But contrary to ASTM's assertion, the analysis does not end there.[10]

First, accepting that it is plain to see how UpCodes' copying will affect the market for the Works, the potential harm to the broader market for technical standards appears limited.[11] *See Google*, 593 U.S. at 36 (considering the "likely

---

[10] To the extent ASTM argues that we should presume significant market harm without further inquiry, we reject that argument. In *Campbell*, the Supreme Court clarified that "[n]o 'presumption' or inference of market harm . . . is applicable to a case involving something beyond mere duplication for commercial purpose." 510 U.S. at 591. It reasoned that "when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects." *Id.* (citation modified). "But when, *on the contrary*, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred." *Id.* (emphasis added). We have already determined that UpCodes' use is transformative and thus will not presume significant harm to ASTM's market for technical standards.

[11] Although the District Court did not delve into the record to examine the extent of market harm, "we may affirm on any

28

amount of loss" under the fourth factor); *ASTM II*, 82 F.4th at 1271 (holding that the fourth factor was equivocal in part because the record evidence "cast[ed] doubt on the plaintiffs' claims of *significant* market injury" (emphasis added)). As to the amount of substitution, ASTM points to evidence showing that a modest number of users who accessed the Works on the UpCodes website were known ASTM subscribers or shared the same email domain as known subscribers. Such data indicates that some ASTM subscribers have accessed UpCodes' copies, but it says nothing about the number of subscribers who have subsequently canceled their ASTM subscriptions. As for lost revenue, ASTM emphasizes that it derives 70% of its revenue from sales of technical standards, but we have no insight into what percentage of revenue derives from sales of standards incorporated into law.

UpCodes identifies evidence that calls into question the robustness of the market for standards incorporated into law. If the Works are any indication, many standards incorporated into law are outdated. Record evidence shows that PDF sales of the individual Works decreased significantly after the relevant standards were updated. While we do not discount that demand may exist for outdated technical standards, it appears dim in comparison to the demand for current standards. Without more information about the demand for

---

ground supported by the record." *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 116 (3d Cir. 2020).

29

each category of standards, and the percentage of incorporated standards within each category, we cannot predict significant market harm based on UpCodes' copying, even if it becomes widespread.[12]  In other words, because the technical standard industry outpaces legislators, it is possible that this case presents an atypical scenario where copies may be effective substitutes for the Works (as found by the District Court) without necessarily usurping the relevant market.

Second, it is necessary to consider the likely public benefits of UpCodes' copying as part of the fourth factor analysis in this case.  *See Google*, 593 U.S. at 35–36.  We do not suggest that assessing public benefits is always required under the fourth factor, even where copying enhances public access to a copyrighted work.  *See id.* at 36 ("We do not say that these questions are always relevant to the application of fair use . . . .").  But it is pertinent in a case implicating public access to the law, which all citizens are "presumed to know." *Georgia*, 590 U.S. at 265 (citation modified).  We assess how likely public benefits balance against likely economic harm, paying special attention to implications for copyright's core concern with "the creative production of new expression." *Google*, 593 U.S. at 35.  In *ASTM II*, the D.C. Circuit noted the

---

[12] While it may be significant that ASTM generates substantial subscription revenues from the *SIBC* publication, this issue would benefit from additional factual development. *See supra* Section IV.A.1.

30

"substantial public benefits of free and easy access to the law." 82 F.4th at 1271. The District Court followed suit, noting that UpCodes' copying would mitigate notice and accountability problems associated with incorporation by reference and provide "practical value" to journalists, union members, and legal organizations. JA36.

Enhanced public access to the law is a clear and significant public benefit. In this context, enhanced access benefits not only regulated entities that must comply with a building code, but also building residents protected by the code, government entities enforcing its requirements, press members reporting on such enforcement, and members of the public who wish to debate or change the law. *See* Br. Reporters Comm. Freedom Press as Amicus Curiae Supp. Appellees 5–13, Dkt. No. 64-1; Br. Admin. L. Professors as Amici Curiae Supp. Appellees 15–19, Dkt. No. 60.[13]

But an accurate assessment of the potential public benefits of UpCodes' copying must account for the other side

---

[13] ASTM reiterates that it will provide a standard for free to anyone who cannot afford to purchase it. But the process for requesting a free standard appears opaque, and there is no evidence in the record that anyone has used it to access the Works at issue. The mere possibility of obtaining a free technical standard does not nullify the public benefits associated with enhanced access to law.

31

of the same coin—potential public harm. *See Hachette*, 115 F.4th at 195 (considering, under the fourth factor, that disseminating digital books for free would result in "little motivation to produce new works," which would "negatively impact the public"). It is not lost on us that this dispute only exists because ASTM and other standard development organizations also serve an important public purpose. They develop cutting-edge standards that promote safety and efficacy across industries, and they save the government substantial resources by providing the technical content for many laws. *See* Br. Am. Med. Assoc. & Am. Dental Assoc. as Amici Curiae Supp. Appellant 5–7, Dkt. No. 35; ANSI Br. 10–12.

Should unfettered copying cause significant economic loss to ASTM, it could threaten ASTM's ability to develop technical standards, which would undermine copyright's "ultimate aim" of promoting creativity for the public good. *Sony Corp.*, 464 U.S at 432 (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)); *see* ANSI Br. 13–15 (describing how loss of revenue could cause standard development organizations to publish fewer or lower quality standards). Because we lack sufficient information to assess the likelihood of significant market harm to ASTM, we also cannot assess the likelihood of this threat and the weight that should be afforded to it. The District Court's tentative finding that ASTM "*may* have other incentives to continue developing technical standards" provides some reason to question the

32

vulnerability of ASTM's standard development business, but it surely does not settle the issue.  JA35 (emphasis added).[14]

On the current record, the likely market harm from UpCodes' copying appears limited.  Nonetheless, many important questions remain unanswered, and we view the fourth factor as equivocal.

### E.  Overall Assessment

The District Court properly concluded that UpCodes has met its burden to show likely success on the merits of its fair use defense.  Three of the four statutory factors weigh in favor of fair use, and the fourth factor is equivocal.  On balance, the factors favor fair use.  The District Court did not

---

[14] The District Court construed its assessment of ASTM's incentives to continue developing technical standards as relevant to whether ASTM will have "more economic power than is necessary to achieve the incentive to create" and thus whether enforcing ASTM's copyright will "interfere with . . . copyright's basic creativity objectives."  JA35 (quoting *Google*, 593 U.S. at 21, 39).  We think the discussion of ASTM's incentives is more simply and appropriately situated within an analysis of the potential public benefit (and harm) of copying, which is also relevant to whether copying serves the creativity objectives of copyright.  *See Google*, 593 U.S. at 35 (asking whether public benefits are "related to copyright's concern for the creative production of new expression").

33

abuse discretion in denying ASTM's motion for a preliminary injunction.

\* \* \* \* \*

For the foregoing reasons, we will AFFIRM the District Court's October 2, 2024 Order denying ASTM's motion for a preliminary injunction.

*Counsel for Appellant*
J. Kevin Fee [**ARGUED**]
Stanley Panikowski
Jane W. Wise
DLA PIPER

*Counsel for Amicus Appellant*
Linda Steinman
DAVIS WRIGHT TREMAINE
Jack R. Beirig
ARENTFOX SCHIFF
Rachel Miller-Ziegler
MUNGER TOLLES & OLSON

*Counsel for Appellee*
Joseph R. Palmore [**ARGUED**]
Joseph C. Gratz
Hannah Jiam
Aditya V. Kamdar
Brian R. Matsui
Joel F. Wacks

34

MORRISON & FOERSTER

*Counsel for Amicus Appellee*
Samuel W. Silver
WELSH & RECKER
Adina H. Rosenbaum
PUBLIC CITIZEN LITIGATION GROUP
Paula K. Burke
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS

35